UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

FARON RAYMOND HAWKINS,

          Petitioner,

v.

JAY CHRISTENSEN,

          Respondent.

Case No. 1:13-cv-00321-BLW

**MEMORANDUM DECISION
AND ORDER**

Petitioner Faron Hawkins ("Petitioner" or "Hawkins") is proceeding on his Second Amended Comprehensive Petition for Writ of Habeas Corpus, which the Court has concluded must be considered under 28 U.S.C. § 2254. (Dkt. 182.) The Petition challenges state court convictions on two counts of bank robbery, following a trial in which Petitioner contended that he was coerced to rob banks by government agents and a remand by the Idaho Court of Appeals concluding that, based on Petitioner's behavior, stories, and events during pretrial proceedings, the trial court should have taken steps to determine Petitioner's competence to stand trial. (State's Lodging B-4.)

Pending before the Court is Respondent's Motion for Summary Dismissal. (Dkt. 203.) The Motion is now fully briefed and ripe for adjudication. Other motions are also

pending. The Court takes judicial notice of the state court records lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

Having carefully reviewed the record and considered the arguments of the parties, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order granting in part and denying in part the Motion for Summary Dismissal.

## REVIEW OF PRELIMINARY MOTIONS

Petitioner's counsel has moved to withdraw. Petitioner has filed numerous motions requesting a hearing with respect to counsel's representation as well as copies of all filings made by counsel in this case. (Dkt. 224, 226, 227, 228, 230.)

On August 26, 2019, Petitioner's counsel, John Prior, filed a response to the pending Motion for Summary Dismissal. (Dkt. 220.) On September 24, 2019, Petitioner filed a request for clarification, stating that he hired Mr. Prior to brief "all" grounds, and that Mr. Prior did not have authorization to limit the grounds in responding to the dismissal motion. (Dkt. 222.)

On October 10, 2019, the Court ordered Mr. Prior to file either a motion to withdraw from representation of Petitioner or a notice of intent to continue representation no later than October 25, 2019. (Dkt. 223.) Mr. Prior's copy of the Order was returned by the United States Postal Service as undeliverable (Dkt. 225), but the Clerk of Court called Mr. Prior for his new address and mailed a copy to him.

Petitioner filed several motions in January and February 2020 to determine the status of Mr. Prior's representation. (Dkts. 226, 227.) In response, Mr. Prior finally filed a Motion to Withdraw. (Dkt. 228.) Good cause appearing, the Court will grant Mr. Prior's Motion to Withdraw, with the admonition that he should have acted sooner in response to the Court's order to notify the Court of his representation status (even if the status was to report that the status was not yet resolved). It was improper and unprofessional to let the October 25, 2019 deadline pass without a response. Because (1) the record shows that Petitioner often desires legal representation but is not willing to permit an attorney to use his best legal judgment in how to pursue a case; (2) an attorney has an ethical obligation not to make frivolous arguments (which has put Petitioner's attorneys at odds with him as to some of his claims); and (3) in accordance with his legal judgment and ethical obligation, Mr. Prior filed a limited brief on behalf of Petitioner, the Court will not issue a sanction.

On March 19, 2020, Petitioner filed a Supplemental Brief to protect his interest in asserting all of his claims. The Court has fully considered that briefing. Respondent's request to strike Petitioner's Supplemental Brief will be denied. No further briefing is required or will be entertained, however, with respect to the Motion for Summary Dismissal.

Petitioner's Motion for Order to Provide Petitioner with Copies of All Filings with this Court of John Prior (Dkt. 224) will be denied as moot. Mr. Prior made one filing prior to withdrawing. That filing was the response to the Motion for Summary Dismissal.

Obviously, Petitioner received it, because he openly objected to the content of Mr. Prior's response.

Petitioner's Motions to Show Cause regarding Mr. Prior's services (Dkt. 226, 227, and 230) will be denied as moot, as Petitioner filed his response to the dismissal motion and clearly does not want to have Mr. Prior's representation continued, and the Court has considered and decided against issuing a sanction against Mr. Prior.

## BACKGROUND

### 1. Facts of the Crimes

On December 16, 2005, Petitioner entered a Key Bank in Boise, Idaho. He approached a teller, showed her a note demanding $15,000, and threatened to "shoot people" if his demands were not met or if he was followed outside the bank. (State's Lodging A-4, pp. 555-58.) The teller complied, and Petitioner left with the money. (*Id.*, pp. 559-62.) On that same day, Petitioner had made a telephone call to George Calley, a retired FBI special agent, who had conducted a bank robbery investigation that led to Petitioner's arrest and incarceration for robbing a bank in Horseshoe Bend, Idaho in 1978. (State's Lodging G-20, p. 140.) Based on what Calley learned in the phone call and passed along to police investigators, authorities deduced that Petitioner was the Key Bank robber. Confirming the Calley information, the Key Bank teller identified Petitioner in a photographic line-up. (State's Lodging A-4, pp. 568-72.)

On January 4, 2006, the state of Idaho filed a criminal complaint against Petitioner in the Ada County District Court for the state of Idaho, charging him with the Boise Key

Bank robbery. (State's Lodging A-1, pp. 14-15.) No action was taken on the complaint at that time, because authorities could not locate Petitioner.

About six months later, on June 6, 2006, Hawkins committed a robbery at a Washington Mutual Bank in Boise. He gave the teller a note demanding $15,000 and threatened to "shoot people." (State's Lodging A-4, pp. 606, 622-23, 633.) As he was leaving, he told the bank teller and other employees, "By the way, my name is Faron Hawkins, and this is all because of George Calley." (*Id*., pp. 602, 635.)

On June 16, 2006, Calley received another phone call from Petitioner, who asked him why he hadn't visited Petitioner's two sons who were incarcerated in Colorado and why he had not called Petitioner back. Petitioner revealed to Calley that he had robbed a Washington Mutual Bank branch in Boise and that he had "used both of their names" during the robbery. (State's Lodging A-4, pp. 521-52; State's Lodging G-20, p. 149.)

On June 27, 2006, an amended complaint was filed in Idaho, adding the Washington Mutual Bank robbery. (State's Lodging A-1, pp. 17-18.) Oregon law enforcement officers found Petitioner in a campground near The Dalles, Oregon. (State's Lodging A-4, pp. 649, 652.) After an eight-hour standoff, Petitioner was arrested by Oregon authorities on August 11, 2006. (*Id*., pp. 535-39, 653-55, 672, 925, 927-35.) Oregon officers obtained a search warrant for Petitioner's vehicles and camp trailer and seized items matching the description of items used during both robberies. (*Id*., pp. 681-82, 684-88.)

After his Oregon arrest, Petitioner was interviewed by Idaho Detective Dave Smith. Petitioner admitted to Smith that he had robbed a Boise bank on December 16. (*Id.*, pp. 1043-44.)

## 2. Pretrial Proceedings

Petitioner was arrested on the Idaho charges on August 28, 2006. (*See* State's Lodging A-1, Register of Actions, p. 3.) On August 29, 2006, Petitioner attended an initial video arraignment, where he was appointed counsel (the Ada County Public Defender), and public defender J. Bublitz appeared with him. Petitioner's bond was set for $1,000,000. The court set his preliminary hearing for September 12, 2006. (State's Lodging A-1, pp. 3, 22.)

Several different Ada County magistrate judges presided over preliminary matters in Petitioner's criminal case. (*See* State's Lodging A-1.) The presiding state district judge in the criminal case was Ada County District Judge Michael R. McLaughlin. The prosecuting attorneys were Roger Bourne and Jan Bennetts.

On September 12, 2006, Petitioner appeared in court with public defender Kevin Rogers, who asked to continue the preliminary hearing because he had just received discovery. The state did not object, and the hearing was rescheduled to September 27, 2006. (*Id.*, p. 24.)

On September 27, 2006, Petitioner appeared with the public defender and made his first of many requests for appointment of a new attorney. After a brief recess, Petitioner had changed his mind—he made his first of many requests to proceed pro se.

The Court dismissed the public defender from the case and ordered that the public defender give Petitioner the requested discovery. A review hearing was set for October 19, 2006. (*Id.*, p. 25.) On October 4, 2006, Petitioner filed a pro se motion to compel, informing the Court that the public defender and the county prosecutor had not provided him with copies of their files. (*Id.*, pp. 26-27.)

On October 19, 2006, Petitioner appeared pro se at the review hearing (designated a preliminary hearing in the court minutes). (*Id.*, p. 28.) Because Petitioner had not been provided police reports and an interview tape, it was reset to November 7, 2006. (*Id.*, pp. 24-25, 28.)

On November 17, 2006, Petitioner appeared pro se and requested the reappointment of counsel. The magistrate judge granted the motion, appointing the public defender again. As a result, the preliminary hearing was continued to November 30, 2006. (*Id.*, p. 29.)

On November 30, 2006, Petitioner appeared with public defender Steve Botimer, who reported that Petitioner did not want to accept the state's plea offer, but wanted to proceed to a hearing. (*Id.*, p. 30.) The hearing was reset to January 11, 2007. (*Id.*)

On January 2, 2007, a grand jury indicted Petitioner on both robbery charges, mooting the need for a preliminary hearing. (*Id.*, pp. 33-34.) Petitioner requested and was granted copies of the grand jury transcript. (*Id.*, pp. 39-43.)

Petitioner asked to represent himself in the criminal proceedings, and the state district court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1976).

(State's Lodging A-3.) The state district court granted Petitioner's request to represent himself, but appointed the Ada County public defender as standby counsel. (State's Lodgings A-3, A-4, pp. 1-16.) The public defender assigned to the case as standby counsel was Edward Odyssey.

At the *Faretta* hearing, Petitioner contended his children had been "taken by the Prosecutor's Office and Health and Welfare for the sole purpose of preserving their testimony against [him] on these charges of bank robbery." (*Id.*, pp. 16-17.) The court explained it had not entered any orders regarding anyone being held as a material witness and stated that it had no jurisdiction over the child custody matters. (*Id.*, p. 19.) The court also heard and denied Petitioner's motion for reduction of the $1,000,000 bond.

On February 2, 2006, Petitioner pleaded not guilty to both counts. The trial court set a jury trial for May 7, 2006. (State's Lodging A-1, pp. 47-48.) Petitioner, representing himself at the time, filed a number of pro se motions. (*Id.*, pp. 49-55, 58-60, 67-72, 75, 77, 87-88, 92, 95.) Petitioner requested and was granted two trial continuances. (*Id.*, pp. 52-53, 55, 68, 87, 92, 93; State's Lodging A-4, pp. 55-56, 70-71.) Trial was to begin on September 17, 2007. On the day of the pretrial conference, the court denied another request by Petitioner to vacate the trial. (State's Lodging A-4, pp. 112-45, 150-51.)

On the day of trial, Petitioner asked for reappointment of counsel. The Court granted the motion and reset the trial to January 7, 2008, to allow counsel to prepare for trial. (State's Lodging A-1, pp. 96-97, 100; State's Lodging A-4, p. 155.) However, about a month later, Petitioner moved to represent himself again. (State's Lodging A-1, p. 101.)

After hearing from Petitioner's counsel and completing a second *Faretta* colloquy, the court granted Petitioner's motion, but again appointed Odyssey as standby counsel. (State's Lodging A-4, pp. 158-74.)

Petitioner filed a list of witnesses, after which the State moved to quash subpoenas for some of the witnesses. After a hearing, the trial court quashed Petitioner's subpoenas for persons related to his child custody matter, but permitted him to proceed with subpoenas of other named defense witnesses. (State's Lodging A-4, pp. 276-301; see also State's Lodging A-1, pp. 161-62.) It was not until this point, when the trial court held an ex parte hearing with Petitioner to inquire about what relevant information each witness possessed, that the court began to learn that Petitioner's defense would be that government agents coerced him to rob the banks. At the same hearing, Petitioner complained about his standby counsel, but the court found his claims meritless and stated that they were simply a "continuing effort on the part of the defendant to prolong and delay" the trial. (*Id.*, pp. 309-22.)

### 3. Trial Proceedings

Trial commenced on January 7, 2008. During trial, Petitioner participated in jury selection (*id.*, pp. 480-90), cross examined state witnesses (*id.*, pp. 542-50, 580-85, 626-29, 643-45, 660-65, 689-709, 727-39, 749-51), argued against a motion in limine (*id.*, pp. 724-25, 756-61, 869-70, 873-77), made an opening statement (*id.*, pp. 767-76), examined defense witnesses (*id.*, pp. 777-847, 905-09, 961-87, 992-1024, 1029-32), and testified on

his own behalf (*id*., pp. 810-914, 916). He consulted with his standby counsel as needed throughout the trial.

In the State's case in chief, the prosecutor called George Calley, who's testimony was consistent with the background facts described above. (State's Lodging A-4, pp. 521-52.) The prosecutor also called another FBI agent, Scott Mace, who had interviewed Petitioner, and several bank personnel who were victims or witnesses of the robberies. (State's Lodging A-4, pp. 521-52.)

In his case in chief, Petitioner told a long story about how government agents coerced him to rob the banks. The story is extensively detailed in the Idaho Court of Appeals' opinion lodged at State's Lodging B-4, pp. 9-13, and will not be repeated here. The short version is that government officials (assisted by local businessmen) forced him to wear a bomb vest and rob the banks, threatening to harm his family and detonate his bomb vests if he did not cooperate. He asserts that he robbed the two banks and handed over the money to officials.

Also in support of his defense, Petitioner questioned FBI agent Scott Mace during the State's case in chief. Petitioner wanted to call as witnesses Idaho Detective Dave Smith, Petitioner's mother, and several other individuals, but none of these people came to trial because of various issues with subpoenas, some due to Petitioner's fault, some due to others' fault.

During jury deliberations, Petitioner moved the court for permission to address the jury. He wanted to provide a statement that he "was mentally not able to function

properly and my public defender did not help me decide." (*Id.*, p. 1102.) The trial court denied the motion, finding that Petitioner "has been fully functional and focused and alert," and, "[i]n fact, his testimony before this jury on direct examination was clear, concise." (*Id.*, pp. 1102-03.) On Friday, January 11, 2008, the jury found Petitioner guilty of both counts of robbery. (State's Lodging A-1, p. 197.)

### 4. Post-Trial Proceedings and First Direct Appeal

The same day he was convicted, Petitioner requested appointment of counsel for sentencing, which the court granted. (State's Lodging A-4, p. 1110.) Odyssey was again appointed. Petitioner desired to file a motion for a mistrial and new trial. Mr. Odyssey thought there were no grounds for the motions, and told Petitioner he would not file them. Petitioner then asked to proceed pro se. (*Id.*, pp. 1110-15.)

Because Petitioner had filed a pro se motion to dismiss "on grounds of mental incapacity," the trial court ordered a psychological evaluation pursuant to I.C. § 19-2522 for sentencing purposes, appointing Dr. Chad Sombke to perform the evaluation. (*Id.*, pp. 1115-19; (State's Lodging A-1, pp. 198-99.)

Dr. Sombke went to the jail to evaluate Petitioner in January, but Petitioner refused to meet with him. On January 31, 2008, the court held a hearing to discuss why the evaluation had not taken place. Petitioner would not tell the court whether his refusal was an assertion of his Fifth Amendment right to remain silent, because Petitioner wanted to consult with a new attorney. The court concluded that Petitioner's refusal was an assertion of that right. (State's Lodging A-4, pp. 1120-31.)

Petitioner went back and forth on whether he wanted representation for his post-trial motions and sentencing. The trial court observed that "this court – throughout the course of these proceedings and Mr. Hawkins' representation of himself over many months – certainly has no reason to believe that Mr. Hawkins has a mental disease or defense that causes him to lack the capacity to understand the proceedings against him or to assist in his own defense." (State's Lodging A-4, p. 1120.) However, out of an abundance of caution, the court did not want to permit Petitioner to proceed pro se, explaining that, "if Mr. Hawkins is contending that he is delusional, I don't think his decision whether to hire or not keep an attorney, at this point, is appropriate." (*Id*., pp. 1117-18).

On February 12, 2008, Petitioner reaffirmed he wanted counsel to continue representing him. (*Id*., p.1133.) On February 20, 2008, Petitioner filed a motion to dismiss, motion to strike verdict, and a motion for new trial. (State's Lodging A-2, pp. 243-52.) Also on that date, Petitioner filed a "motion for pro se status." (State's Lodging A-2, pp. 249-51.)

On March 13, 2008, the court conducted another *Faretta* colloquy with Petitioner. (State's Lodging A-4, pp. 1139-41, 1145.) Also during the hearing, counsel said that, if required to argue Petitioner's pro se motions, his position would be that the motions had no merit. (*Id*., p.1144.) At the end of the hearing, the Court found that Petitioner had "freely and voluntarily chosen to represent himself; that he's competent to make that decision; and he understands the advantages of counsel; the disadvantages of representing

himself; and that he is competent to make that decision." Petitioner's request for self-representation was granted. (*Id*., p. 1147.)

After Petitioner complained he no longer had access to a law library, the court reappointed counsel, but advised Petitioner that he could notify the court if he no longer wanted representation. (*Id*., pp. 1176-78.) Though represented, Petitioner continued to file pro se motions, which were denied. (State's Lodging A-2, pp. 256-69, 283-85; State's Lodging A-4, pp. 1179-80, 1211.)

Petitioner was represented by Mr. Odyssey at the sentencing hearing, but was displeased with his representation. (State's Lodging A-4, p .1179.) Petitioner was sentenced to concurrent sentences of thirty fixed years of incarceration, followed by an indeterminate life sentence (State's Lodging A -2, pp. 276-79). Petitioner's judgment of conviction was entered on April 24, 2008. (State's Lodgings A-4, pp. 1179-1121; A-2, p. 276.)

New counsel Dennis Benjamin was appointed to represent Petitioner on direct appeal. Benjamin selected two claims for appeal: (1) whether the trial court erred by failing to sua sponte order a psychiatric examination and conduct a hearing to determine Petitioner's competency before trial, and (2) whether he was competent to waive counsel. (State's Lodging B-1, p. 17.) The Idaho Court of Appeals agreed with Benjamin, concluding the trial court abused its discretion by failing "to sua sponte order a psychiatric evaluation and conduct a hearing to determine Hawkins' competence to stand trial because there was enough indicia existing to raise a bona fide doubt as to Hawkins'

mental capacity." (State's Lodging B-4, p. 14.) The court reasoned: "When taking the entire record into account, the [trial] court should have entertained a reasonable doubt about Hawkins' mental competency either to stand trial or to represent himself." (*Id.*, p. 13.)

Although the issue of the appropriate remedy had not been raised or briefed, the Idaho Court of Appeals stated in its opinion, "Because it is not possible to retroactively make a determination as to Hawkins' competency at the time he was tried, we must vacate the judgment of conviction and leave the state free to retry Hawkins if he is found competent to stand trial." (*Id.*, p. 14) (footnote omitted). The Idaho Supreme Court denied the state's petition for review and issued its remittitur. (State's Lodgings B-5 to B-8.)

### 5.  Proceedings on First Remand and State's Interlocutory Appeal

On remand, the trial court entered an order for psychiatrist Michael Estess to conduct a psychological examination of Petitioner, who was still represented by Benjamin. (State's Lodging C-1, pp. 29-30.) At the request of Dr. Estess, the court also ordered that Petitioner undergo psychological testing by Dr. Sombke. (*Id.*, pp. 34-36.) The state moved for a retroactive competency hearing. (*Id.*, pp. 47-68.) Petitioner retained private attorney John Eric Sutton to represent him on remand. Petitioner later said he thought Mr. Sutton was going to co-counsel with Benjamin, but instead Sutton fired Benjamin without Petitioner's permission. (*Id.*, pp. 69-70.)

Dr. Sombke went to the jail to evaluate Petitioner on July 14, 2010, but Petitioner refused to meet with him. Petitioner did agree to meet with Dr. Sombke on August 4,

2010. Dr. Sombke found that Petitioner's test results did not show signs of malingering.

He diagnosed Petitioner with delusional disorder and, on August 11, 2010, concluded:

> As a result of the information and observations obtained during this evaluation, it is this examiner's opinion that Mr. Hawkins does not currently understand the risks and benefits of treatment and he does not have the capacity to make informed decisions about treatment. He is currently not receiving any psychiatric treatment for his psychiatric illness and it appears as though he will need supervision, care, and treatment at a psychiatric facility in order to become competent in the future.

(*Id.*, p. 165.) Dr. Sombke further concluded:

> Mr. Hawkins does have the capacity to understand the proceedings against him on a basic and factual level, but he does not have the capacity to assist in his own defense in any logical or rational manner. He will need to receive psychiatric treatment in order for him to become competent in the future.

(*Id.*)

On November 10, 2010, the court held a competency hearing. Petitioner was represented by Mr. Sutton. Dr. Sombke testified that he had changed his mind about Petitioner's diagnosis, based on his later review of one to two years of prison medical records from Petitioner, an earlier psychological report from Dr. Michael Johnston, psychological evaluations of Darcy Bervik, and consultations with Dr. Estess. (State's Lodging C-2, p. 20-22.) Dr. Sombke opined that Petitioner was not malingering, as his test results had confirmed, but manipulating. Dr. Sombke and Dr. Estess opined that the newer records, letters written by Petitioner to his parents, two years of incarceration records, and interviews with Petitioner's common law wife and his mother, showed that

Petitioner's elaborate stories of coercive government intervention in his life did not permeate his communications, but were selectively used (with the content changing from time to time) in past and present criminal cases. (*See* State's Lodging C-2.) At the competency hearing, Dr. Estess and Dr. Sombke testified that Petitioner had been competent to stand trial. (State's Lodging C-2, pp. 16-46, 53-54, 68-95.)

The trial court found that Petitioner had been competent during the first trial, and that he currently was competent to proceed to a new trial. (State's Lodging C-1, pp. 134-36.) Because the court felt "constrained by the law of the case," the court ordered that Petitioner be retried. (*Id.*, p. 136.)

Petitioner filed a pro se affidavit complaining about Sutton's representation, and Sutton filed a motion to withdraw. (State's Lodging C-1, pp. 78-79, 111-31, 137-235.) The court granted Sutton's motion to withdraw, and appointed new counsel to represent Petitioner for the new trial proceedings. (*Id.*, p. 240; State's Lodging C-3, pp. 12-14.)

The State filed a motion for permissive appeal to challenge the trial court's order that required a new trial. (State's Lodging C-1, pp. 243-52.) The trial court granted the state's motion. (*Id.*, pp. 272-77.) Petitioner continued to file pro se pleadings, though represented by counsel. (*Id.*, pp. 278-80, 292-300, 344-51.) The state moved to stay proceedings, which the trial court granted. (*Id.*, pp. 339-40, 363-64.)

The Idaho Supreme Court granted permission for the state to file an interlocutory appeal. (*Id.*, p. 373.) After considering the parties' briefing, the Idaho Supreme Court reversed the trial court, explaining that neither the Idaho Court of Appeals' dictum nor

the law of the case doctrine prevented the trial court from making a retroactive

competency determination. (State's Lodging D-4.)

### 6. Proceedings on Second Remand

On May 29, 2013, at the status hearing held on the second remand, retained

counsel Eric Fredrickson appeared on behalf of Petitioner. (State's Lodging E-1, p. 88.)

At that time, the trial court outlined its plan to give Petitioner a second chance to present

evidence relating to his competency:

> I have read [the State's] motion for the court to take
> judicial notice of the prior proceedings. And certainly, Mr.
> Fredericksen, I will give you an opportunity to respond to
> that. But I am inclined to do that in this respect. Certainly the
> defense can subpoena Dr. Estess, cross-examine him,
> determine what the basis of his opinion was regarding the
> retroactive competency, perhaps, if necessary, take his
> deposition. I mean I will let you folks work out the details
> there. But you could subpoena him, call him to testify, cross-
> examine him.
>
> And then certainly you have the opportunity to present
> evidence to the court from your expert or fact witnesses
> regarding Mr. Hawkins' competency back in 2007 or perhaps
> even his current competency.

(State's Lodging E-3, p. 7.) The hearing was set for August 29, 2013. (*Id.*, p. 9.)

On June 17, 2013, the court held a status hearing. Mr. Frederickson indicated he

was trying to find an expert for Petitioner. (State's Lodging D-2, p. 129.) Petitioner was

declared an indigent for the purpose of receiving funding for a psychiatrist or

psychologist to evaluate him on the retroactive competency issue. (*Id.*, pp. 128-29.)

On June 28, 2013, Mr. Frederickson filed a motion to withdraw as attorney for Petitioner, because Frederickson had not received payment from Petitioner and for other reasons Fredrickson could not disclose. (*Id.*, pp. 101-05.)

On July 3, 2013, the court held a status hearing. Frederickson's motion to withdraw was discussed on that date. Petitioner again asked to proceed pro se, without standby counsel. (State's Lodging E-4, pp. 9-10.) The trial court expressed reluctance to permit Hawkins to proceed pro se, explaining:

> That kind of presents a conundrum for the court, or a conflict, because the focus of this hearing is the argument that was presented by your attorneys in the appeal before the Court of Appeals that you were not competent to essentially stand for trial back in January of 2007, I believe in your – when your jury trial was held, okay? And so that raises a question about your competency then, your competency since then, and your competency now, and so if someone is saying that they aren't competent, you can understand when they want to represent themselves that creates a real conflict in the court's way of looking at this thing.

(*Id.*, p. 10.) After another *Faretta* colloquy with Petitioner, the court allowed Mr. Frederickson to withdraw. The court appointed the Ada County public defender as standby counsel for Petitioner. (*Id.*, pp. 11-28.) The court set a follow-up hearing for July 17, 2003.

At the status hearing on July 17, 2013, Petitioner appeared with his standby counsel. The court advised Petitioner that he had the right to appointed counsel, including standby counsel if desired. Petitioner insisted he wanted to proceed pro se without standby counsel. (*Id.*, pp. 11-12.) The court completed another *Faretta* colloquy and

found his waiver of counsel was knowing, intelligent, and voluntary. (State's Lodging E-3, pp. 14-17.)

Petitioner stated at the hearing that he could not hire an expert for the August hearing until the State provided him with another copy of discovery, because his former attorney did not forward that to him. The Court ordered the State to provide a copy of the discovery to Petitioner, and then made sure Petitioner understood that he was to have his expert ready to testify in Court on August 29, and that he should subpoena both his own expert and Dr. Estess. Petitioner indicated that he understood. (State's Lodging E-3, pp. 21-30.)

On July 31, 2013, the court held another status hearing, at which time Petitioner stated that he desired to hire Dr. Robert Cloninger, a well-known psychiatrist from St. Louis, who charged $450 an hour, plus travel and lodging expenses. (State's Lodging E-2, pp. 134-37.) The court denied the request, finding the costs associated with Dr. Cloninger unwarranted. Petitioner stated that Dr. Cloninger was willing to reduce his fee to that commensurate with a local expert, but the court refused to appoint him. Instead, the court instructed standby counsel to assist Petitioner in retaining a qualified psychiatrist within a 500-mile radius of Boise, Idaho. (*Id.*, pp. 141-44.) The court also vacated the August hearing date to give Petitioner time to find an expert. (Id., pp. 143-45.)

On August 13, 2013, the court issued an order stating that Petitioner had made no showing that there was not an expert in the Boise area comparable to the St. Louis expert

Petitioner wanted to hire. The court narrowed its 500-mile-radius order and ordered that Petitioner had to select an expert in the Boise-Nampa-Caldwell-Twin Falls area. Petitioner and his standby counsel were ordered to disclose the name of the expert to the court in writing by August 29, 2013. Petitioner was warned that his failure to submit the name of his expert by that date, or to submit to testing by the expert within thirty days of disclosure would result in Petitioner waiving his right to present evidence at the retroactive competency hearing. (State's Lodging E-1, pp. 229-31.)

The court set a status conference for October 17, 2013, for the purpose of selecting an expert for Petitioner. The court notified Petitioner that if he did not submit the name of an expert prior to the hearing, one would be selected for him. (*Id.*, p. 261.)

On October 17, 2013, Petitioner renewed his request for Dr. Cloninger to be appointed as his expert. (State's Lodging E-5, pp. 5-6.) The court denied Petitioner's request and appointed a local psychologist, Dr. Robert Engle, to examine him. The court specifically advised Petitioner that he had three choices: (1) to have the Ada County public defender irrevocably appointed as his counsel and permit counsel to select a local expert for him; (2) to submit to an evaluation by Dr. Engle; or (3) be sentenced immediately. (*Id.*, pp. 11-12.)

Petitioner asked the court to consider permitting his parents to pay the cost of Dr. Cloninger. The Court said that was a possibility, but his parents would need to submit financial commitment documentation to the court, and Petitioner would have to work that out with his counsel. (*Id.*, pp. 13-14.) Petitioner refused to be represented by the public

defender unless he was guaranteed that Dr. Cloninger would be his expert. The court

would not permit that condition, and asked Petitioner to choose among the three options.

Petitioner chose to be sentenced that day. (*Id.*, pp. 15-16.)

The court then questioned Petitioner about his current mental status. Afterwards,

the court found:

> [T]he court will find from the totality of the record that Mr.
> Hawkins, particularly in light of the extensive motions that he
> has filed since this was submitted back to the court in April of
> this year . . . that Mr. Hawkins is competent, and he
> understands the nature of the proceeding, that he has made a
> decision, and I find him to have made a knowing and
> intelligent decision to continue to insist that a psychiatrist
> from St. Louis, Missouri, be appointed to testify on his behalf
> for his articulated basis for not appointing that psychiatrist
> [sic], that there have been numerous delays caused as a result
> of again Mr. Hawkins' . . . failure to follow through with the
> court's specific order.
>
> The court will find that there has been ample opportunity
> afforded to Mr. Hawkins to present evidence to the court
> regarding his mental status at his trial in 2007. The court will
> find that the testimony and evidence presented to the court by
> Dr. Estess that Mr. Hawkins was competent to stand trial, that
> he was at the time of his evaluation by both Dr. Sombke and
> Dr. Estess was capable of understanding the proceedings,
> assisting in his defense, and that remains the case today.

(*Id.*, pp. 18-19.)

The court asked the State for comments, and then permitted Petitioner to

comment. He said:

> You denied me a hearing, you know, to be able to put
> Estess and Sombke back on the stand. You let the prosecutors

> lie. You, of course, are biased and prejudiced. I don't know
> what else there is to say.

(State's Lodging E-5, p. 20.) The court thanked Petitioner for his comments and

reinstated the judgment and Petitioner's concurrent unified sentences of thirty years fixed

with life indeterminate. (State's Lodgings E-1, pp. 280-84; E-5, pp. 19-20.) Petitioner

filed a motion for reduction of sentence, which the trial court denied. (*Id.*, pp. 270-79,

297-99).

### 7. Second Direct Appeal

Benjamin represented Petitioner on appeal following the second remand. The

Idaho Supreme Court heard the appeal, characterizing it as consisting of three issues, as

contained in the body of the appellate briefing: "(1) whether retroactive competency

hearings that occur more than a year after trial violate due process; (2) whether there was

insufficient evidence to support the district court's determination that Petitioner was

competent to stand trial in 2008; and (3) whether Petitioner was competent to waive his

right to counsel." (State's Lodging F-9, pp. 5-6; *compare* State's Lodging F-1, pp. 17-18

(Petitioner's statement of issues combined issues 1 and 2, and set forth 3 separately).)

After Benjamin filed the opening brief (State's Lodging F-1), Petitioner filed a pro

se opening brief. (State's Lodging F-7.) Because Petitioner was represented by counsel,

the Idaho Supreme Court took no action on the pro se brief. (State's Lodging G-20, p.

381.) During the course of the appeal, Benjamin filed a motion to withdraw as counsel

(State's Lodging F-4) and a supporting affidavit asserting that Petitioner was "dissatisfied

with [Benjamin's] performance in this case, with [his] performance in the original appeal and in [his] performance as his trial counsel during the remand proceedings following the original appeal." (State's Lodging F-5, p.2). Petitioner believed Benjamin "should have raised additional issues." (*Id.*)

The Idaho Supreme Court granted Benjamin's motion, and permitted Petitioner to proceed pro se. (State's Lodging F-6.) Petitioner filed an "Affidavit in Support of Closing Argument" and "Closing Brief of Appellant" (State's Lodgings F-11, F-12), which the Idaho Supreme Court ordered be "considered only for the purpose of identifying relief sought by the Appellant" (State's Lodging F-8).

The Idaho Supreme Court affirmed the state district court's decision to reinstate the judgment. (State's Lodging F-9.) The Idaho Supreme Court refused to consider the claims in Petitioner's reply brief because they "largely repeat[ed] issues that the district court declined to address,"  because they were "unrelated to the competency issues that were originally raised on appeal and which were the subject of the district court's decision," and because they were raised in the reply brief for the first time on appeal. (*Id.*, p.13.)

### 8.  Federal Habeas Corpus Petition and Stay of Federal Proceedings

On July 22, 2013 (mailbox rule date), after the Idaho Supreme Court determined that a retroactive competency determination could be made in Petitioner's case, he filed a federal habeas corpus petition under 28 U.S.C. § 2241(c)(2)(3), asking the federal court

to intervene in the state proceedings. (Dkt. 2.) He filed numerous motions, amendments, supplements, and other papers (Dkts. 3-12, 15, 16, 17-19, 20-25, 26-28).

In the Initial Review Order, Magistrate Judge Ronald E. Bush opined that Petitioner must proceed under 28 U.S.C. § 2254. (Dkt. 29, pp. 2-3.) This case was reassigned to this Court. Petitioner was ordered to file a second amended habeas petition or a motion to stay if he intended to pursue state court action. (Dkt. 33.) Petitioner filed a notice of appeal (Dkt. 34) that was denied because the United States Court of Appeals for the Ninth Circuit did not have jurisdiction without a final order from the district court. (Dkt. 37).

This Court ordered Hawkins to file a "comprehensive 'Second Amended Petition for Writ of Habeas Corpus,' under the proper habeas statute, 28 U.S.C. § 2254," that must include the proper respondent, all of his claims and how and when each claim was exhausted, and whether he had any pending state court actions. (Dkt. 47.) Instead, Petitioner filed a non-conforming Amended Supplemental Petition for Writ of Habeas Corpus. (Dkt. 49.) He was ordered to file another amended petition that conformed to the Court's prior order. (Dkt. 53, pp. 1-2.) Disregarding the Court's instructions, Petitioner filed his third amended petition for writ of habeas corpus. (Dkt. 60.) The State responded with a Motion to Stay, which this Court granted (Dkt. 88) because Petitioner had filed a petition for post-conviction relief (Dkt. 65).

### 9. Post-Conviction Proceedings

On February 13, 2015, while his appeal before the Idaho Supreme Court was still pending and he was litigating his federal habeas petition, Petitioner filed a state pro se petition for post-conviction relief. (State's Lodging G-19, pp. 6-74.) Petitioner was appointed conflict counsel, Joseph Ellsworth. (*Id.*, pp. 92-93, 113-14.) Because Hawkins continued to file pro se pleadings even though he was represented by counsel, the post-conviction court ordered the state clerk of court to refuse acceptance of pro se documents. (*Id.*, pp. 115-16.)

Ellsworth moved to withdraw because Petitioner was not satisfied with the representation and desired to proceed pro se. (*Id.*, pp. 129-31.) The trial court denied the motion because counsel was needed to help clarify Petitioner's incomprehensible pro se petition. Ellsworth was ordered to file an amended petition. (State's Lodging, pp. 7-12, 18.) Ellsworth renewed his motion to withdraw, filed a motion asking the court to accept Petitioner's pro se filings, and filed various pro se motions and documents from Petitioner. (State's Lodging A-1, pp. 140-327.) The State filed an answer and motion for summary disposition. (*Id.*, pp. 328, 346-64.) Ellsworth filed a supplemental petition for post-conviction relief with various attachments that incorporated Hawkins' initial pro se petition. (*Id.*, pp. 546-609.)

The post-conviction court filed a lengthy notice of intent to dismiss the petition, requiring petitioner to respond to avoid summary dismissal. (*Id.*, pp. 610-38.) After

Ellsworth responded, the court denied post-conviction relief. (*Id*. pp. 657-58.) Ellsworth again asked to withdraw. (*Id*., pp. 639-40.)

Petitioner also filed a pro se Rule 35 motion to correct an illegal sentence. (State's Lodging I-1, pp. 43-45). Ellsworth was appointed to represent Petitioner, but Petitioner continued to file pro se motions and documents. (*Id*., pp. 49-51, 66-207.) The trial court denied the Rule 35 motion. (*Id*., pp. 208-09.)

### 10. Post-Conviction and Rule 35 Appeals

On appeal from the post-conviction denial, new counsel Greg Silvey was appointed to represent Petitioner. (State's Lodging H-1.) Silvey identified two issues for appeal: (1) whether the post-conviction court erred by denying the motions to withdraw as counsel and failing to rule on the subsequent motions to withdraw, and (2) whether the post-conviction court erred by failing to take judicial notice of the underlying criminal case. (State's Lodging H-3, p. 12.) The Idaho Court of Appeals affirmed denial of post-conviction relief, and the Idaho Supreme Court denied the petition for review. (State's Lodgings H-6 to H-9.)

On appeal from the denial of his Rule 35 motion, Petitioner represented himself and raised forty-two issues related to his underlying convictions. (State's Lodging J-5.) The Idaho Court of Appeals explained that claims challenging a conviction cannot be raised in a Rule 35 motion, and affirmed the denial of Petitioner's Rule 35 motion. (State's Lodging J-7.) Petitioner did not seek review from the Idaho Supreme Court,

resulting in the Remittitur being issued after the Idaho Court of Appeals' opinion. (State's Lodging J-8.)

Finally, Petitioner filed a pro se petition for writ of mandate in the Idaho Supreme Court, raising multiple claims. (State's Lodging J-1.) The Idaho Supreme Court denied the petition. (State's Lodging J-2). Petitioner filed a pro se "motion for review of entire cases" (State's Lodging J-3), which the Idaho Supreme Court denied. (State's Lodging J-4).

## 11. Recent Federal Habeas Proceedings

After having been stayed for approximately five years to permit Petitioner to try to exhaust his state court remedies, this Court lifted the stay on August 31, 2018. Petitioner was ordered to file one comprehensive petition, following these guidelines for each claim: (1) its federal legal basis, (2) the facts supporting the claim, (3) the procedural facts showing how and when the claim was properly presented to the Idaho Supreme Court, and (4) a brief argument stating why the state court decision is contrary to, or an unreasonable application of, federal law. Petitioner then filed his Second Amended Comprehensive Petition, the operative pleading in this case. (Dkt. 182.)

Respondent filed a Motion for Summary Dismissal on April 5, 2019. (Dkt. 203.) In the Motion for Summary Dismissal, Respondent argues that all of Petitioner's claims are subject to dismissal, except Claims 2, 19, 27, 28, 29, and 36, to the extent that they all raise due process claims based upon the trial court conducting a retroactive competency hearing, the court's determination that Petitioner was competent to stand trial in 2008,

and that he was incompetent to waive his right to counsel. Respondent argues that the remainder of the claims are procedurally defaulted, non-cognizable, and/or vague and conclusory. (Dkt. 203-1, p. 25.)

## STANDARDS OF LAW GOVERNING SUMMARY DISMISSAL

### 1. Notice Pleading Insufficient

When a petitioner's compliance with threshold procedural requirements is at issue, a respondent may file a motion for summary dismissal, rather than an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989). Rule 4 of the Rules Governing § 2254 Cases authorizes the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *See also* 28 U.S.C. § 2243. In other words, the Court may exercise its discretion to dismiss claims based only on the petition, without an answer from the respondent. Here, the Court will do so, because Petitioner was placed on notice to respond to the request for summary dismissal, and, in fact, has responded through his attorney and as a pro se litigant.

Notice pleading is insufficient in habeas corpus proceedings; rather, the petitioner must state sufficient facts to support a claim for relief. *Blackledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). As explained in *Allen v. Perini*, 424 F.2d 134 (6th Cir. 1970),

> [u]nder [28 U.S.C. § 2243], the District Court has a duty to screen out a habeas corpus petition which should be dismissed for lack of merit on its face. No return is necessary

when the petition is frivolous, or obviously lacking in merit, or where, as here, the necessary facts can be determined from the petition itself without need for consideration of a return.

*Id.* at 141.

## 2. Exhaustion Requirement

A petitioner must "exhaust" his state court remedies before pursuing a claim in a federal habeas petition. 28 U.S.C. § 2254(b). That means fairly presenting it as a federal claim to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Unless a petitioner has exhausted his state court remedies relative to a particular claim, a federal district court cannot grant relief on that claim, although it does have the discretion to deny the claim. 28 U.S.C. § 2254(b)(2).

State remedies are considered technically exhausted, but not *properly* exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies now available. *O'Sullivan*, 526 U.S. at 848. A claim may also be considered exhausted, though not properly exhausted, if a petitioner pursued a federal claim in state court, but the state court rejected the claim on an independent and adequate state law procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 731-732 (1991).

If a claim has not been properly exhausted in the state court system, the claim is considered "procedurally defaulted." *Coleman,* 501 U.S. at 731. A procedurally defaulted claim will not be heard in federal court unless the petitioner shows either that there was legitimate cause for the default and that prejudice resulted from the default, or,

alternatively, that the petitioner is actually innocent and a miscarriage of justice would occur if the federal claim is not heard. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

### 3. Traditional *Coleman* Cause

Ordinarily, to show "cause" for a procedural default, a petitioner must prove that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). To show "prejudice," a petitioner must demonstrate "not merely that the errors [in his proceeding] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

A defense attorney's errors that rise to the level of a violation of the Sixth Amendment right to effective assistance of counsel may, under certain circumstances, serve as a cause to excuse the procedural default of other claims. *Murray v. Carrier*, 477 U.S. at 488. However, an allegation of ineffective assistance of counsel will serve as cause to excuse the default of other claims *only* if the ineffective assistance of counsel claim itself is not procedurally defaulted or, if defaulted, a petitioner can show cause and prejudice for the default. *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000). In other words, before a federal court can consider ineffective assistance of counsel as cause to excuse the default of underlying habeas claims, a petitioner generally must have presented the ineffective assistance of counsel claim in a procedurally proper manner to

the state courts, such as in a post-conviction relief petition, including through the level of the Idaho Supreme Court.

A petitioner does not have a federal constitutional right to effective assistance of counsel during state postconviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). As a result, the general rule is that any errors of counsel during a postconviction action cannot serve as a basis for cause to excuse a procedural default. *Coleman*, 501 U.S. at 752.

### 4. *Martinez* Cause

The Supreme Court established a limited exception to the *Coleman* rule in *Martinez v. Ryan*, 566 U.S. 1 (2012). That case held that inadequate assistance of post-conviction review (PCR) counsel or lack of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. at 9. To show ineffective assistance of PCR counsel, Petitioner must show that the defaulted ineffective assistance of trial counsel claims are "substantial," meaning that the claims have "some merit." *Id*. at 14. To show that each claim is substantial, Petitioner must show that trial counsel performed deficiently, resulting in prejudice, defined as a reasonable probability of a different outcome at trial. *Id*.; *see Strickland v. Washington*, 466 U.S. 668, 695-96 (1984).

The *Martinez* exception applies only to defaulted claims of ineffective assistance of trial counsel; it has not been extended to other types of claims. *See Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017) (holding that *Martinez* is not applicable to claims of

ineffective assistance of direct appeal counsel); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (holding that *Martinez* is not applicable to a defaulted *Brady* claim).

### 5. Dismissal on the Merits Notwithstanding Procedural Default

Federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."); *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) ("In the present case, the question of procedural default presents a complicated question of Michigan law and is unnecessary to our disposition of the case. We will therefore proceed directly to the merits of Hudson's ... claim."); *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## DISCUSSION OF PETITIONER'S CLAIMS

The Court agrees with Respondent that the majority of Petitioner's claims are procedurally defaulted, non-cognizable, and/or vague and conclusory. However, in his Supplemental Brief, Petitioner has asked the Court to rule upon all grounds. (Dkt. 231, p. 2.) The Court has combed through the record to try to identify or flesh out the factual basis for each claim. Where possible, the Court will rule on the merits of the procedurally

defaulted claims, using a de novo standard of review. Where impossible, the Court will either deny the claim for failure to state a claim, permit Petitioner to brief cause and prejudice, or permit Petitioner to proceed on the merits.

**Claim 1**

Claim 1 is a non-cognizable claim that the United States of America and this Court violated Petitioner's constitutional rights by deliberately delaying the resolution of this habeas case brought under 28 U.S.C. § 2241 in July 2013. (*See* Dkt. 1.) Petitioner argues that the Court erroneously required him to exhaust his state court remedies before proceeding on his § 2241 case and erroneously construed this case under 28 U.S.C. § 2254. (Dkt. 182, p. 3.) He argues that, had this Court exercised its authority to stay the state criminal case, the state trial court could not have illegally resentenced him without a new trial or competency hearing, which occurred on October 17, 2013. (Dkt. 231, p. 5.)

Claim 1 is subject to summary dismissal. A petitioner is not authorized to bring a federal habeas corpus cause of action against the federal district court that is adjudicating his petition. Title 28 U.S.C. § 2241 permits the Court to exercise its discretion to require exhaustion of state court remedies and to apply the Rules Governing Section 2254 Cases to § 2241 habeas corpus cases. *See* Rule 1(b), Rules Governing Section 2254 Cases; *Carden v. State of Montana*, 626 F.2d 82, 83 (9th Cir. 1980) (in both a § 2254 and a § 2241 case, a petitioner must exhaust his state court remedies before coming to federal court in habeas corpus). The Court informed Petitioner that he must show extraordinary circumstances before a federal court can intervene in an ongoing state criminal action,

and he was ordered to make that showing. (Dkt. 29.) For example, extraordinary circumstances include "cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction," or cases "where irreparable injury can be shown." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). Petitioner did not make that showing.

Petitioner has not provided any facts to support his contention that the "U.S. Court conspired with state to deny petitioner's rights, even delaying and participation with the state, knowing Petitioner was unlawfully imprisoned, without a remedy d[ue] to federal stay." (Dkt. 231, p. 5.) As the Court has explained to Petitioner, federal courts are courts of limited jurisdiction. The law does not permit federal court interference in pending state criminal matters because of principles of comity, absent extraordinary circumstances. (*See* Dkt. 29.)

The Court also disagrees with Petitioner's characterization that, when he filed the § 2241 petition, his status was "unconvicted." (Dkt. 231, p. 5.) He had not been set free. Rather, his conviction had been vacated for the purpose of allowing the state district court to determine Petitioner's competency and retry him or commit him for psychiatric care. There is no extraordinary reason for the federal court to become involved in a pending state court action where the state courts are in the midst of taking action to address possible reversible error in the trial court proceedings.

Petitioner has brought numerous mandamus actions and appeals to contest the manner in which the federal district court has handled his filings in this case—those are

among the statutorily permissible ways to complain against the federal district court. As a federal habeas corpus claim, Claim 1 is without merit and will be dismissed with prejudice for failure to state a habeas corpus claim upon which relief can be granted.

**Claim 2**

Claim 2 is that Judge Michael McLaughlin, the state district judge who presided over Petitioner's trial, violated Petitioner's federal constitutional rights under Amendments 1 through 21 by conducting a retroactive competency hearing. Respondent asserts that Petitioner exhausted this claim only under a due process theory, and that all other legal bases for the claim are procedurally defaulted. This Court agrees, and the response filed by Mr. Prior is correct in its argument that the due process claim should proceed to a merits determination.

Petitioner will be permitted to proceed to the merits of Claim 2 as a violation of Petitioner's due process rights only. All other federal bases for such a claim are procedurally defaulted.

To excuse the procedural default of those federal bases, Petitioner asserts that Eric Fredrickson rendered ineffective assistance of counsel by failing to raise other federal bases for this claim. Mr. Frederickson represented Petitioner at the status hearing held on the second remand, but remained on the case only for a little over a month, because Petitioner did not pay him. While on the case, Mr. Fredrickson did not object to having a new competency hearing and demand that the case should simply go to trial; instead, he cooperated with the state court in trying to find a competency expert for Petitioner.

Before Petitioner can use "ineffective assistance of counsel" to excuse the default of another claim, the ineffective assistance claim must itself be properly exhausted. Because Petitioner did not properly exhaust a claim that Mr. Frederickson or direct appeal counsel performed ineffectively as to the other legal grounds the retroactive competency hearing transgressed, Petitioner cannot use such a claim to excuse the default of Claim 2. The narrow *Martinez v. Ryan* exception does not apply, because Claim 2 complains of judge error, not trial counsel error. Petitioner has not shown prejudice, as he has not explained how any other legal theory applies to this set of facts. Accordingly, the portions of Claim 2 that rely on constitutional provisions other than the Due Process Clause are subject to denial and dismissal with prejudice.

Petitioner also asserts that he was denied the right to self-representation on post-conviction review, because all  his pro se filings were returned to his "extremely ineffective counsel"—Joseph Ellsworth, John Eric Sutton, and Dennis Benjamin. Petitioner also asserts that the state appellate courts are at fault for not accepting his pro se filings while he was represented by counsel, and that all of his now-defaulted claims were raised in the pro se filings. Even assuming that the courts' refusal to accept pro se filings constitutes *Coleman* "cause," Petitioner has not shown that prejudice resulted from the failure to argue the other legal theories. Therefore, the Court concludes that there is no adequate legal excuse for the default of Claim 2 based on Amendments 1, 4, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, and 21. The Court will dismiss these claims with prejudice based on their procedural default.

**Omission of Claim 3**

For clarity's sake, the Court notes that the Amended Petition does not contain a claim numbered 3. (Dkt. 182.)

**Omission of Claim 4**

The Petition does not contain a claim numbered 4. (*Id.*)

**Claim 5**

Petitioner asserts that the federal and state governments conspired to create a dual criminal law scheme that violated his federal constitutional rights under Amendments 1 through 18. He asserts that, had he been charged and convicted in federal court, he would have received a five-year sentence, but the state prosecutor chose to charge him in state court, where he received a life sentence. The Court agrees with Respondent that these claims were not properly raised before the Idaho Supreme Court and are procedurally defaulted.

Even if the Court ignores the procedural default and rules on the merit of this claim, it finds that Petitioner has failed to state adequate facts showing that the federal and state governments conspired together to lengthen his sentence by the state prosecutor's decision to charge him in state court, and the federal prosecutor's decision not to charge him in federal court. Moreover, there is no case law supporting Petitioner's assertion that this is a cognizable habeas corpus claim. In fact, under the dual sovereignty doctrine, both the state and federal governments could have charged him simultaneously,

and, if convicted, he would be subject to serving sentences in both jurisdictions. *Heath v. Alabama*, 474 U.S. 82, 88-93 (1985).

Therefore, Claim 5 fails to state a federal claim upon which relief can be granted and will be dismissed with prejudice on the merits.

### Claim 6

Petitioner asserts that, as a Texas resident, his rights under Amendments 1 through 21 were violated when he was "denied comity in charging, prosecution, [and] sentencing." (Dkt. 182, p. 7.) He asserts that, if he had been prosecuted in Texas, he "would have been prosecuted federally, and if prosecuted by the state been afforded equal protection, due process, five year sentence." (Dkt. 182, p. 7.) The Court agrees with Respondent that these claims were not properly raised before the Idaho Supreme Court.

Setting aside the procedural default, the Court concludes, that, for the same reasons expressed in the analysis of Claim 5, this claim also fails on the merits. For these reasons, Claim 6 will be dismissed with prejudice.

### Omission of Claim 7

Petitioner has not included a claim numbered 7.

### Claim 8

Claim 8 is a conglomeration of various subclaims. Petitioner alleges that the indictment was "invalid" under Amendments 1, 4, 5, 6, 8, and 14. The factual basis of the first subclaim is that Idaho Detective Dave Smith testified before the grand jury about "illegally obtained admissions" of Petitioner in interviews with the detective. The grand

jury transcript is not a part of the record before the Court; but, for the reasons that follow, the Court does not deem it necessary. Consistent with the law set forth below, Petitioner was offered the full panoply of civil rights in his petit jury trial, mooting the concerns related to the grand jury proceedings. In the course of Petitioner's trial proceedings, the trial court determined that the admissions were *not* illegally obtained. (State's Lodging A-4, p. 263.)

Other subclaims include a conspiracy to violate Petitioner's constitutional rights by turning an evidence suppression hearing into a *Franks* hearing and then wrongfully sealing it from public view and interfering with his subpoenas and blocking his witnesses from coming to trial. Each subclaim is discussed in a subsection below.

The Court agrees with Respondent that Claim 8, as a cumulative error claim, was not properly raised before the Idaho Supreme Court. Therefore, the claim is procedurally defaulted. Rather than proceed to a showing of cause and prejudice, the Court considers the claim on the merits.

### A. *Suppression Hearing Background*

On November 15, 2007, Petitioner filed a pro se motion to suppress Idaho Detective Dave Smith's testimony and the physical evidence of the robberies obtained through the search warrant. (State's Lodging A-1, p. 109.) He did not reveal the grounds for suppression in his one-page motion.

The trial court held a suppression hearing on December 13, 2007. (State's Lodging A-4, pp. 216- 63.) The trial court made the grand jury transcript a part of the record for consideration of the motion to suppress. (*Id.*, pp. 249-50.)

At the suppression hearing, Detective Smith testified that he first interviewed Petitioner on August 11, 2006, in a detention facility in The Dalles, Oregon. Smith's main purpose in conducting the interview was to obtain information from Petitioner about the Boise, Idaho robberies. (*Id.*, p. 224.)

Smith testified that he evaluated Petitioner's status during the interview and found that he was "lucid, coherent, and responsive to [his] questioning." (*Id.*, p. 225.) Smith testified that, as soon as he walked into the room, he read Petitioner his *Miranda* rights,[1] and Petitioner verbally waived his right to an attorney. (*Id.*, p. 242.) Petitioner chose to answer some questions and, articulated, as to others—"We'll leave that question for my attorney." (*Id.*, pp. 225-26.)

Petitioner requested a second interview with Smith, and Smith agreed to meet with Petitioner and Scott Mace of the FBI. (*Id.*, p. 227.) Smith said that Petitioner's stated purpose in meeting with him and Mace was to try to make a deal regarding the bank robberies. (*Id.*)

Smith said his recollection was that Petitioner *said* he wanted to speak with George Calley during the first interview, but that Petitioner went ahead and spoke to

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Smith and Mace for about two hours. Petitioner disagreed with Smith, and said that Petitioner believed the first interview was for the purpose of stating that he would speak only to George Calley, and that it lasted only fifteen minutes. Either way, Smith observed, the exact words were contained on the audiotape of the interview. (*Id*., pp. 227-230.)

Petitioner asked for a continuance of the suppression hearing to produce the jail logbook to prove the length of the interview. He also told the court that the prosecutor had not provided him with copies of the interview tape or transcript. The court denied the request for a continuance, over Petitioner's objections. (*Id*., p. 229 )

Petitioner asserted that Oregon Judge John V. Kelly had issued a "gag order" and tried to establish that Detective Smith questioned him even though he had notice of the "gag order." (State's Lodging A-4, p. 226.)  Detective Smith testified that he had never heard of Judge Kelly or a "gag order." The prosecutor and judge both said they did not know what a "gag order" was. (*Id*., p. 234-36.) The judge required Petitioner to produce a copy of the "gag order" but would not let him further question Detective Smith about a "gag order" without having produced a copy of it. (*Id.*, pp. 236-37.)

Also at the suppression hearing, Oregon detective, Lori Rosebraugh—who had obtained the search warrant for his vehicles—was ready to testify via telephone. The court asked Petitioner what the subject of her testimony would be. Petitioner stated that he did not really know, because he had not been provided with Rosebraugh's affidavit in support of the search warrant. The prosecutor said that the affidavit had been included in

the State's discovery responses. Petitioner said that Rosebraugh "had full knowledge of the 'gag order,'" and that she had included false information in her affidavit regarding probable cause to obtain the search warrant. Petitioner accused the prosecutor of having knowledge of the false information in the Rosebraugh affidavit and the Oregon "gag order." The prosecutor told the judge that the accusation was false. (*Id.*, pp. 260-62.)

At that point in the suppression hearing, the trial court identified Petitioner's accusations as potential issues that should be decided in a *Franks* hearing.[2] The court explained to Petitioner that, to have a *Franks* hearing, "there must be a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard of the truth, was included by the affiant in the warrant affidavit, and that the false statement is necessary for the finding of probable cause." (*Id.*, pp. 262-63). The trial court concluded that Petitioner's offer of proof was insufficient to show that a *Franks* hearing was warranted, and so the court did not proceed to hold or schedule a *Franks* hearing, but denied the motion to suppress in its entirety. (*Id.*, p. 263.) This discussion provides background for Claim 8's subclaims.[3]

**B.** *Grand Jury Proceedings Subclaim*

Petitioner contends that his constitutional rights were violated during the grand jury process, based on his allegation that Detective Smith wrongfully testified before the

---

[2] *Franks v. Delaware*, 438 U.S. 154 (1978).

[3] For efficiency's sake, the Court addresses the subclaims according to content, rather than the sequence in which they appear in the Amended Petition.

grand jury about Petitioner's admissions during investigative interviews. The Court agrees with the trial court that Petitioner did not prove in the suppression hearing that Petitioner's admissions were illegally obtained. In addition, the law does not support his claim that the allegedly tainted grand jury proceedings is an appropriate ground for issuing a writ of habeas corpus.

A grand jury proceeding "is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *United States v. Calandra*, 414 U.S. 338, 343-344 (1974). "Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial." *Id*. at 349. In *Costello v. United States*, 350 U.S. 359 (1956), the Supreme Court observed that "[i]t would run counter to the whole history of the grand jury institution in which laymen conduct their inquiries unfettered by technical rules" to permit an indictment to be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury." *Id*. at 364.

Instead, the indicted person is "afforded the procedural safeguards required by due process of law" in a criminal jury trial. *In re Oliver*, 333 U.S. 257, 265 (1948). In *Costello*, the United States Supreme Court held that a conviction could be sustained even if only hearsay evidence was presented to the grand jury that indicted him, reasoning that "neither the Fifth Amendment nor any other constitutional provision prescribes the kind

of evidence upon which grand juries must act." *Id.* at 362. The Court rejected the request

to set down rules to govern grand juries:

> Petitioner urges that this Court should exercise its power to
> supervise the administration of justice in federal courts and
> establish a rule permitting defendants to challenge
> indictments on the ground that they are not supported by
> adequate or competent evidence. No persuasive reasons are
> advanced for establishing such a rule.... Neither justice nor
> the concept of a fair trial requires such a change. In a trial on
> the merits, defendants are entitled to a strict observance of all
> the rules designed to bring about a fair verdict. Defendants
> are not entitled, however, to a rule which would result in
> interminable delay but add nothing to the assurance of a fair
> trial.

*Id.* at 363-64. *See also United States v. Williams*, 504 U.S. 36, 54 (1992) (concluding that

"requiring the prosecutor to present exculpatory as well as inculpatory evidence would

alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory

body"); *Holt v. United States*, 218 U.S. 245 (1910) (refusing to quash an indictment on

grounds that a witness's grand jury testimony of the defendant's alleged admissions

"were obtained under circumstances that made them incompetent.") *Id.* at 247.

A rare exception to the United States Supreme Court's resolution of non-

interference with grand jury proceedings is in incidents regarding racial discrimination. In

*Rose v. Mitchell*, 443 U.S. 545 (1979), the Court determined that racial discrimination in

selection of a grand jury is a valid ground for setting aside a criminal conviction, even

where defendant has been found guilty beyond a reasonable doubt by a properly

constituted petit jury at a trial on the merits that was free from other constitutional error.

That Court reasoned: "Because discrimination on the basis of race in the selection of members of a grand jury thus strikes at the fundamental values of our judicial system and our society as a whole, the Court has recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Id*. at 556. This rare exception does not apply to Petitioner's facts.

*Goodrich v. Hall*, 448 F.3d 45 (1st Cir. 2006), is more similar to Petitioner's facts. There, after conviction by a petit jury, the petitioner asserted that the prosecution had improperly offered evidence at the grand jury proceeding that was so egregious as to require dismissal of the indictment and vacation of the conviction. The petit jury had convicted the defendant after a trial in which the petit jury was unaware of the challenged grand jury testimony. *Id*. at 47. The *Goodrich* court concluded that the claim was meritless because the defendant would have been indicted anyway and the petit jury was unaware of the allegedly improper testimony. *Id*. at 50.

Importantly, the *Goodrich* court observed: "We add that the Supreme Court has not defined the circumstances in which impropriety involving even a federal grand jury can ever lead to dismissal of an indictment once a petit jury has returned a verdict of guilt." *Id*. at 49. *Goodrich* relied on *United States v. Mechanick*, 475 U.S. 66 (1986), where a federal grand jury had violated Federal Rule of Criminal Procedure Rule 6(d), which provides that only "the witness under examination" may be present at a grand jury proceeding. *Id*. at 70-73. The grand jury had permitted two law enforcement agents to

testify together before the grand jury in support of a superseding indictment to expand the charges. The *Mechanick* court reasoned that the societal costs of retrial were far too substantial to justify setting aside the verdict when the error had no effect on outcome of trial, under the harmless error rule set forth in *Chapman v. California*, 386 U.S. 18 (1967). *Id.* at 71-72. Thus, the *Mechanick* court held that a subsequent guilty verdict by a petit jury demonstrated beyond a reasonable doubt that there was probable cause to indict. *Id.*

Another grand jury error Petitioner complains of is that one of the tellers said to the grand jury, "I have been told that the defendant has lost weight so he does not look like he used to." (State's Lodging A-4, p. 33.) Petitioner argued that this situation equated to prepping the witness, because only one person had picked him out of a lineup. (*Id.*) The trial court correctly responded that, at trial, Petitioner would be "afforded ... full and complete cross-examination subject to the Rules of Evidence." (*Id.*, p. 34.)

Petitioner's grand jury error claims are of the nature of those that are cured by the procedural protections of trial by jury, as the state court explained to him. The United States Supreme Court has not endorsed the limitation of evidence presented to a grand jury, because of its investigatory function and independent nature. Finally, the Court agrees with Respondent that the grand jury error claims fail under *Teague v. Lane*, 489 U.S. 288 (1989), because there is no United States Supreme Court precedent governing this issue. This subclaim will be denied on the merits and dismissed with prejudice.

## C. Franks *Hearing Subclaim*

With the foregoing background facts in mind, this Court turns to the *Franks* hearing subclaim. Petitioner asserts that the prosecutor turned the suppression hearing into a *Franks* hearing and the court sealed the transcript of the hearing to hide the "fact" that the grand jury wrongfully considered Petitioner's illegally-obtained admissions in Detective Smith's testimony. The record does not support this subclaim.

Rather, the record reflects that the trial judge properly identified Petitioner's accusation that the probable cause affidavit contained false information as *potential* grounds for a *Franks* hearing, rather than simply ignore that possibility because Petitioner was pro se and did not raise it himself. The judge raised the issue sua sponte to protect Petitioner's interests and provide him with an opportunity to explain why he believed the evidence was false.[4] Petitioner simply did not meet the threshold showing for a *Franks* hearing.

Petitioner does not identify, and the Court did not find, any indication in the record showing that the hearing transcript was "sealed." It is part of the public state court record. (*See* State's Lodging A-4.) There being no evidence to support Petitioner's claim, the Court will deny the *Franks* hearing subclaim on the merits and dismiss it with prejudice.

---

[4] As a side note, this Court noticed several other steps the trial judge took to make the proceedings fair to Petitioner, such as requiring Detective Smith to call Petitioner "Mr. Hawkins" rather than "Faron," and not permitting the prosecutor to push Petitioner into having a hearing on a motion to quash one of his subpoenas for trial immediately, but setting it several weeks away to give Petitioner adequate notice and time to prepare. (See State's Lodging A-4, pp. 219-221; 232.)

### D. *Conspiracy Subclaim*

The next subclaim is that the judge, prosecutor, and public defender are corrupt and conspired against him. In particular, Petitioner alleges that they conspired to make Detective Smith and all of Petitioner's witnesses unavailable at trial. (Dkt. 182, pp. 8-9.)

### i. Local Subpoenas

Petitioner included 34 witnesses on his trial list, with a statement that the "list may be added to or subtracted from at later dates." (State's Lodging A-1, p. 130.)

The prosecution filed a motion to quash some of Petitioner's subpoenas. (State's Lodging A-1, p. 131.) The subject of the motion was the set of subpoenas "to people believed to be connected to the child protection action involving the defendant's children." Other subpoenas sought to be quashed were to attorneys, Ada County Sheriff and Jail personnel, and other witnesses whose connection to the case was unknown. The prosecutor argued that these subpoenas directed people to come to court and bring information that would not be relevant to the criminal action. (*Id.*, p. 133.)

The subpoenas sought to be quashed included: Andrew Ellis, child protection prosecutor; Laura Bessy, Idaho Department of Health and Welfare (IDHW); Heidi Quijas, IDHW: Pam Derby, IDHW; Heather Taylor, IDHW; Jerrilyn Archer, Ada County Sheriff detective; Eric Bjorkman, a Boise attorney; Pam Tarlow, a Boise attorney who represented Darcy Bervik in the child protection action; Ann Cosho, Ada County Public Defender who initially was assigned to represent Petitioner in the child protection matter; Kevin Rogers, Ada County Public Defender, who represented Petitioner at the early

stages of the criminal case; Edward Odyssey, Ada County Public Defender, assigned as standby counsel to Petitioner in the criminal case; Joshua Wickard, Ada County Public Defender; Gary Raney, Ada County Sheriff; Dr. Garret, medical provider at the Ada County Jail; Kate Pape, Ada County Deputy Sheriff; Deputy Anderson, Ada County Sheriff; Joseph Tertling, a Boise businessman; Steve Jordan, Petitioner's cousin; and William Gordon, listed as a Simplot employee.

In preparation for the hearing, the prosecution had tried to contact the witnesses on Petitioner's list to determine whether they had relevant information about the case. Prosecutor Roger Bourne reported that Joseph Tertling and Steve Jordan said they had never heard of Faron Hawkins. (State's Lodging A-4, p. 292.) Mr. Bourne had spoken to the Ada County Sheriff about Petitioner's subpoenas, because he reported to the trial court that "William Gordon, according to the subpoena, works at Simplot, but the Sheriff's Office tells me that there is no employee by that name at Simplot." (*Id.*, p. 191.) Mr. Bourne went on to say, "And we just – we don't – ultimately, we found a person named William Gordon on just an address in Boise who claims to have never heard of the defendant." (*Id.*)

The court then asked Petitioner to disclose the relevance of these persons so that the court could assess whether to spend public funds and cause them to be required to come to court to testify. The court asked to see the list of names and said, "I may confer with Mr. Hawkins about those folks outside the presence of the prosecution." (*Id.*, p. 292.) The court then ordered:

> We'll clear the courtroom so I can find out more
> information, and we'll seal the record. The following portion
> is sealed. Turn off the tape recorder. We'll ask that the
> courtroom be cleared. The bailiff will be instructed not to
> divulge any of this information.

(*Id.*, p. 293.)

Petitioner then disclosed that Mr. Tertling and Mr. Gordon had told Nigel Winters

of the FBI to threaten Petitioner, and that Steve Jordan "will support that." (*Id.*, pp. 294-

300.) The court then called in the prosecutors and told them that the court would not

quash the subpoenas of Mr. Tertling, Mr. Gordon, or Mr. Jordan at that time. (*Id.*, p. 301.)

Therefore, the prosecution's motion to quash was granted only in part as to the persons

related to the child custody matter, the attorneys, and the Ada County personnel. (State's

Lodging A-1, pp. 161-62.)

At trial, Petitioner desired to call in his case in chief a number of witnesses.

Petitioner did not subpoena several witnesses that he assumed the prosecution was going

to use (Oregon Detective Alan Birchfield and Idaho Detective Dave Smith). Petitioner

provided incorrect addresses to the Ada County Sheriff for Steve Jordan, Petitioner's

cousin; and Steven Carter, a local FBI agent. (State's Lodging A-4, p. 712, 719.)

Petitioner did not follow the correct process for subpoenaing out of state witnesses on his

list (Richard Armitage, of the Department of Defense; and Darcy Bervik, his common-

law wife), but he indicated that Darcy and her son Travis were planning to come on their

own without subpoenas the next day. (*Id.*, pp. 719-20, 766.)

The record reflected no returns of service on the subpoenas for Donna Hawkins, Petitioner's mother; and Kelly Beeman, a local attorney who had represented Petitioner years earlier in a dog bite case. (State's Lodging A-4, 712-20 & 1031-35.)

After trial, the prosecutor wrote a letter to Petitioner's standby counsel, informing him that he had just learned that the Ada County Sheriff's Office had mistakenly believed that the subpoenas for Steven Carter, Donna Hawkins, Scott Mace, William Gordon, and Kelly Beeman had been quashed at the time the subpoenas for the child custody witnesses had been quashed. (State's Lodging G-20, pp. 486-87.) Thus, the subpoenas were never served on Defendants' trial witnesses.

Petitioner alleges that he submitted a subpoena for Joe Tertling, who was the prosecutor's "friend and Mormon priest," but the prosecutor intentionally omitted Tertling from the explanatory letter. (*Id.*, p. 486.) However, Petitioner has provided no evidence that he actually subpoenaed Tertling and no affidavit from Tertling as to the substance of his testimony. Therefore, Petitioner has not shown that the absence of Tertling harmed his defense. The subclaim regarding Tertling is subject to denial on the merits.

Scott Mace had been called in the prosecution's case in chief, and Petitioner examined him at that time, and, thus the nonservice of the subpoena was of no consequence. This claim is also denied on the merits.

As to the other four individuals identified in the prosecutor's letter, the prosecutor explained:

- [T]he Court ruled that FBI agent Steven Carter had nothing admissible to testify to[]. Carter had done a polygraph on the defendant concerning certain aspects of the defendant's story. [The Court specifically ruled that polygraph evidence was not admissible in Idaho.]

- Kelly Beamon [Beeman] is a Boise attorney. Mr. Beamon told one of our office investigators that he had represented the defendant in some matter involving a "dog bite."

- Donna Hawkins is the defendant's mother. We had no contact with her.

- The subpoena to William Gordon was directed to the J.R. Simplot Company, [which] had no employee by the name of William Gordon. A man by that name [was] living in Caldwell. That William Gordon advised that he had never worked for J.R. Simplot and had no knowledge of Faron Hawkins.

(State's Lodging G-20, p. 487 (alterations added).)

Petitioner alleges, without any supporting evidence, that the prosecutor called the Ada County Sheriff's staff and instructed them not to serve *any* of the defense witness subpoenas they had, because they all had been quashed. He asserts, "the Prosecutor called the sheriff and told them not to serve the subpoenas as they were quashed, which was a lie." (Dkt. 182-1, p. 11.) From these unsupported allegation, Petitioner asserts that the prosecution "unconstitutionally blocked [and] denied all defense witnesses at trial." Petitioner alleges that this action constitutes a violation of Amendments 1 through 21. (Dkt. 182-1, p. 7.)

Because Petitioner has produced no evidence to support his speculation that the prosecutor was involved in the non-service of the subpoenas that were not quashed, this claim fails. For example, Petitioner could have brought forward affidavits of Ada County

Sheriff's Office employees or written instructions by prosecutors to the Ada County Sheriff's Office, or he could have deposed the prosecutor or sheriff.

In addition to failing to show who was at fault for the non-service of the subpoenas, Petitioner has failed to provide sufficient evidence of what the absent witnesses would have testified to, had they been subpoenaed to trial. Petitioner asserts that his mother had seen the bomb vests that government agents allegedly forced Petitioner to wear to commit robberies—which is information that would have been important for the jury to hear. However, the Petitioner has not produced an affidavit from her stating that she had seen the bomb vests. (The Court does not see an explanation in the record about why Petitioner's mother required a subpoena, or why, after he discovered she had not been subpoenaed, he did not contact her himself or through his standby counsel to come to court on her own.)

The state district court denied Petitioner's motion for a new trial for lack of any showing of the evidence that the witnesses might have had to aid the defense. (*Id*., pp. 632-634.) This Court similarly concludes that Petitioner's claims of corruption of the attorneys and the trial court and their conspiracy to block his trial witnesses from testifying does not have an adequate factual foundation and is meritless. Accordingly, this subclaim will be denied on the merits and dismissed with prejudice.

ii.    Out-of-State Subpoenas not Served

Petitioner notified the trial court that he needed forms or research materials to determine how to subpoena out-of-state witnesses. (State's Lodging A-4, pp. 47-48.) The

trial court informed Petitioner that the subpoena forms are contained within the state rules of criminal procedures. (*Id.*, p. 49.) The court also made it clear that a prerequisite to having subpoenas issued was that Petitioner must disclose "who these people are and what their relevance is to this case." (*Id.*, p. 48.) The court further ordered prison officials to provide Petitioner three-hour blocks of time to conduct his research in the prison legal resource center, rather than 45-minute blocks, so that he could research subpoenas and other legal issues. (*Id.*, pp. 51-52.) The court also continued the trial (with Petitioner's waiver of the speedy trial rule) to allow him more time to prepare for trial. (*Id.*, p. 54.)

Months before trial, the court instructed Petitioner to have his subpoenas issued through his standby counsel's office, the Ada County Public Defender, because that office knew how to complete the process. (*Id.*, pp. 118-19.) The record is clear that Petitioner did not take the procedural steps necessary to obtain authorization from foreign courts to serve out-of-state subpoenas beyond the jurisdiction of the Idaho court. Petitioner has provided insufficient evidence showing that he did not have the opportunity, instructions, and legal resources to be able to serve his out-of-state subpoenas.

Further, Petitioner does not provide evidence showing how these witnesses would have aided his defense. Petitioner stated only the following—with no details about witness testimony—in his motion for a new trial:

> It was a surprise that my out of state subpoenaed
> witnesses did not show. I was just informed one was sick and
> the other could not make it due to bad weather out of

Colorado. This was extremely prejudicial since they were my
most important witnesses. Denied me a fair trial.

(State's Lodging A-2, p. 20.)

Therefore, the Court concludes that this subclaim is meritless, and it will be denied

and dismissed with prejudice.

### iii.    Failure of Detective Smith to be Made Available at Trial

Petitioner wanted to question Detective Dave Smith, but the detective did not

attend trial. In Claim 46, discussed below, Petitioner asserts that he subpoenaed Detective

Smith (Dkt. 182-1, pp 10-11), but at trial Petitioner stated that he had *not* subpoenaed

Detective Smith, because he assumed that, because Smith's name on the State's amended

witness list, he would be present a1435t trial. The State decided not to call him, however.

(State's Lodging A-1, p. 139.)

Petitioner asserts that this was an act of deception on the prosecutor's part, but

even Petitioner himself had many more witnesses listed on his witness list than he

attempted to call at trial. He is hard-pressed to argue that he should have been able to rely

on the State's witness list. Neither the trial court nor the prosecutor recalled the State ever

represented that Detective Smith absolutely would be attending trial. For example, the

prosecution represented at a pretrial conference that it would be serving subpoenas on

two witnesses that were common to Petitioner's witness list—George Calley and Lori

Rosebraugh—and, therefore, Petitioner did not need to issue subpoenas for them. (State's

Lodging A-4, pp. 188-89.) "As an officer of the court, Mr. Bourne said they are going to

be subpoenaed. They will be here," said the trial court. (*Id.*, p. 189.) And, both witnesses did appear, and Petitioner questioned them.

Petitioner cannot blame the State for his failure to secure Detective Smith's presence for his own case in chief. In any event, Petitioner has not brought forward facts showing that Detective Smith had any testimony helpful to the defense. Rather, his testimony likely would have been consistent with his testimony at the suppression hearing, where he testified that Petitioner "wanted to make a deal to try and basically save [him]self and confess to several robberies." (State's Lodging A-4, p. 227.) This claim will be denied on the merits and dismissed with prejudice.

**Claim 9**

Petitioner asserts that the State hid and blocked him from the content of his children's interviews in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). Petitioner asserted in a pretrial conference: "I was told by Andrew Ellis in court over there that the whole purpose these children was taken [sic] was to preserve their testimony against me in my bank robbery trial. There is no abuse, no neglect, or no abandonment there." (State's Lodging A-4, p. 40.)

Petitioner sought transcripts of the children's interviews in the child custody case from Judge McLaughlin, but the motion was denied. Judge McLaughlin consistently denied any motion that had to do with the child custody proceedings for lack of relevance to the criminal matter. (*See* State's Lodgings A-1 to A-4.)

The prosecutor informed Judge McLaughlin that the State was not intending to call the children as witnesses at trial. Petitioner likewise informed the court that he did not intend to call or impeach the children at trial. (State's Lodging A-4, pp. 39-40.) The trial court granted Petitioner's motion to exclude the testimony of the children. (*Id.*, p. 44.) The prosecution did not try to introduce the children's statements or call the children as witnesses at trial. Thus, as to Petitioner's allegations regarding the State's withholding of the children's statements, there is no evidence that the statements were wrongfully withheld by the judge who presided over the child custody matter, nor was there any prejudice to Petitioner when Judge McLaughlin directed him to the child custody court to obtain release of information pertaining to minor children. Therefore, this subclaim will be denied and dismissed with prejudice.

Petitioner asserts in this habeas corpus matter that the prosecution used the children's statements as evidence to find him retroactively competent. However, he has provided no evidence of that. This subclaim will be denied on the merits and dismissed. However, Respondent shall be required to check the state court record and determine whether the prosecution had any of the children's statement in its possession, whether they were provided to the State's experts, and whether the statements were used in the competency proceedings. If so, those statements shall be disclosed to Petitioner and the Court. If there were none, Respondent shall so state. The Court will revisit this claim if evidence supporting the claim is produced.

**Omission of Claim 10**

Petitioner has not included a claim numbered 10.

**Claim 11**

Petitioner asserts that attorney Dennis Benjamin provided ineffective assistance of counsel on direct appeal in several ways. Preliminarily, the Court has determined that this claim appears to be procedurally defaulted, because it was not exhausted on post-conviction appeal. The *Martinez v. Ryan* exception does not apply, because the errors alleged involve appellate counsel, not trial counsel. Even if the Court assumes that the state appellate courts' refusal to permit Petitioner to file his own briefing is enough to show cause to meet the traditional *Coleman* cause and prejudice standard, then Petitioner must also show prejudice. Because the procedural default prejudice analysis is closely related to the merits analysis, the Court will instead review the merits of the ineffective assistance of appellate counsel claims.

The *Strickland* principles apply to appellate counsel claims. *Evitts v. Lucey*, 469 U.S. 387 (1985). To constitute prejudice on appeal, an attorney must have failed to raise an issue obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would have resulted in reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not ineffective for failing to raise the issue, and petitioner suffered no prejudice as a result of its omission. *Id.* at 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id*. at 754. "[T]he process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

### A. *Failing to Provide a Copy of the Opening Brief to Petitioner or his Parents before Filing*

Petitioner asserts that Benjamin had the duty to raise "all issues that would provide the fullest complete defense of Hawkins available by law." (Dkt. 182, p. 10.) As set forth above, that is an incorrect statement of the law. Good lawyering demands that appellate counsel omit weaker claims in favor of stronger ones, rather than risk burying the good claims under a mountain of frivolous claims. This claim fails, because no "duty" to raise all issues and claims exists in the law.

Petitioner has failed to show that, if he or his parents had been given a copy of the opening brief for comment before its filing, the outcome of the appeal probably would have resulted in reversal. Nor has Petitioner identified a claim that was omitted on direct

appeal that probably would have resulted in reversal.[5] Therefore, he has failed to show prejudice or deficient performance. This subclaim will be denied on the merits subject to reevaluation as discussed in note 9, below.

**B.** ***Failing to Inform Petitioner that Benjamin Limited the Scope of Representation to only the Competency Issue, which Permitted the State to File an Interlocutory Appeal***

Petitioner's claim that, had Benjamin not limited the appeal to only the competency issue, the State would not have been able to file an interlocutory appeal, rests on faulty reasoning and speculation. Petitioner's argument rests on the assumption that an appeal of additional claims otherwise would have resulted in a finding of reversible error as to another claim, and a new trial could not have been thwarted by simply holding a retroactive competency hearing. As discussed above, Petitioner has identified no other claim that probably would have resulted in reversal. For that reason, there was no deficient performance of appellate counsel and no prejudice. This subclaim is subject to denial on the merits and dismissal with prejudice.

**C.** ***Failing to Appeal any Issue involving Detective Dave Smith's Testimony about Petitioner's Admissions before the Grand Jury***

Petitioner alleges that, at the suppression hearing on December 13, 2007, Detective Dave Smith testified under oath that his testimony before the grand jury as

---

[5] Later in this Order and from its own review of the record, this Court has identified a few claims upon which it would like to have more factual information. Should any of those claims prove fruitful for Petitioner, the Court will re-evaluate this claim. Based on this record, however, no appellate claim has sufficient support for the Court to conclude that it would probably have resulted in a reversal.

invalid, but Petitioner does not point to the place in the record where that colloquy is. The Court has reviewed the transcript, and does not see such a statement. (State's Lodging A-4, pp. 216- 63.)

Petitioner alleges that he asked Detective Smith for counsel numerous times during interrogation, was deprived of sleep for thirty hours, and was under the influence of drugs and alcohol. Petitioner asserts that Detective Smith's testimony regarding Petitioner's admission during his interrogation was the *only* evidence the State had, and the State knew that Detective Smith's testimony would not stand up to cross-examination in a preliminary hearing. Petitioner further posits that, because of the anticipated cross-examination problem, the State kept continuing the preliminary hearing through November 30, 2006, and eventually "forum shopped to a grand jury indictment" to deny Petitioner a preliminary hearing and reset the speedy trial clock.

At the end of the suppression hearing, the trial court heard and rejected Petitioner's claim that his right to remain silent was violated by Detective Smith in pre-arrest interrogations. In its suppression ruling, the trial court said nothing about an alleged admission by Detective Smith that his grand jury testimony had been invalid.

Further, the grand jury presumably had the bank employees' testimony, which was the best evidence that Petitioner robbed the banks, and so Petitioner's characterization that Detective Smith had the *only* evidence that supported the indictment is erroneous.

For the reasons set forth above, appellate counsel was not deficient in failing to raise this claim on direct appeal, and no prejudice resulted. This claim is without merit and will be dismissed with prejudice.

### D. *Failing to Appeal Issue of Lack of Subject Matter Jurisdiction due to Conspiracy*

Petitioner also alleges that the state court did not have subject matter jurisdiction over him because the judge, prosecutor, and defense attorneys conspired to hide the fact that they did not have a valid indictment to try or convict him. (Dkt. 182, p. 11.) Petitioner has not brought forward sufficient facts to support this claim. There is no hint of a conspiracy in the record. For example, the state trial court carefully accommodated the perpetually-swinging pendulum of Petitioner's requests to represent himself or be represented by counsel in this case. The trial court extended many deadlines to ensure that Petitioner would be ready for hearings and trial. The Court does not see evidence in the record that the prosecution had any agreements with the trial court or defense counsel to allow prosecution under an invalid indictment. Likewise, the record does not reflect that defense counsel conspired with anyone to hide an invalid indictment from him. This claim will be denied and dismissed with prejudice for failure to show either deficient performance or prejudice on the part of appellate counsel.

### E. *Failing to Raise the Issue of Expiration of the Grand Jury's Term before Indictment*

In the record, Petitioner asserts that the grand jury's term had expired before the indictment was issued. In such case, he argues, the indictment would be void under state

law and could not confer subject matter jurisdiction over the cases. *See State v. Dalling*, 911 P.2d 1115, 1116-17 (Idaho 1996). The Court could not find underlying facts in the record about the grand jury's term to address this ineffective assistance of appellate counsel claim. Therefore, the Court will permit the parties to brief this issue in the next stage of proceedings.

### F. *Failing to Appeal Speedy Trial Issue*

Petitioner was arrested in August 2006. His jury trial began January 7, 2008— almost a year and a half after arrest. Petitioner asserts that his federal constitutional right to a speedy trial was violated, and that Benjamin was ineffective for failing to include this issue in the direct appeal.

The right to a speedy trial is a fundamental right protected by the Fourteenth Amendment Due Process Clause. *Kloper v. North Carolina*, 386 U.S. 213 (1967). To prevail on a speedy trial claim, a petitioner must show that he "suffered actual, non-speculative prejudice" and that the length of the delay, when balanced against the prosecution's reasons for the delay, "offends ... fundamental conceptions of justice." *United States v. Sherlock*, 962 F.2d 1349, 1353-54 (9th Cir.1992) (relying on *U.S. v. Lovasco*, 431 U.S. 783, 789-90 (1977)).

The record reflects that Petitioner's trial was delayed many times because of *his own* requests for evidence, for appointment of counsel, or for assertion of the right to self-representation. Petitioner's trial was set for May 7, 2007. On March 2, 2007, Petitioner asked for a continuance of the trial to make further preparations; on March 23,

the court heard the motion, and the State objected to moving the trial date. The court did not vacate the May 7 trial date, but set a status conference for April 13. (State's Lodging A-4, pp. 1-12.)

On April 13, 2007, the court entertained Petitioner's motion for a trial continuance. Petitioner expressly waived the speedy trial rule, and the court re-set the jury trial from May 7, 2007, to June 25, 2007. Petitioner also stated that no one had made any promises or threats to him to waive his speedy trial rights. (*Id.*, pp. 52-56.)

On June 1, 2007, the court entertained a motion from Petitioner to vacate the new trial date based on his limited time allowed in the prison legal resource center and his contention that he had not received full discovery from the State yet. The court continued the trial to September 17, 2007. (*Id.*, pp. 65-78.)

On August 24, 2007, Petitioner again asked to have the trial vacated, because he had sent out FOIA requests, and the responses were not due until after the trial date. (State's Lodging A-4, p. 112.) Petitioner admitted on that date: "It's my understanding that I have previously waived my motion for a speedy trial with regards to the motion to vacate." (*Id.*, p. 145.) At that time, the prosecution argued:

> [W]e oppose the motion to vacate the trial....[B]y the time the trial date comes around in about three or four weeks from now, the defendant will have been in custody for more than a year, and it's been about ten months, nine-and-a-half or ten months since the defendant entered a not guilty plea. Nine months, I guess. And the state has a right to a speedy trial, as well.

(State's Lodging A-4, p. 150.) At that point, the Court ruled that the trial would remain set for September 17, 2007. (*Id.*, p. 151.)

However, on September 17, the day of trial, Petitioner, who had been proceeding pro se, re-engaged counsel and no longer wanted to represent himself. Therefore, the Court continued the trial to January 7, 2008, when it was held.

The law is clear that there is no speedy trial violation where the accused himself causes or seeks the delay. *See Vermont v. Brillon*, 556 U.S. 81, 92-95 (2009). That is the case here. An appeal of this issue would have been unsuccessful. This claim is without adequate factual basis and will be denied and dismissed with prejudice.

### G. *Failing to Appeal Prosecutor's Failure to Advise the Grand Jury of the Standard for Probable Cause*

Petitioner asserts that Benjamin should have appealed issues regarding the grand jury, particularly that the State did not advise the grand jury of the standard of law for a finding of probable cause. As explained above, when a petit jury hears and decides whether a defendant has committed a crime, what happened at the grand jury becomes moot, except in rare circumstances, such as allegations of racial discrimination. This issue would not have been successful on appeal; therefore, Benjamin was not deficient for failing to raise it, and no prejudice resulted. This subclaim will be denied and dismissed with prejudice.

### H. *Failing to Appeal the Quashing of Defense Subpoenas*

As discussed above, Petitioner has not brought forward sufficient evidence to show that the prosecutor and/or judge caused the Ada County Sheriff's Office to fail to serve some of Petitioner's local subpoenas. Nor has he shown that the witnesses for whom the subpoenas were quashed (child custody matter participants or his former attorneys) would have made a difference to his defense. No affidavits of witnesses' testimony are contained in the record. This claim would not have been successful on appeal. Accordingly, counsel was not deficient for failing to raise it, and no prejudice resulted from its omission. It will be denied on the merits and dismissed with prejudice.

### I. *Failure to Appeal Issue of Lateral Temporal Lobe Epilepsy Evidence*

Petitioner asserts that his appellate counsel should have appealed his trial counsel's ineffective performance when trial counsel told Petitioner that his "extremely abnormal EEGs and Lateral Temporal Lobe Epilepsy [were] not anything that could be admitted as a defense, or mitigation." (Dkt. 182, p. 12.) Petitioner has attached to his Amended Petition a copy of a "Mercy Hospital Electroencephalographic [EEG] Report" and medical notes of follow-up treatment. (Dkt. 182-2, pp. 6-7.) The report dates back to 1971, when Petitioner suffered a seizure when he was thirteen years old. The report shows that Petitioner apparently did not have additional seizures beyond his initial one, but that his EEG reports were "definitely abnormal," even after his seizures ceased. (Dkt. 182-2, pp. 6-7.)

Petitioner has not brought forward a medical expert opinion to connect the 1971 abnormal EEG report to the crimes committed when he was an adult, especially where Petitioner's chosen defense was that he was coerced by government agents to commit the crimes, not that he did so as a result of some organic abnormality of the brain. On this record, the Court agrees with Petitioner's trial counsel that the report is not anything that would have been admitted into evidence at trial. Therefore, trial counsel did not perform deficiently, and no prejudice resulted from exclusion of the report. Consequently, there was no deficient performance or prejudice on appellate counsel's part. This claim will be denied on the merits and dismissed with prejudice.

### J. *"Failure to Issue Unity Instruction in Grand Jury Indictment"*

Petitioner asserts that, because the State failed to give the grand jury a "unity instruction," his indictment is fatally flawed. As explained above, the procedural protections of the petit jury moot this grand jury claim. Benjamin was not deficient in omitting this claim from the appeal, and Petitioner suffered no prejudice by its omission. This subclaim will be denied and dismissed with prejudice.

Petitioner further argues that the two Boise robbery counts should not have been presented to the grand jury during the same proceeding, because one included an admission that he committed the robbery, and the other had no evidence of an admission. Again, grand jury proceeding claims are mooted by a petit jury trial. An appellate claim based on what happened at the grand jury would have been unsuccessful. This claims fails for lack

of deficient performance of appellate counsel and lack of prejudice. It will be denied on the merits and dismissed with prejudice.

## K. *Failing to Appeal Denial of Counsel at Arraignment*

Petitioner asserts that he was denied counsel at his arraignment. The record reflects that, on August 29, 2006, Petitioner attended an initial video arraignment, where he was appointed counsel (the Ada County Public Defender). Attorney J. Bublitz of that office appeared with him—albeit in the courtroom, while Petitioner was incarcerated. Petitioner's bond was set for $1,000,000, and his preliminary hearing was scheduled for September 12, 2006. (State's Lodging A-1, p. 22.) Petitioner has not provided adequate facts that he was constructively denied counsel at his arraignment simply because his counsel appeared in the courtroom and Petitioner appeared via video; thus, his appellate attorney could not have performed deficiently by omitting this claim. Therefore, the Court will deny this claim on the merits and dismiss it with prejudice.

## L. *Failing to Appeal "Quick and Speedy 72-hour Arraignment Rule"*

Petitioner asserts that he was arrested on August 11, 2006, but that was on Oregon charges. (State's Lodging J-1, p. 2.) Petitioner was arrested on the Idaho charges on August 28, 2006. (*See* State's Lodging A-1, p. 3.) On August 29, 2006, Petitioner attended an initial video arraignment. (State's Lodging A-1, pp. 3 & 22.) Petitioner has failed to provide facts showing that this claim has any support. It will be denied on the merits and dismissed with prejudice.

**M.** *Failing to Appeal a Confrontation Clause Claim based upon Detective Dave Smith's Unavailability*

As set forth above, the failure of Detective Smith to appear at trial rests on Petitioner's failure to properly subpoena him. Even if fault for the failure lies with the Ada County Sheriff for failing to serve Detective Smith, Petitioner has not shown that he had any testimony that would have aided Petitioner's defense. As noted above, his testimony most likely would have been damaging. Accordingly, Petitioner has not shown that Benjamin performed deficiently or that prejudice resulted from not having presented this claim to the appellate court. This subclaim will be denied on the merits and dismissed with prejudice.

**N.** *Failing to Appeal "State versus Federal Government Dual Charging System"*

This claim duplicates Claim 5, which the Court has denied on the merits. Therefore, counsel was not deficient for failing to raise this issue on appeal, and no prejudice resulted from its omission on appeal. This subclaim will be denied on the merits and dismissed with prejudice.

**Claim 12**

Claim 12 is that Idaho Criminal Rule 5.1(a) is unconstitutional, violating United States Constitution Amendments 1, 4, 5, 6, 8, and 14. Between 1999 and 2007, Idaho Criminal Rule 5.1(a) (2007) provided:

> (a) Preliminary Hearing. Unless indicted by a grand jury, a defendant, when charged in a complaint with any felony, is entitled to a preliminary hearing. If the defendant

waives the preliminary hearing, the magistrate shall forthwith file a written order in the district court holding the defendant to answer. If the defendant does not waive the preliminary hearing, the magistrate shall fix a time for the preliminary hearing to be held within a reasonable time, but in any event not later than fourteen (14) days following the defendant's initial appearance if the defendant is in custody and no later than twenty-one (21) days after the initial appearance if the defendant is not in custody. With the consent of the defendant and upon showing of good cause, taking into account the public interest and prompt disposition of criminal cases, time limits in this subsection may be extended. In the absence of such consent by the defendant, time limits may be extended only upon a showing that extraordinary circumstances exist, including disqualification of the magistrate by the defendant pursuant to Rule 25.

Petitioner argues that defendants who are indicted are entitled to a preliminary hearing, and to deny them that opportunity violates "equal protection, due process, comity, confrontation clause, privileges and immunities guaranteed [sic]." (Dkt. 182, p. 13.) In particular, Petitioner asserts that it is an equal protection violation to permit those who are indicted by a grand jury to be deprived of a preliminary hearing, and those charged by information to be entitled to a preliminary hearing. Setting aside the procedural default issue, the Court concludes that Petitioner's claim is without merit.

Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike" by governmental entities. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

As set forth in the background section of this Order, Petitioner's preliminary hearing was continued many times with Petitioner's express or implied consent. However, because Petitioner was later indicted, the timing of the preliminary hearing became moot.

A preliminary hearing and a grand jury proceeding both fulfill the same function of having a government actor find that there is probable cause for the defendant to stand trial on the particular charges against him or her. *State v. Edmonson*, 743 P.2d 459, 463-64 (Idaho 1987). Under the Idaho Constitution, a prosecutor may select either means to initiate a criminal proceeding. *See* Idaho Const., Art. 1 § 8; *Edmonson*, 743 P.2d at 464.

Yet, an equal protection claim can lie if a defendant can bring forth "evidence of a deliberate and intentional plan to discriminate." *Edmonson*, 743 P.2d at 464. Such evidence must show that the discriminatory plan was based on an "unjustifiable classification such as race, sex, religion, etc." *Id*. Petitioner has provided no factual allegations of a deliberate and intentional plan to discriminate against him, or that he fits within a suspect classification. Therefore, a strict scrutiny analysis does not apply.

Neither has Petitioner provided any facts under which he could proceed on a rational basis theory. Under a rational basis inquiry, to state an equal protection claim, Petitioner must state facts alleging that he is similarly situated to others and is being treated in a disparate manner, and that there is no rational basis for the disparate treatment. *More v. Farrier*, 984 F.2d 269, 271 (8th Cir. 1993). Those defendants charged by indictment are not similarly situated to those charged by information/preliminary

hearing, because an indictment has taken the place of the probable cause inquiry that would take place in a preliminary hearing.

Petitioner argues that the prosecution chose to have him indicted to avoid dismissal of the charges because Petitioner's preliminary hearing was not held in time when he was previously charged by mere information. However, Petitioner does not show how that translated into a federal constitutional violation, because the prosecution used one of two available (and constitutional) methods to show probable cause. There are insufficient facts in the record to show that the prosecution had any deliberate or intentional plan to discriminate against Petitioner, or, for that matter, that the prosecution caused the delays in holding a preliminary hearing.

In Idaho, the prosecutor is given discretion on how and when to charge an accused. There is no federal law supporting Petitioner's position that the prosecutor cannot use a grand jury indictment even though the criminal charge originally was filed as an information. The Idaho Supreme Court explained the lack of legal support for a theory such as Petitioner's in the *Edmonson* case:

> [T]he United States Supreme Court has held that a state's refusal to afford a criminal defendant a preliminary hearing does not violate the fourteenth amendment through the fifth amendment. *Lem Woon v. Oregon*, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed.2d 1340 (1913). In a slightly different context (whether a person arrested and held for trial is entitled to a judicial determination of probable cause for detention), the Supreme Court also has held the fourth amendment did not apply. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). As the Court stated *in Gerstein*:

> "The use of an informal procedure is justified
> not only by the lesser consequences of a
> probable cause determination but also by the
> nature of the determination itself. It does not
> require the fine resolution of conflicting
> evidence that a reasonable-doubt or even a
> preponderance standard demands, and
> credibility determinations are seldom crucial in
> deciding whether the evidence supports a
> reasonable belief in guilt. *See* F. Miller,
> *Prosecution: The Decision to Charge a Suspect
> with a Crime* 64–109 (1969). This is not to say
> that the confrontation and cross-examination
> might not enhance the reliability of probable
> cause determinations in some cases. In most
> cases, however, their value would be too slight
> to justify holding, as a matter of constitutional
> principle, that these formalities and safeguards
> designed for trial must also be employed in
> making the Fourth Amendment determination
> of probable cause." *Id*. at 121–122, 95 S.Ct. at
> 867 (footnotes omitted).

> Even an informal procedure in which an accused is not given
> the right to contest the state's evidence, or even put on his
> own evidence is not per se constitutionally infirm. *See Lem
> Woon*, *supra*; *Beck v. Washington*, 369 U.S. 541, 82 S.Ct.
> 955, 8 L.Ed.2d 98 (1962).

743 P.2d at 463.

For the reasons above, Claim 12 fails under any legal theory set forth in the

Amended Petition. The claim will be denied on the merits and dismissed with prejudice.

In addition, Petitioner also argues that Idaho Criminal Rule 5.1(a) violates the

Idaho Constitution. However, that is a non-cognizable state law claim that is subject to

dismissal for failure to state a federal claim upon which relief can be granted. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

**Claim 13**

Petitioner asserts that state actors unlawfully transferred him to an unknown offsite location for seven hours or more of interrogations without food, water, or a bathroom—all for the purpose of "coercing statements to get children's custody back." Petitioner alleges that this action violated his rights under Amendments 1 through 21. Regardless of whether this claim has been properly exhausted, it does not state a federal habeas corpus claim because coercion for the purpose of obtaining an advantage in a child custody matter is not remediable in a federal habeas corpus action.

To the extent that this issue has anything to do with the criminal matter, Petitioner had opportunity in state court to seek suppression of any of his statements on the basis of his physical condition when the trial court held a suppression hearing. Petitioner did not show that any condition amounted to coercion at the hearing. The interrogating officer testified that, regardless of Petitioner's physical condition, the officer observed him to be "lucid, coherent, and responsive to [his] questioning." (State's Lodging A-4, p. 225.) The state trial court's factual findings are entitled to deference regarding the suppression of evidence, and Petitioner has not met his burden to show otherwise. Finally, there is no indication that the prosecution ever intended to call Petitioner's children to testify against him at his criminal trial. Therefore, this claim will be denied on the merits and dismissed with prejudice.

**Claim 14**

Petitioner alleges that the state court judge "turned status conference for upcoming competency hearing into a sentencing hearing without 14 day notice, plea, trial, or competency hearing while [he] was pro se." (Dkt. 182, p. 16.) He alleges that this action violated his rights under Amendments 1 through 21. Petitioner refused to cooperate with mental health evaluators and told the trial court it should just sentence him right then— which the court did. (State's Lodging E-5, pp. 16-21.)

The sentencing process in a criminal case must satisfy the requirements of the Fourteenth Amendment's Due Process Clause. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). For example, the defendant is entitled to full disclosure of the presentence report. *Id*. at 359-60. A criminal sentence violates the defendant's due process rights if the sentencing proceedings are fundamentally unfair, such as where the defendant is not represented by counsel and it appears that the defendant was sentenced on the basis of assumptions about the defendant's criminal record which are materially untrue. *See Townsend v. Burke*, 334 U.S. 736, 740-41 (1948).

Because Petitioner refused to cooperate with appointment of experts in the re-sentencing phase, the Court simply reinstated the prior sentence on October 13, 2013. (State's Lodging E-4.) Petitioner's case is somewhat unique because he already had participated in a full sentencing hearing after trial, where he was afforded adequate due process, on April 28, 2008. (State's Lodging A-4, pp. 1179-1211.)  During the previous sentencing hearing, Petitioner's counsel, Jon Eric Sutton, had opportunity to see and

contest the full presentence report and attempt to correct any materially untrue portions of that report. (State's Lodging A-4, pp. 1180-83.) Sutton made a statement on Petitioner's behalf. Petitioner made an allocution statement.

Petitioner's assertion that he did not have 14 days' notice to prepare for the new sentencing hearing is a state law requirement, not a federal due process requirement. Because Petitioner (1) had due process protections at the prior hearing; (2) the sentencing court considered nothing new; (3) the same sentence as before was imposed; and (4) Petitioner himself requested that the Court sentence him that day, thus waiving advance notice and time to prepare, the reinstatement of the same sentence did not violate his federal due process rights. This claim will be denied and dismissed with prejudice.

Petitioner further asserts that he was denied a fee waiver and the right to appeal. (*Id.*) He does not specify the time frame or the case in which he denied a fee waiver. The record reflects that Petitioner has been able to pursue direct appeals and various post-conviction appellate actions related to his criminal convictions. Therefore, no constitutional violation related to fee waivers for paupers is apparent from the record.

Petitioner seems to have a habit of bringing the same claims repeatedly, even though he has completed the appeal processes afforded by the state of Idaho. It is unclear whether the Idaho courts have tried to prohibit Petitioner from repeat filings. The United States Supreme Court has explained that failing to grant in forma pauperis status in instances of frivolous filings is *not* contrary to the Constitution:

> [T]he Court waives filing fees and costs for indigent individuals in order to promote the interests of justice. The goal of fairly dispensing justice, however, is compromised when the Court is forced to devote its limited resources to the processing of repetitious and frivolous requests. Pro se petitioners have a greater capacity than most to disrupt the fair allocation of judicial resources because they are not subject to the financial considerations—filing fees and attorney's fees—that deter other litigants from filing frivolous petitions. *Id.*, at 184, 109 S.Ct., at 996. The risks of abuse are particularly acute with respect to applications for extraordinary relief, since such petitions are not subject to any time limitations and, theoretically, could be filed at any time without limitation. In order to prevent frivolous petitions for extraordinary relief from unsettling the fair administration of justice, the Court has a duty to deny in forma pauperis status to those individuals who have abused the system. Under the circumstances of this case, we find it appropriate to deny in forma pauperis status to petitioner in this and all future petitions for extraordinary relief.

*In re Sindram*, 498 U.S. 177, 180 (1991).

Because there are insufficient facts in the record to support a claim that Petitioner has been denied access to the courts as a pauper, this claim will be denied and dismissed with prejudice.

### Claim 15

Petitioner alleges that his speedy trial rights were violated because he was not brought to trial within six months from the date of arrest, information, or arraignment, under Idaho Code § 19-3501. This claim duplicates Claim 11(d), without the ineffective assistance of counsel overlay. It will be denied on the merits and dismissed with prejudice for the same underlying reasons.

**Claim 16**

Petitioner alleges that his counsel violated his rights under Amendments 1 through 21 by allowing "Sixth Amendment counsel violations, unconstitutional interrogations, denied preliminary, quick speedy, All defense [illegible], etc. (All other grounds) cumulative due diligence, allowed state to unlawfully imprison [sic]." (Dkt. 182, p. 17.) This claim is an incomprehensible conglomeration of subclaims. Petitioner was specifically ordered to set forth each claim separately. There are no supporting facts included in Petitioner's presentation of this claim, or any legal argument to show that the subclaims have merit. Each separate part of this claim that *is* addressable has been addressed herein. As discussed elsewhere herein, Petitioner has not shown that distinct constitutional errors occurred. Therefore, there are no errors to cumulate to support either a stand-alone federal constitutional claim or an ineffective assistance of counsel claim. This claim will be denied on the merits and dismissed with prejudice.

**Claim 17**

Claim 17 is that the trial court erred in reconvicting and resentencing Petitioner according to the original judgment because the Idaho Court of Appeals vacated the judgment of conviction and the Idaho Supreme Court did not reverse the Court of Appeals' vacation of the judgment. (Dkt. 182, p. 18.) This claim requires some background of the history of Petitioner's appeals. The Idaho Court of Appeals vacated the original judgment of conviction, instructing the trial court to hold a competency hearing and re-try Petitioner (if competent). (State's Lodging B-4.)  On remand, the trial court

determined that the Idaho Court of Appeals' opinion prohibited it from retroactively determining Petitioner's competence and set the case for a new trial. The State filed an interlocutory appeal to contest whether a retroactive determination was, in fact, prohibited. The Idaho Supreme Court disagreed with the Idaho Court of Appeals and determined that a retroactive competency hearing *was* permissible. As detailed above, after being unable to obtain the cooperation of Petitioner to hold a second competency hearing, the trial court resentenced Petitioner to the same sentence as before.

Petitioner argues that the Idaho Supreme Court's failure to address the vacation and the "law of the case" doctrine set by the Idaho Court of Appeals "ma[de] it impossible to simply reconvict and resentence Hawkins without a trial [or] plea." (Dkt. 182, p. 18.) He argues that, because the Idaho Supreme Court never "reversed" the Idaho Court of Appeals, it was wrong for the state district court to reinstate the judgment of conviction.

This is not a federal claim upon which relief can be granted, but, rather, an argument that the state courts applied state law incorrectly. In *Swarthout v. Cooke*, the United States Supreme Court reiterated that "'federal habeas corpus relief does not lie for errors of state law.'" 562 U.S. at 219, citing *Estelle v. McGuire,* 502 U.S. 62, 672d 385 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)). Rather, the habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) *(per curiam)*

(quoting 28 U.S.C. § 2254(a)). Accordingly, this claim will be denied for failure to state a federal claim upon which relief can be granted and dismissed with prejudice.

Petitioner alternatively classifies this claim as judicial corruption and abuse of power. He asserts that he was denied fair proceedings. There is no factual or federal basis for such a claim based on the succession of events involving his two remands. Construed in this manner, the claim will be denied on the merits and dismissed with prejudice.

**Claim 18**

Claim 18 is that the trial judge erred in not holding a competency hearing, as ordered by the Idaho Court of Appeals, resulting in a violation of Amendments 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19. After the first remand, the trial judge ordered that Petitioner would have a competency hearing. Petitioner alleges that, on October 17, 2013, the trial court did not follow its own order, or the Idaho Court of Appeals' order. Rather, without issuing another order, the Court changed the status conference for the competency hearing into a sentencing hearing without a 14-day advance notice, denying Petitioner's motion to appoint the psychological expert of Petitioner's choice, "even if Petitioner paid for it." (Dkt. 182, p. 19.)

The record reflects that, because the State prevailed on its interlocutory appeal before the Idaho Supreme Court, the trial court was not required to follow the Idaho Court of Appeals' prior opinion regarding the non-availability of a retroactive competency procedure. This claim—as a federal constitutional challenge to the trial court's implementation of Idaho state court system procedures—has no merit.

Petitioner's other subclaims—that the trial court erroneously held a sentencing hearing when Petitioner failed to yield his position that he was entitled to pick and pay for his own expert and that he was denied the expert of his choice—were addressed by the Idaho Supreme Court on appeal after the second remand. That court concluded:

> Hawkins' primary challenge to the district court's retroactive competency determination is based on the timing of the determination. As we have explained, the passage of time alone does not invalidate a retroactive competency determination. There was important evidence presented that mitigated the impact of the passage of time. The contemporaneous medical observations of Dr. Estess and his staff were important to the determination that Hawkins was competent in 2008. Likewise, Drs. Estess and Sombke were able to review the trial transcript when formulating their opinions.

> The district court attempted to give Hawkins a second chance to present evidence relating to his competency, but Hawkins failed take advantage of this opportunity due to his insistence on having Dr. Cloninger serve as his expert witness. The district court's extension of the opportunity for Hawkins to present additional evidence regarding his competency shows that the district court made every reasonable effort to develop a complete factual record upon which to make a meaningful competency determination. The district court relied on its earlier 2010 competency determination only after Hawkins left it with no alternative.

> The district court's competency finding was based upon substantial and competent evidence. The expert witnesses agreed that Hawkins was competent at the time of trial in 2008. The district court, as finder of fact, was entitled to rely on these opinions. For these reasons, we are unable to find error in the district court's decision that Hawkins was competent at the time of trial.

(State's Lodging F-9, p. 10.)

The Court will permit Petitioner to proceed to the merits of these subclaims, as Fourteenth Amendment due process claims only, in the merits briefing.[6] Petitioner may not proceed on any other legal ground for failure to show that any other ground was properly exhausted or that its procedural default should be excused.

**Claim 19**

Claim 19 is that the trial judge denied Hawkins a competency hearing when he was proceeding pro se. This claim has been properly exhausted and is not a subject of Respondent's Motion for Summary Dismissal.

**Claim 20**

Petitioner asserts that the trial court imposed "a sentence greater than necessary." (Dkt. 182, p. 24.) He cites federal criminal statutes, 18 U.S.C.§§ 924 and 3553, which do not apply to state convictions. He also cites 42 U.S.C. § 1983, 28 U.S.C. § 1367, and 28 U.S.C. § 1651(A)&(B)—civil rights statutes that also do not apply. He further relies upon the Equal Protection Clause and the Due Process Clause.

---

[6] Petitioner argues in his Supplemental Brief that the state district court should have recused itself because it considered its own observations of Petitioner during trial in making the competency determination. (Dkt. 231, p.8.) In its opinion, the Idaho Supreme Court stated: "We also find it significant that the same judge making the retroactive competency determination presided over the trial and had the opportunity to factor in his first-hand observations of Hawkins' condition at the time of trial and compare those observations with the testimony of the experts." State's Lodging F-1, p. 10. Therefore, if this issue was included in briefing before the Idaho Supreme Court, it may be included as an issue when the parties address this claim at the next stage of proceedings. If not, it is procedurally defaulted, and Petitioner must show cause and prejudice to proceed.

Even though Petitioner has cited various provisions of the United States Constitution, there is no constitutional right to have a sentence that is not "greater than necessary." To the extent that the claim can be construed as one that violates the Cruel and Unusual Punishment Clause of the Eighth Amendment, the claim fails on the merits. The United States Supreme Court has reviewed several harsh sentences and has not deemed any similar punishment cruel and unusual. In *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991), the Supreme Court upheld a Michigan court judgment sentencing the defendant to a statutory mandatory life sentence without the possibility of parole for possessing more than 650 grams of cocaine. In *Rummel v. Estelle*, 445 U.S. 263, 274 n.11 (1980), the Supreme Court did not disturb a sentence of life with the possibility of parole for a recidivist offender for the crimes of fraudulent use of a credit card to obtain $80 in goods and services, passing a forged check for $28.36, and obtaining $120.75 by false pretenses. In doing so, the Court cited as an example of a disproportionate sentence, "if a legislature made overtime parking a felony punishable by life imprisonment." *Id*.

In *Lockyer v. Andrade*, 538 U.S. 63 (2003), the Supreme Court held that two consecutive sentences of 25 years to life in prison for a "third strike" provision of state law for stealing $150 worth of videotapes did not violate the gross disproportionality principle and did not warrant habeas corpus relief. Finally, in *Ewing v. California*, 538 U.S. 11 (2003), a life sentence was affirmed where the defendant was convicted of felony grand theft for stealing three golf clubs, worth $399 apiece.

The crime of robbery "is punishable by imprisonment in the state prison not less than five (5) years, and the imprisonment may be extended to life." Idaho Code § 18-6503. Here, Petitioner's concurrent unified sentences of 30 years with a tail of indeterminate life for robbery is statutorily authorized and well within the reasonable range, under the de novo review standard. This claim fails on the merits and will be dismissed with prejudice.

**Claim 21**

Petitioner contends that the Idaho Supreme Court erred in its decision as to the "law of the case doctrine" by not following the Idaho Court of Appeals' decision on the second remand. The United States Supreme Court has explained that the law of the case doctrine applies when a court is addressing "the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (emphasis added) (citation omitted). The Court is unaware of any case of precedent holding that a higher court's decision to consider whether a lower appellate court's decision contained unwarranted dictum violates either the "law of the case doctrine" or the Constitution. This claim has no legal basis and will be denied and dismissed with prejudice.

**Claim 22**

Petitioner argues that "Idaho violated Hawkins' constitutional, federally protected right by creating a unity, prejudicial joinder during a grand jury indictment" (verbatim). He alleges that this act violated his rights under Amendments 1 through 21. He explains

that the "coerced statement of admission to one count of robbery was merged in presentation with second count with no admission. This conferred guilt upon the second count, unfairly prejudicing Petitioner with a crime, charge, and conviction due to a violation creating prejudice." (Dkt. 182, p. 27.)

This claim duplicates Claim 8, without the ineffective assistance of counsel overlay. Because any grand jury proceeding errors of this type were mooted by the petit jury finding him guilty beyond a reasonable doubt, this claim is without merit and will be denied and dismissed with prejudice.

**Claim 23**

Petitioner articulates Claim 23 as "Incorporate the Ground into all grounds and all grounds into each other" (verbatim). (Dkt. 182, p. 28.) He alleges a violation of Amendments 1 through 21. Petitioner asserts that, due to the State's coercion, he made admissions to law enforcement officers just to get his children back.

To the extent that Petitioner asserts he was coerced by the State into confessing to the robberies, the state district court addressed the facts supporting that claim in the suppression hearing. On de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to them. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Petitioner has not come forward with admissible evidence showing that the state district court was incorrect in rejecting Petitioner's claim of coercion in his police interviews. Nor has he shown that he was not offered the opportunity to bring forward

evidence at the suppressions hearing, or that the fact-finding process was materially deficient.

Petitioner next asserts that the State knowingly argued known perjury. Petitioner argues that the record clearly proves that Darcy did know about Nigel and the CIA, and the State permitted its witnesses to testify contrarily. Petitioner has not clearly pointed out which statements of the prosecution in which proceedings amount to a knowing presentation of known perjury. It appears that Petitioner is referring to Dr. Estess' direct examination testimony at the competency hearing, and so that is what the Court will address.

In his Supplemental Brief, Petitioner complains that, at the competency hearing, Dr. Estess incorrectly testified that Petitioner regularly used a PVC pipe on his children, starved them, and made them do calisthenics at night. (State's Lodging C-2, p. 82.) Petitioner is correct in asserting that this seems to be, at the least, sloppy testimony, and at the most, untruthful. The source of this information seems to be Darcy's 2006 psychological evaluation with Dr. David DeLawyer, which was for the purpose of assessing her parenting abilities after Petitioner was arrested. Dr. DeLawyer's report supports Petitioner's position in that it shows Darcy said Petitioner "frequently would 'punish *her*' for what he considered to be 'misbehavior' on *her* part." (State's Lodging C-1, p. 150 (emphasis added).) The reported punishments Petitioner inflicted on his common-law wife included: "on one occasion he beat the back of her legs with a PVC pipe until they were bloody"; "he would make her do thousands of exercise repetitions

and would make her lie down in a cold stream for long periods of time"; and "at times he wouldn't allow her to eat and at other times would only allow her to eat white rice, sometimes for days at a time." (*Id.*)

While quite clearly incorrect (unless the State can point to a different Darcy Bervik interview that attributes these punishments to being inflicted on the children, not her), Dr. Estess' misstatements are irrelevant to the topic of whether Petitioner showed signs that he believed he was being controlled by government agents. The competency hearing was not focused on what kind of husband or father he was. Therefore, even if allowing these misstatements on direct examination amounts to prosecutorial misconduct, its effect at a bench hearing was minimal because of its minimal relevance to the issue of competency.

As to Darcy's knowledge of the government agents, the following colloquy occurred at the competency hearing:

> Prosecutor: Was there talk of Nigel and C.I.A. and things like that?
>
> Dr. Estess: No, nothing. There was nothing that was – nothing that made her think at all that he was being controlled or that he even thought he was. You know, as things went forward, she – actually, I don't know what she knew or what she didn't know from the trial or how to participate.
>
> But, again, what was really interesting about her history was what wasn't there with regard to anything that might be interpreted as illogical, inappropriate, delusional, or anything like that.

> She saw him as not wanting to work and as
> being very controlling.

(State's Lodging C-2, p. 84.)

Comparing Dr. Estess' testimony to other written sources, the Court notes that, in Darcy's interview with FBI agent Scott Mace, Darcy said that Petitioner had mentioned the name "Kenny" about "15 years ago," and that she had heard Petitioner speak of Nigel, Mike, and Stephanie more recently, but she had never met them and did not know if any of these people actually existed. (State's Lodging G-20, p. 154.) Agent Mace asked Bervik "if she had attended a meeting with Kenny and Mike outside of Boise just prior to a bank robbery committed by Hawkins, and she said that she did not, and again pointed out that she had never actually seen or met any of the people in question." (*Id.*)

Detective Lori Rosebraugh reported that Darcy said Petitioner had told her "that he had worked for the federal government ... and about planes landing in fields around them to meet with him (Hawkins), and things like that." Darcy said "that really did happen." She also said, "there were several instances where she believed that people had been hanging around them." (State's Lodging G-20, p. 102.)

The Court notes that Dr. Estess' testimony is not focused on whether Darcy heard anything about the government agents *at all*, but whether she had heard anything about them that made her think *that he was being controlled* or that he *even thought* he was being controlled by them. The Court concludes that this testimony was a fair representation of what is contained in the record. It does not amount to prosecutorial

misconduct for the prosecutor to have presented it. Rather, this is material subject to interpretation to be tested on cross-examination.

For these reasons, Claim 23 will be denied on the merits and dismissed with prejudice.

### Claim 24

Claim 24 is that the Idaho Supreme Court violated the Rule of Mandate, an alleged violation of Petitioner's rights under Amendments 1 through 26. Petitioner argues that when a case is once decided and disposed of by decree as the law of the case, the issue decided in the case is considered finally settled.

This is a matter of state law. The Idaho Constitution and statutes provide that the Idaho Supreme Court is the highest judicial court with authority to interpret Idaho law. Accordingly, the Idaho Supreme Court most certainly can overturn any lower court, including the Idaho Court of Appeals.

Claim 24 fails to state a federal claim upon which relief can be granted; for the sake of argument, the Court also notes that it clearly fails under state law. This claim will be dismissed with prejudice for failure to state a federal claim upon which relief can be granted.

### Claim 25

Claim 25 is that Petitioner's state indictment was untimely under 28 U.S.C. § 1257. Petitioner argues that he was indicted thirteen months after the original charge by information, six months after arrest, and five months after arraignment. He asserts that

this timeline amounts to "preindictment delay," invalidating the indictment, verdict, and conviction. He asserts that he never waived his preliminary hearing or quick and speedy trial rights.

Title 28 U.S.C. § 1257 provides, in pertinent part, that the United States Supreme Court may review the decision of a state's highest court "where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution." Petitioner has not stated a claim under this federal statute because he is not asking the United States Supreme Court to review a state statute—he is asking the United States District Court to do so, and he has not identified a state statute that is repugnant to the Constitution.

This federal statute simply does not apply, and Petitioner has failed to state a claim upon which relief can be granted. This claim will be dismissed with prejudice.

**Claim 26**

Claim 26 is a request for the "U.S. Court to take Judicial Notice of entire record in all state proceedings as [Hawkins] is denied All legal files to admit into record" (verbatim). This is not a claim upon which relief can be granted. This claim will be construed simply as a request for the Court to take judicial notice of the record in this habeas corpus action. The Court has done so, to the extent it has been lodged by the parties. Claim 26 fails to state a claim upon which relief can be granted and will be dismissed with prejudice.

**Claim 27**

Claim 27 is that a "Pro se litigant must have Testamentary Capacity, a disposing sound mind, a testators capacity. State denied this by denying a competency hearing." (Verbatim). This claim has been properly exhausted as a Fourteenth Amendment due process claim, and is not the subject of the present motion.

To the extent that Petitioner has alleged that this action violated his rights under any other constitutional provisions, such claims are procedurally defaulted. Nevertheless, going to the merits of these claims, the Court concludes that Petitioner has failed to provide adequate factual and legal support, and, thus, all of Claim 27's subclaims other than the Fourteenth Amendment due process claim will be dismissed with prejudice for failure to state a claim upon which relief can be granted.

**Claim 28**

Petitioner alleges that the trial court's "failure to sua sponte a competency hearing at time of trial was a due process violation that a retroactive competency hearing cannot cure 34 months later" (verbatim). This claim has been properly exhausted as a Fourteenth Amendment due process claim, and is not the subject of the present motion. To the extent that Petitioner has alleged that this action violated his rights under any other constitutional provision, such claims are procedurally defaulted.

Further, addressing the merits of these subclaims, the Court concludes that Petitioner has failed to provide factual and legal support, and, thus, they will be dismissed

with prejudice for failure to state a claim upon which relief can be granted (with the exception of the Fourteenth Amendment due process claim).

**Claim 29**

Petitioner contends that the "State denied Hawkins a competency hearing for 3½ years while it had him proceed pro se" (verbatim). (Dkt. 182, p. 31.) He asserts that he did not have "representative capacity," meaning that he did not have the mental ability to understand the nature and effects of his acts. (*Id*.) This claim has been properly exhausted as a Fourteenth Amendment due process claim, and is not the subject of the present motion.

To the extent that Petitioner has alleged that this action violated his rights under other constitutional provisions, such subclaims are procedurally defaulted. Going to the merits of these claims, the Court concludes that Petitioner has failed to make an adequate legal argument, supported by adequate facts. Thus, these subclaims (with the exception of Fourteenth Amendment due process claims) will be dismissed with prejudice for failure to state a claim upon which relief can be granted.

**Claim 30**

Petitioner alleges that his constitutional rights under Amendments 1 through 21 were violated when the trial court refused to permit him to introduce the "Carlos Zaragoza evidence." He asserts that Judge McLauglin had "pre-knowledge" of Zaragoza, and that the judge committed judicial misconduct, blocked the evidence, was unfairly prejudicial, and denied full confrontation and testimony. (Dkt. 182-1, p. 1.)

On re-direct examination when Defendant was asking himself questions, the following colloquy occurred:

> (Petitioner): Was there any other subsequent investigation regarding the phone calls coming up with a name of Carlos Zaragoza?
>
> Petitioner: Yes.
>
> (Petitioner): And what was the substance of that investigation?
>
> Mr. Bourne: Objection. Relevance.
>
> The Court: Sustained. It's beyond the scope of cross. Next question.

(State's Lodging A-4, pp. 1031-32.)

Petitioner has provided no facts to support his contention that the judge acted wrongfully in not permitting Petitioner to introduce a new topic during re-direct—the scope of which is determined by the scope of cross-examination. Neither has Petitioner shown that his defense was prejudiced by the exclusion of the Carlos Zaragoza evidence, because it remains a mystery who Zaragoza was and why this information was relevant to the defense. For these reasons, Claim 30 will be denied on the merits and dismissed with prejudice.

**Claim 31**

Claim 31 is that the State failed to advise the grand jury of the probable cause standard, making the jury's finding unconstitutional as they were not given the required standard in which to find guilt or innocence, especially given Detective Smith's

testimony about his interview with Petitioner. This claim is a duplicate of Claim 8. It will be denied on the merits and dismissed with prejudice for the same reason.

Petitioner also includes in Claim 31 various other subclaims: "ineffective assistance provided by state," "denied pro se filings," and denial of a motion to dismiss the indictment. To the extent that this claim asserts constitutional violations that are not addressed elsewhere in this Order, Petitioner has not presented sufficient facts and legal grounds to show they have merit, and they are too vague to state a federal claim upon which relief can be granted. Claim 31 will be denied on the merits and dismissed with prejudice.

**Claim 32**

Claim 32 is failure of the State to "provide a comparative sentencing structure." (Dkt. 182-1, p. 2.) Petitioner alleges that the state of Idaho has violated his equal protection rights by failing to compare the sentences given between cases, between like crimes, and between disparate crimes like murder and robbery. For example, a manslaughter charge carries a maximum sentence of ten years, while a robbery (where no one was hurt) carries a maximum sentence of life.

These allegations fail to state a claim upon which relief can be granted. There is no constitutional right to a comparative sentencing structure. As discussed above, Petitioner's sentence does not violate the Eighth Amendment's Cruel and Unusual Punishment Clause.  This claim fails under the Fourteenth Amendment's Equal Protection Clause because Petitioner has not shown that he was similarly situated to any other

robbery convict. Instead, he compares his sentence to persons who committed dissimilar crimes—murder and rape.

In his Supplemental Brief, Petitioner points to *State v. Hall*, 387 P.3d 81 (Idaho 2016), as a case of comparison, arguing that Mr. Hall received a sentence of fifteen years for murder. However, in that case, Mr. Hall shot his wife's lover during a confrontation with him. He was convicted of second degree murder, because it was a "heat of passion" homicide. Mr. Hall was sentenced to 17 fixed years, with 12 years indeterminate. *See State v. Hall*, 2015 WL 6159918 (Idaho Ct. App. 2015). The *Hall* case is not similar to Petitioner's in any way. "Heat of passion" that fuels a killing related to a spouse's extramarital affair is considered a mitigating factor in Idaho. *See* Idaho Code § 18-4012.

Petitioner also points to a robbery case as a point of comparison, *State v. Coleman*, 2012 WL 9435859 (Idaho Ct. App. 2012). In that case, Charles Coleman was sentenced to 6.5 years of incarceration, with 24.5 indeterminate. The Idaho Court of Appeals concluded that Mr. Coleman's sentence was not excessive, given the record before the sentencing court, but the court provided no insight into the factors behind the sentence. Neither has Petitioner provided any facts about Mr. Coleman's criminal background or his crime, such that the Court could compare Petitioner's background and crime to Mr. Coleman's. Petitioner has not stated an equal protection claim with any of his comparisons.

Finally, Petitioner argues that "[i]ndigent defendants using Ada County Public Defenders receive sentences as much as 10 times as long as defendants who are

represented by paid counsel." (Dkt. 231, p. 3.) Petitioner offers no facts to support this claim, but cites to the ongoing class action case, *Tucker, et al., v. State of Idaho, et al.*, discussed in conjunction with Claim 34 below. An equal protection claim cannot be maintained without particular facts. Based on all of the foregoing, Claim 32 fails on the merits, and it will be dismissed with prejudice.

**Claim 33**

Petitioner alleges that the Ada County Defenders and the state of Idaho failed to provide him with constitutionally adequate representation. He asserts that his rights were violated under Amendments 1 through 21 in the following ways. (Dkt. 182-1, p. 3.)

The following subclaims have been addressed elsewhere in this Order and are dismissed as being duplicate claims: preliminary hearing issues, speedy trial issues, denial of a speedy trial, denial of all witnesses, invalid indictment, competency hearing issues, and conviction under an invalid indictment.

The following subclaims are too vague to state a claim: unfair trial, ineffective cross-examination, unlawful imprisonment. These claims will be dismissed for failure to state a federal claim upon which relief can be granted.

The Court will permit Petitioner to show cause and prejudice for the default of his claim that trial counsel failed to request a competency hearing. This evidence should be presented with the merits briefing of the claims upon which he will be permitted to proceed.

**Claim 34**

Claim 34 echoes a common sentiment among many of Idaho's pretrial detainees and convicted felons—that the state of Idaho knowingly fails to provide meaningful effective legal representation to indigent citizens because the public defenders are overworked and have few resources for ancillary services system to mount an adequate criminal defense. In 2015, the American Civil Liberties Union initiated a class action lawsuit on behalf of Idaho's convicted felons that remains pending in the Idaho Supreme Court. *See Tucker, et al., v. State of Idaho, et al.*, Case No. CV-OC-2015-10240. However, as a federal habeas corpus claim in this particular case, Claim 34 fails for lack of specificity.

To prevail on such a clam, a petitioner first must show ineffective assistance of the particular public defenders who represented him. Then he must show that the program for providing indigents with legal representation in criminal cases caused the ineffective assistance. While it may be possible for Mr. Tucker, some class member in *Tucker*, or some individual petitioner to make this showing, Petitioner has not done so with his vague allegations. This claim will be denied on the merits and dismissed with prejudice.

**Claim 35**

Claim 35 is that attorneys with the Idaho Attorney General's Office "[a]rgued verbally and in writing a known fraud [and] falsified evidence." (Dkt. 182-1, p. 4.) Petitioner specifically identifies Lawrence Wasden, Lori Fleming, LaMont Anderson, and Greg Pantler—none of whom were prosecutors on the case, but all of whom worked for

the State on the appeals or post-conviction matters. (*See, e.g.*, Dkt. 141.) Petitioner asserts that the attorneys were aware of an FBI report and knew that Petitioner's common-law wife, Darcy, did not say what was argued by prosecutors Mr. Bourne and Ms. Bennetts. At trial, Ms. Bennetts argued that Petitioner changed his story about what happened when he told a detective that "Darcy encouraged the bank robberies because she spent a lot of money"; in addition, Ms. Bennetts referred to Petitioner's trial testimony that "Darcy talked Garrett [her adult son] into doing the robberies and she operated the police scanners." (State's Lodging A-4, p. 1097.)

Federal habeas corpus relief cannot be granted for claims made against the State's attorneys on appeal or on post-conviction review, because the claims do not directly challenge the criminal conviction. Claim 35 fails to state a claim upon which relief can be granted, and it will be dismissed with prejudice.

**Claim 36**

Claim 36 is that the Idaho Supreme Court violated constitutional law "when it err[ed], failed to follow the bright line decision in retroactive competence hearings, setting a cut off limit engaging due process." (State's Lodging 182-1, p. 5.) Petitioner asserts that the Idaho Supreme Court's ruling violated his federal constitutional rights under Amendments 1 through 21. This claim is properly exhausted as a Fourteenth Amendment due process claim only. It is procedurally defaulted under legal theories of any other constitutional provision.

Additionally, because Petitioner has provided no factual or legal basis for these additional theories, the claim will be dismissed for failure to state a claim upon which relief can be granted as to every theory except as a Fourteenth Amendment due process claim. He will proceed to the merits of the Fourteenth Amendment claim.

**Claim 37**

Claim 37 is that "Judge Bail denied Petitioner's right to self-representation, yet considered [him] fully competent." (State's Lodging 182-1, p. 5.) Judge Bail presided over the state post-conviction proceedings. Federal habeas corpus claims must arise from trial court proceedings or direct appeal, not from collateral review proceedings. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam) (holding that claims of error during state post-conviction proceedings are not cognizable on federal habeas review). This claim fails to state a federal claim upon which relief can be granted and will be dismissed with prejudice.

**Claim 38**

Claim 38 is that Attorney John Eric Sutton provided ineffective assistance of counsel, an alleged violation of Amendments 1 through 21, excluding 19. Sutton represented Petitioner in the competency hearing after remand. Petitioner asserts that Sutton (a) failed to adequately cross-examine state witness; (b) appeared in court with breath [that] was "abnormal, clearly under [the] influence of substance"; (c) promised to call a rebuttal witness that never testified; (d) failed to introduce even one document into evidence (e) gave the state "confidential client files that the state did not have"; and (e)

permitted hearsay evidence. (State's Lodging 182-1, p. 5.) Petitioner also newly asserts that Sutton had a conflict of interest and "sold him out" to keep in good graces with Roger Bourne over a personal matter. (Dkt. 231, p.8.)

This claim is procedurally defaulted. In addition, there is no basis for a legal theory other than as a Sixth Amendment ineffective assistance of counsel claim. Petitioner will be permitted to proceed on a Sixth Amendment legal theory only and must show cause and prejudice at the next stage of litigation.

**Claim 39**

Petitioner asserts that the Diagnostic and Statistical Manual (DSM-IV) "clearly refutes Dr. Estess' symptom that he testified to during competency hearing," establishing that Dr. Estess testified falsely. (Dkt. 182-1, p. 38.) Petitioner alleges that Dr. Estess and the prosecutor, Jan Bennetts, created known false testimony regarding published symptoms of illness and that the prosecutor knowingly solicited perjury.

Petitioner asserts that the Dr. Cloninger letter, Dr. Garrett, and the DSM-IV all prove that Dr. Estess' testimony was false. Petitioner argues that "DSM IVTR 297.1 Delusional Disorder clearly refutes Dr. Estess' symptoms that he testified to during competency hearing" on November 12, 2010. (*Id*.)

This claim is based upon the following brief email correspondence between Petitioner's parents and Dr. Cloninger:

> Dear Doctor: One doctor has diagnosed our son as delusional disorder, grandiose, persecutory. A second doctor says he disagrees because if he had the disorder it would be

constant in all conversations and would permeate all aspects of his life. Everyone would hear about his delusion. Is this true? The second doctor did not talk-test him-only the first doctor tested. I have the report if you would like to see it. We do not have a lot of money-but need help. We fear the court will be swayed by the second doctor. Could you tell me what the symptoms are? Do you have a book we could buy that covers this? Our son appears and functions very well most of the time but if questioned about certain aspects of his life, he has this bizarre story he believes and has had it for years. Short background-our son at 13 yrs was in a farm tractor accident where his head was struck and found unconscious, rushed to the hospital. He had two EEGs about a year apart-both came up abnormal as to the left temporal lobe. He has at least two more abnormal. I wonder if this is connected. I understand that you are a very busy important doctor. Very much appreciate whatever help you may see fit to give.

(State's Lodging G-20, p. 187 [spelling regularized].)

Dr. Cloninger responded via email:

Dear Mrs...

People with Delusional Disorder can have abnormal ideas on some topics and not others, so the opinion that you described for the second doctor is completely wrong. That is well-documented in the American Psychiatric Association's Psychiatric Diagnostic manual, called DSM-IV-TR so it is not a matter of personal opinion. I hope this helps.

Best Wishes,

Robert Cloninger, MD

(*Id.*)

After the Idaho Supreme Court remanded the case a second time, the Court gave Petitioner the opportunity to have an additional competency hearing. If the DSM-IV so "clearly refutes" Dr. Estess' testimony, as Petitioner asserts, then any psychiatrist should have been able to use it to refute Dr. Estess' testimony. However, Petitioner refused to

hire a local psychiatrist and insisted on Dr. Cloninger, who, as an out-of-state expert, would have been very expensive at public expense. The court refused to use public funds for Dr. Cloninger, but told Petitioner his counsel could pursue whether Petitioner's parents would pay for Dr. Cloninger, but that, if they could not, his counsel could select a substitute local psychiatrist. Petitioner, instead, chose to proceed to sentencing.

Comparing the DSM-IV, the correspondence of Petitioner's mother, the response by Dr. Cloninger, and the record of Dr. Estess' testimony, the Court finds that the record does not support a conclusion that Dr. Estess' testimony is knowingly false or that the prosecutor solicited perjured testimony. Dr. Cloninger made his brief email response based on a biased layperson's email synopsis of a psychiatrist's report—not based on a review of medical records and psychological tests, an interview with the patient, a review of the trial transcript, or even a review of Dr. Estess's report itself. As such, Dr. Cloninger's email message is speculative and of little value. This claim will be denied on the merits and dismissed with prejudice.[7]

**Claim 40**

Petitioner alleges that the state "unconstitutionally blocked [and] denied all defense witnesses at trial" by contacting the Ada County Sheriff and telling him to not

---

[7] Petitioner newly asserts in his Supplemental Brief that Dennis Benjamin said that Roger Bourne, the prosecutor, and Dr. Estess, the psychiatrist, "really hate [Petitioner]" and that Bourne intended to "falsely argue" against Petitioner. However, Petitioner did not provide this information in the form of an affidavit and has not specifically identified in the record false arguments made against him, except as discussed elsewhere in this Order. To the extent that these claims are not addressed elsewhere in this Order, they are speculative and procedurally defaulted and will be dismissed with prejudice.

serve defense subpoenas because they had been quashed," an alleged violation of Amendments 1 to 21. (Dkt. 182-1, p. 7.) This case duplicates Claim 11 above. Hence, it will be denied on the merits and dismissed with prejudice for the same reasons.

**Claim 41**

Petitioner asserts that he was denied a preliminary hearing. (*Id*.) As discussed above as to Claim 12, Petitioner was not entitled to a preliminary hearing because the indictment superseded the need for such a hearing. This claim will be denied on the merits and dismissed with prejudice.

**Claim 42**

Petitioner asserts that his children were unlawfully taken by the State and coerced to give statements. Petitioner also asserts that the prosecutor threatened to take Petitioner's children if he did not waive his preliminary hearing. When he refused, the prosecutor took the children. (Dkt. 182-1, p. 8.)

There is no support in the record for the allegations that the prosecutor had anything to do with the taking of the children by the State or the interviews of the children in connection with the State's determination of whether to place or continue them in foster care. Petitioner's preliminary hearing was continued several times for Petitioner's, not the prosecutor's, benefit. The hearing then became moot as a result of the indictment. There is no evidence in the record that the delay had anything to do with Petitioner's children.

The record does not support Petitioner's contention that the State had no grounds to place the children in foster care. Petitioner argues that the "St. Luke's evaluator found the children had been well-cared for and there was no abuse, danger, or neglect to report and no reason to take them." He does not cite to a place in the record where the St. Luke's medical records can be found. Therefore, the Court does not know what this record shows.

A psychological evaluation of Ms. Bervik, performed on October 23-24, 2006, in connection with the child custody case, concluded that the children had been neglected and abused and had not been provided proper physical care, medical care, education, or exercise (such that their daughter's legs had not developed normally because the family had lived in, and spent most of their time sitting in, a cargo van for two years). (State's Lodging C-1, pp. 143-59.)

A CARES case worker interviewed the couple's son on August 25, 2006, before he was placed into foster care. The son said that "the police fired two rounds of rubber bullets at his father during the standoff and that his father played a "trick" on police. (*Id.*, p. 154.) The son also said that "his father robbed several banks because 'he was in a tight spot and didn't have much money because of mom.'" (*Id.*) There is no evidence that this "statement" was "coerced"; no evidence that the criminal prosecution arm of the state was involved, rather than the child custody arm of the State; and no evidence that the child's statement was for the purpose of obtaining, or was used as, evidence in Petitioner's criminal case.

A stipulation entered in the children's custody case on October 10, 2006, provided that all parties acknowledged that "the children are neglected as they are without proper parental care and control, or subsistence, education, medical or other care and control necessary for their well-being," in particular, that their mother, Darcy Bervik, had involved them in a hostage situation in Oregon, resulting in a no-contact order between her and the children. Because Ms. Bervik had a no-contact order with the children, it followed that she was, at that time, unable "to provide proper parental care and control for the children." (Dkt. 182-3, pp. 1-2.) Therefore, while it is true that the children were in "State" custody while Petitioner was a pretrial detainee and before their mother regained custody of them, Petitioner has provided no evidence to show that the custody was not completely separate from the criminal proceedings and the prosecuting attorneys, or, for that matter, that State custody of the children was not warranted under the circumstances. This claim will be denied on the merits and dismissed with prejudice.

Petitioner also alleges that he was denied an appeal because the trial judge refused to sign a fee waiver to appeal. This subclaim is a duplicate of Claim 14 and will be dismissed as a duplicate claim.

**Claim 43**

Claim 43 is that this Court "unfairly discriminated" against Petitioner by waiting to rule upon his habeas petition and requiring that he "write a Comprehensive Amended [Petition] while being denied all legal files." (Dkt. 182, p. 9.)

Petitioner's claim is subject to summary dismissal. In neither a § 2241 nor § 2254 habeas corpus matter is the petitioner authorized to bring a cause of action against the federal district court that is adjudicating his petition. Petitioner already has brought numerous mandamus actions and appeals to contest the manner in which the federal district court has handled his filings in this matter—those are among the statutorily permissible ways to complain against the federal district court.[8] This claim is without merit and will be dismissed with prejudice for failure to state a habeas corpus claim upon which relief can be granted.

**Claim 44**

Petitioner asserts that the trial court and prosecutors "conspire[d] to block evidence and rulings to be placed on record so high courts [could] not review and be appealed" by sealing a hearing held on November 15, 2007. (Dkt. 182-1, p. 9.) Petitioner filed a motion to suppress and a motion to extend discovery on November 14, 2007 (State's Lodging A-1, p. 8), but the Court finds no evidence in the record that a hearing was held on November 15, 2007. If one had been held, then Petitioner or his attorneys would have proof of having been given notice of, and attended, the hearing.

This claim will be denied on the merits and dismissed with prejudice. Respondent is ordered to review the state court record and notify the Court and Petitioner of the

---

[8] Title 28 U.S.C. § 2241 permits the Court to exercise its discretion to require exhaustion of state court remedies and to apply the Rules Governing Section 2254 Cases to § 2241 habeas corpus cases. *See* Rule 1(b), Rules Governing Section 2254 Cases; *Carden v. State of Montana*, 626 F.2d 82, 83 (9th Cir. 1980) (in both a § 2254 and a § 2241 case, a petitioner must exhaust his state court remedies before coming to federal court in habeas corpus).

results of their review. If such a hearing was held, Respondent shall provide the transcript of the hearing, and the Court will reconsider this claim at that time.

Petitioner may be referring to a hearing held on November 2, 2007. At that time, Petitioner and both attorneys appeared for a hearing. After having requested representation by counsel, and having been assigned the public defender, Petitioner moved to have the public defender removed from the case and to represent himself. The trial court asked the prosecutor to step outside the room and said that it would seal the record—because Petitioner's disagreements with his counsel properly should be heard ex parte as an attorney-client privileged matter. (State's Lodging A-4, p. 159-77.)

The court stated: "We'll have the courtroom cleared ... at this time because we're going to have to take up some things that may pertain – we'll turn off the recording device, and Madam Court Reporter will keep a sealed record of this proceeding." (*Id.*, p. 159.)

The court then questioned defense counsel about Petitioner's allegations of his deficient performance, permitted Petitioner to respond, and proceeded through another *Faretta* colloquy to ensure that Petitioner was going to undertake self-representation knowing the potential consequences of that decision. (*Id.*, pp. 160-175.) Afterwards, the prosecution was called back in, and the court reported, "Mr. Bourne, I have determined that Mr. Odyssey was not – has not been deficient in his representation of Mr. Hawkins at this point. And Mr. Hawkins has elected to represent himself." (*Id.*, p. 175.) Another

similar ex parte sealed hearing was held on January 2, 2008. (*See* State's Lodging A-2, pp. 304-05.)

The sealed portions of the record was made part of the public record when the trial had concluded and the transcript was prepared for appeal. (State's Lodging A-2, pp. 304-05.) To the extent that Petitioner's claim is meant to challenge either of these ex parte hearings, it is denied on the merits and dismissed with prejudice.

Finally, Petitioner also asserted at the hearing that his trial counsel had not spoken to him in several months. Petitioner's counsel said he had not had time to read through all the material and needed an extension of time for discovery, which was unopposed by the prosecution. Petitioner's counsel said that, after he had reviewed the case, he had planned to meet with Petitioner. However, Petitioner argued that his attorney was deficient per se because he did not have time to work on the case. The court found no deficiency and no prejudice, and extended the time for discovery. Petitioner was given the choice to continue with the public defender or represent himself. Petitioner chose to represent himself. (State's Lodging A-4, pp. 159-66.) The court permitted Petitioner to proceed pro se and appointed the public defender as standby counsel again. (*Id*.) Petitioner has not set forth any particular prejudice that resulted from counsel's failure to speak with him at that point in time. Accordingly, this claim has no merit and will be dismissed with prejudice.

**Claim 45**

Claim 45 is that Petitioner was denied paralegal services, a law library, and his legal files to aid him in filing a federal habeas petition. (Dkt. 182-1, p. 10.) Such a claim might be helpful as a procedural argument in this matter, but it is not a cognizable habeas corpus claim that challenges Petitioner's state criminal conviction. This claim will be dismissed with prejudice for failure to state a federal habeas corpus claim upon which relief can be granted.

**Claim 46**

Petitioner asserts that the prosecutor committed misconduct in several different ways. First, Petitioner argues that denial of the preliminary hearing was prosecutorial misconduct. (Dkt. 182-1, p. 10.) As shown above, the preliminary hearing was mooted by the indictment, and the prosecutor had the discretion to do either. This claim will be denied and dismissed with prejudice.

Second, Petitioner alleges that the prosecutor solicited known coerced statements that were used before the grand jury. As discussed above, grand jury errors are mooted by the factfinding of the petit jury. Petitioner's claim that the prosecutor failed to give a "6.2 ICR advisory before Grand Jury" is also subject to denial and dismissal for the same reason.

Petitioner's claims of denial of his speedy trial rights, preventing service of defense subpoenas, and "criminally hiding evidence" by having the November 15, 2007

hearing "sealed" all duplicate separate claims in this Order. These claims will be denied on the merits and dismissed.

Petitioner's claims that the prosecution "merged 2 counts in presentation one with coerced statement," and "prejudicial joinder"—referring to grand jury proceedings—are mooted by the factfinding of the petit jury. They will be denied and dismissed with prejudice.

Petitioner also alleges that the prosecutor told the jury that Petitioner had burned Darcy with matches, which was a lie. (Dkt. 182-1, p. 11.) He correctly asserts that a physical examination of Darcy after the campground standoff showed there were no burns on her body. (*Id.*)

This subclaim is based on the following trial testimony. Under cross-examination, Petitioner admitted that he pushed, grabbed, and struck Darcy to prevent her from opening the camper door when campground law enforcement officer knocked. (State's Lodging A-4, p. 919.) Then Petitioner testified:

> Q.    You used force on her to keep her from opening the door?
>
> Court: It calls for a yes or no, sir.
>
> A.    Yes.
>
> Q.    Did the force involve matches?
>
> A.    No.
>
> Q.    Did the force involve matches on that evening?
>
> A.    No.
>
> Q.    Have you ever told Detective Rosebraugh something different than that?

| | | |
|---|---|---|
| A. | Yes. | |

A.    Yes.

Q.    What did you tell her?

A.    I stated that I used matches. I believe I said I threatened the use – threatened to use matches on her because she burned my butt.

Q.    All right. And so, you threatened to do it. Did you carry out your threats with her?

A.    No.

Q.    Did you tell Detective Rosebraugh something different than that?

A.    Yes, I did.

Q.    What did you tell her?

A.    That I did.

Q.    That you did what?

A.    I said that I used matches on her butt.

(State's Lodging A-4, pp. 920-21.)

The Court did not find a reference to Darcy being burned with matches in closing argument. The record does not support Petitioner's contention that the prosecutor lied to the jury by telling them that Petitioner had burned Darcy with matches. (Dkt. 182-1, p. 11.) Rather, the prosecution was attempting to show that Petitioner had not told the truth about many different facts related to the robberies, the stand-off, and his allegations of coercion by government officials. The prosecution, therefore, lawfully used Petitioner's prior statements against him during trial when his trial testimony did not match his prior statements. This subclaim will be denied on the merits and dismissed with prejudice.

Petitioner has not supported the subclaim that the prosecutor told Darcy "she would not get her children if she had any contact with [Hawkins]'" with any facts. This

claim fails to state a claim upon which relief can be granted and will be dismissed with prejudice.

Petitioner also alleges that the prosecutor "[s]olicited Dr. Estess to lie about symptoms of illness and Darcy's statements." This claim has been addressed as Claim 23, and this subclaim will be denied and dismissed with prejudice on the same grounds.

The following subclaims alleging prosecutorial misconduct are too vague to be actionable. For that reason, they will be dismissed with prejudice for failure to state a federal claim upon which relief can be granted: claims that the prosecution had hearsay evidence admitted at trial, lied to the district court and Idaho Supreme Court, and uploaded fraudulent statements to the internet.

Petitioner's subclaim that the prosecution "maliciously lied such that as of 2018 the state and Corizon den[ied] medical treatment" is not a challenge to his conviction or sentence. It is a civil rights claim that cannot be pursued in a federal habeas corpus matter. (Dkt. 182-1, p. 11.) This subclaim will be dismissed without prejudice.

**Claim 47**

Claim 47 is focused on the abnormal EEGs tests Petitioner had in his youth. This claim has the same factual basis as 11(I), without the ineffective assistance of appellate counsel overlay. For the same reasons, Petitioner has not shown that his trial counsel performed ineffectively by telling him that his "extremely abnormal EEGs and Lateral Temporal Lobe Epilepsy [were] not anything that could be admitted as a defense, or mitigation." This claim will be denied on the merits and dismissed with prejudice.

**Claim 48**

Claim 48 is that the trial court and prosecutors conspired to read "the juror books," which, Petitioner asserts, resulted in Juror 1 being excused during deliberations. By reading the juror's notes, Petitioner alleges, the trial court and prosecutors "learned that Juror 1 would vote not guilty and would not be swayed to vote guilty." Therefore, the argument goes, in final deliberations, Judge McLaughlin removed Juror 1 at the request of Prosecutors Bourne and Bennetts. (Dkt. 182-1, p. 13.)

There is no evidence in the record to support this claim. Rather, Juror 1 was the alternate juror and was excused prior to deliberation according to customary court practices. The trial court asked the clerk of court to use the selection process to determine who would be the alternate juror, and Juror 1 was selected. (State's Lodging A-4, pp. 1100-01.) Petitioner has no evidence of any illicit means by anyone to select the alternate juror. This claim will be denied on the merits and dismissed with prejudice.

**Claim 49**

Petitioner alleges that Judge McLaughlin used "his button to stop transcription of all words said in court." (Dkt. 182, p. 47.) Petitioner has not pointed to a place in the trial transcript where Judge McLaughlin pressed his button to stop the trial transcription "of all words said in court," nor has he identified the dates and times this allegedly happened.

Petitioner also alleges that, when he was handed the "Darcy Bervik stipulation," he was given a note that said she had failed and the children would be put up for adoption if he rebutted the prosecution's case or made a closing statement. (*Id*.) Petitioner has not

produced the note. He did not report existence of the note to law enforcement or the judge when he allegedly received the note.

Because Petitioner has provided no facts in the record to support these subclaims, Claim 49 will be denied on the merits and dismissed with prejudice.

**Claim 50**

Petitioner asserts that his "confession" to Detective Smith that was used during grand jury proceedings was "coerced and inadmissible" because he was under the influence and "sleep deprived, and "requested a lawyer numerous times." (Dkt. 182-1, p. 14.) This claim duplicates Claim 11(C), without the ineffective assistance of counsel overlay, and it will be denied on the merits and dismissed with prejudice on the same underlying grounds.

**Claim 51**

Petitioner asserts that his constitutional rights were violated because he could be sentenced to life imprisonment only by a jury, rather than a judge. (Dkt. 182-1, p. 14.) This assertion is unsupported in the law. Only a jury may find facts that makes the defendant death eligible, but a judge may sentence a defendant to any other sentence so long as it does not require an additional finding of fact that operates as "the functional element of a greater offense." *See Ring v. Arizona*, 536 U.S. 584, 608-09 (2002). In Idaho, a judge may sentence a convicted felon to life imprisonment where the statute of conviction permits that sentence. Petitioner's does. The crime of robbery "is punishment by imprisonment in the state prison not less than five (5) years, and the imprisonment

may be extended to life." Idaho Code § 18-6503. No additional finding of fact is specified for a sentence of life imprisonment. Therefore, this claim is without merit and will be dismissed with prejudice.

**Claim 52**

Claim 52 alleges "prosecutorial vindictiveness," violating Petitioner's rights under Amendments 1 through 21. (Dkt. 182-1, p. 15.) Petitioner lists of variety of factual grounds underlying this claim. The following grounds have been addressed separately above and will be dismissed as duplicate claims: (a) denial of preliminary hearing; (b) illegally taking Petitioner's children, (c) lying to the jury that the state did not take Petitioner's children, (d) denial of a quick and speedy trial, (e) prosecuting Petitioner in state court as opposed to federal court so that Petitioner could be given a life sentence, (f) use of ICR 5.1 (preliminary hearing) and ICR 6.2 (transcript of grand jury proceedings); (g) arguing known false testimony; (h) prosecuting him in state as opposed to federal court; and (i) arguing false testimony.

The remaining subclaims alleging prosecutorial misconduct are too vague to be actionable. For that reason, they will be dismissed for failure to state a federal claim upon which relief can be granted: claims that the prosecutor falsified discovery responses, gave those false responses and information to state witnesses, and falsified reports.

**Claim 53**

Claim 53 is that the trial court failed to give Petitioner an adequate colloquy as required by *Faretta v. California*, 422 U.S. 806 (1975), before he waived his right to

counsel and chose to represent himself. A court does not need to follow a particular script when conducting a *Faretta* hearing, but it must ensure that the defendant "understands (1) the nature of the charges against him, (2) the possible penalties, and (3) the dangers and disadvantages of self-representation." *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004) (internal quotation marks and citation omitted). If the court ensures that the defendant understands these three factors, then a waiver is deemed "knowing and intelligent." *Faretta*, 422 U.S. at 835.

Petitioner had several *Faretta* discussions in person with the court over the course of his state criminal proceedings. On February 9, 2007, the day of Petitioner's arraignment, his counsel, Ada County Public Defender Edward Odyssey, notified the court that Petitioner wanted to proceed pro se. (State's Lodging A-3, p. 1.) The court notified Petitioner: "I have to make a determination that your decision to represent yourself, that you do so understanding the advantages of having a lawyer, the disadvantages of representing yourself, making sure you're competent to make that decision." (*Id.*, p. 3.) Because Petitioner admitted he was unhappy with Mr. Odyssey, the court asked him if he would proceed with a lawyer if he had a competent and diligent one to represent him. Petitioner responded that, even in that instance, he still would choose to represent himself. (*Id.*, pp. 3-4.)

The *Faretta* colloquy was based on a standard form the judge used for that particular purpose. It included the following discussion items: that Petitioner understood he had a right to a lawyer; and he understood a lawyer has experience and knowledge of

the entire trial process, can question witnesses for him, present evidence for him, question potential jurors, help him understand which jurors could be in his best interest or not in his best interest, advise him of the harm and consequences of what to say in court and what you have a right not to say in court, object to improper questions according to the law, argue for his side during the whole trial, present the best legal argument in his defense, and enter into negotiations with the State freely and without restrictions. (*Id*., pp. 5-6.)

The trial court explained that, if he entered into negotiations with the State, it "can be problematic because you're a defendant and they have a constitutional duty in some areas where they can't, necessarily, maybe even communicate with you." (*Id*., p. 7.) The court explained it cannot give him "any special treatment" because he is representing himself, that he has to "follow all of the procedural and substantive rules of criminal law which it took lawyers years to learn and abide by," that he will be limited to the resources he has available to him in custody, and that "a lawyer doesn't have those restrictions as far as researching your defense and contacting people and preparing a case for trial." For example, the court, told Petitioner, "your access to the state's attorney will be severely reduced as compared to a lawyer who can easily contact the state's attorney." (*Id*., pp. 6-8.)

Petitioner was warned that the State would not go easier on him because he is pro se; that it would present its prosecution of the case with an experienced, knowledgeable lawyer; that if Petitioner became disruptive at trial, the trial could continue without his

presence; that he may be prohibited from contacting the victim or other witnesses because of no-contact orders, making it difficult to prepare for trial; and that he could not claim his own incompetence at presenting his defense if he was convicted. (*Id.*, pp. 8-9.)

The court reminded Petitioner that he had received a copy of the indictment on January 12 during his arraignment. Petitioner stated that he "must have" received it, and that he did understand the charges against him. The court specified that he was facing two counts of robbery, with a potential penalty of life in prison, a $50,000 fine, or both, and that "those could be made consecutive or stacked on top of each other." If convicted, the court warned, he would have a permanent criminal record and may have to report to a parole or probation officer, and that those options were not guaranteed. (*Id.*, pp. 9-10.)

The court then went over Petitioner's personal qualifications and competency to represent himself. Petitioner testified that he was able to read, write, and understand the English language, and that he had completed two years of college. He testified that no one threatened him if he did use a lawyer, and that he knew he could have a lawyer appointed for him free of charge. He stated that he had represented himself in his child custody matters because he did not approve of the attorney representation. (*Id.*, pp. 11-13.)

Petitioner stated that he had never been diagnosed with or treated for a mental illness. Petitioner testified that he understood the risk, the danger, and the disadvantages that could come to him from representing himself. (*Id.*, pp. 13-14.) The Court then asked

Petitioner if he would object to having an appointment of standby counsel made for him, and Petitioner said he would accept that. (*Id*., p. 14.)

The court made these findings:

> I'll find that Mr. Hawkins has demonstrated to the court that his decision regarding the representation of himself, that it's been freely, voluntarily, knowingly made; that he understands both the advantages and disadvantages of his decision; that it is his independent decision and not one based upon at least current counsel's representation, or for that matter representation in this case by other public defenders on these charges that is the basis for his decision. It's his decision to represent himself.

(*Id*, p. 15.)

On March 2, 2007, the court received another motion to continue the trial from Petitioner. (State's Lodging A-4, p. 1.) The court did not vacate the May 7 trial date, but set a status conference for April 13. (State's Lodging A-4, pp. 1-12.) On April 13, 2007, the court re-set the jury trial from May 7, 2007, to June 25, 2007, at Petitioner's request. (*Id*., pp. 52-56.) On June 1, 2007, the court continued the trial to September 17, 2007, again at Petitioner's request. (*Id*., pp. 65-78.) On August 24, 2007, Petitioner asked to have the trial vacated, the Court ruled that the trial would remain set for September 17, 2007. (State's Lodging A-4, p. 112, 151.)

However, on September 17, Petitioner, who had been proceeding pro se, reported to the court that he wanted to re-engage counsel and did not want to continue to represent himself. Therefore, the Court reappointed the public defender and continued the trial. (State's Lodging A-1, -p. 98.) On October 5, 2007, the court re-set the hearing to January

7, 2008. On October 26, 2007, the court received a motion from Petitioner to remove the public defender as his counsel of record. (State's Lodging A-4, p. 157.)

On November 2, 2007, the court took up Petitioner's request to have the public defender removed from the case and to represent himself pro se. The trial court asked the prosecutor to step outside the room and said that it would seal the record—because Petitioner's disagreements with his counsel properly could be heard ex parte as an attorney-client privileged matter. (State's Lodging A-4, p. 159-77.)

The court then questioned counsel about Petitioner's allegations of deficient performance and permitted Petitioner to respond. (*Id*., pp. 160-175.) Petitioner complained that Mr. Odyssey had not met with him and told him he was too busy to work on his case. The court explained that the trial was still months away, and Mr. Odyssey would be granted an extension of time to complete discovery. The court found that Mr. Odyssey had not been deficient, and gave Petitioner the choice to continue with Mr. Odyssey as his counsel or represent himself. (*Id*., pp. 162-64.) Petitioner chose to represent himself. (*Id*., p. 165.)

The trial court prefaced the *Faretta* colloquy with, "Mr. Hawkins, I think this will be about the fourth time I have gone through these issues, but it's important that we communicate on these." (*Id*., p. 165.) The trial court reminded Petitioner that he had been given a pro se or self-representation outline of procedures. Petitioner agreed that he had received and reviewed it. (State's Lodging A-4, p 158.) The court used the same standard set of questions it had used earlier in the case and proceeded through another *Faretta*

colloquy to ensure that Petitioner was going to undertake self-representation knowing the potential consequences of that decision. (*Id.*, pp. 160-175.) This colloquy covered all three of the *Faretta* points, and the court found that Petitioner's decision to represent himself was made freely, voluntarily, and knowingly. (*Id.*, pp. 166-174.)

Petitioner represented himself throughout trial, with the help of Mr. Odyssey, his standby counsel. On January 11, 2008, the jury found Petitioner guilty of both counts of robbery. (State's Lodging A-1, p. 197.)

On the same day of his conviction, Petitioner requested appointment of counsel for sentencing, which the court granted. (State's Lodging A-4, p. 1110.) Later, Petitioner again asked to proceed pro se. The court did not permit Petitioner to represent himself because he had filed the motion during trial alleging that he was mentally incapacitated and delusional. (*Id.*, p. 1115-17.) Petitioner declined to meet with the psychologist who was appointed to do an evaluation of him. Because Petitioner asserted his Fifth Amendment right not to meet with the psychologist, the evaluation was withdrawn. (*Id.*, p. 1137.) Petitioner filed a motion for a new trial, a motion for mistrial, a motion to strike the verdict, a motion to dismiss the case, and a motion to remove counsel and proceed pro so. (*Id.*, p. 1136.)

On March 13, 2008, the court addressed Petitioner's new motion to represent himself. The court conducted another *Faretta* colloquy with Petitioner. (State's Lodging A-4, pp. 1139-41, 1145.) The court said:

> Okay. We'll have to spend a moment to go through this decision for the fourth time. I've shared with you on a number of occasions the advantages of having appointed counsel represent you, the disadvantages of representing yourself, and a third phase that the court goes through is to make sure your decision is made — that you're competent to make the decision.

(*Id.*, pp. 1139-40.)

In response to the court's questions, Petitioner testified that he was not on a medication for a mental illness, that he was not contending that he suffered from a mental illness, that no professional had ever told him he suffered from a mental illness, that he was not under the influence of drugs or alcohol, that no one told him not to use a lawyer, and that no one threatened him if he were to use a lawyer. (*Id.*, pp. 141-44.)

The court then proceeded with a shortened version of the previous two colloquies:

> Q.   I don't think that – we have gone over the advantages of having a lawyer, the disadvantages, Mr. Hawkins. We have gone over them, I think, three or four times. Do you recall those discussions we have had before? Did you want me to go over those again? I'll certainly do it for you.
>
> A.   I don't think we need to – we have went over it before [sic]. We don't need to do it again.
>
> Q.   Okay. The important thing is that you understand that there are advantages to having counsel represent you. There are certainly disadvantages to representing yourself. You have indicated to me that you recall those discussions we have had before and understand them. And, again, no one has made any promises or threats to you to have you proceed today without the assistance of counsel. Is that a correct statement?
>
> A.   That's a correct statement.
>
> Q.   All right.

(*Id*., pp. 1145-56.)

Petitioner also stated that he understood that the public defender (at that time, Craig Stevely) could continue to represent him free of charge. Petitioner opted to represent himself, but wanted to put off arguing his motions until he received the trial transcript. The court said it would not order a transcript before hearing the motions, and it gave him the option to have Mr. Stevely argue the motions or argue the motions himself that day. After consulting with Mr. Stevely (who disclosed that he was going to concede that the motions were without merit), Petitioner chose to represent himself. (*Id*., pp. 1141-46.)

Before the motions were argued, the prosecutor asked the court, and the court responded as follows, to wrap up the *Faretta* portion of the hearing:

> (Prosecutor): Is the court satisfied that the record is clear that the defendant is competent today; he is not under the influence of anything and under the influence of a doctor's care; and that he clearly understands the advantages and disadvantages of representing himself?

> (Court): Based upon the totality of the information that the court has received today and considering, also, our past conferences on this issue, the court will make that finding: that Mr. Hawkins has freely and voluntarily chosen to represent himself; that he's competent to make that decision; that he understands the advantages of counsel; the disadvantages of representing himself; that he is competent to make that decision.

(State's Lodging A-4, pp. 1146.47.)

Based upon all of the foregoing, the Court concludes that each *Faretta* hearing was conducted in accordance with clearly-established federal law. During the last colloquy, which was after conviction and before sentencing, the trial court did not review the possible sentence he could receive; however, the court had gone over that twice before in the two prior *Faretta* hearings, which was sufficient.

In addition, Petitioner represented himself only for the motion argument; he again permitted the court to appoint the public defender for him for the pre-sentencing and sentencing portion of proceedings. (See State's Lodging A-4, pp. 1176-77.) Therefore, even if the *Faretta* hearing was deficient, it was not structural error or harmful error because Petitioner's representation of himself lasted only for the duration of one motions hearing, and his counsel would have conceded the meritlessness of the motions. *See, e.g., Washington v. Recueno*, 548 U.S. 212, 217-22 (2006) (explaining structural error and harmless error). This claim will be denied and dismissed with prejudice.

### Claim 54

Claim 54 complains of a disproportionate sentence. (Dkt. 182-1, p. 16.) This claim duplicates Claim 20 and will be denied on the merits and dismissed with prejudice for the same reasons.

### Claim 55

Claim 55 is that the "State's habitual violation of procedure, law, rules, their very act of criminally failing to perform their duty, waives any procedural defenses, as it is their action that violated procedures." (*Id.*) This appears to be an argument to excuse the

procedural default of his claims in federal court, rather than an independent constitutional claim. Petitioner cannot excuse the procedural default of his claims based on this vague statement. He has been given the standards of law to show cause and prejudice. He has made no appropriate cause and prejudice argument to excuse any of his claims. Because this is not a cognizable habeas corpus claim, Claim 55 will be dismissed with prejudice for failure to state a federal claim upon which relief can be granted.

**Claim 56**

Claim 56 is that Idaho violates *Furman v. Georgia*, 408 U.S. 238 (1972), because "it is open and arbitrary in charging and sentencing." (Dkt. 182-1, p. 17.) *Furman* held that imposition of the death penalty in rape cases constituted cruel and unusual punishment in violation of Eighth and Fourteenth Amendments. *Furman* does not particularly apply to Petitioner's robbery convictions. The Court considers this a duplicate of his claim that his sentence is constitutionally excessive. For the reasons set forth above, this claim is denied on the merits and dismissed with prejudice.

**Omission of Claim 57**

Petitioner has failed to provide any claim under Ground 57.

**Claim 58**

In Claim 58, Petitioner incorporates all of his other claims into a cumulative error claim. (Dkt. 182-1, p. 19.) Because Petitioner's claims that are subject to dismissal on procedural default grounds are also subject to dismissal for either failure to state a federal claim upon which relief can be granted or for lack of merit, the cumulation of such claims

does not equal a meritorious claim. Petitioner's claims that are properly exhausted will be determined at the next stage of litigation, and a few will proceed to the cause and prejudice stage, as noted above.

Petitioner also alleges a violation of the Eighth Amendment for "false imprisonment for over twelve years." Petitioner has provided no supporting facts that he has been falsely imprisoned. To date, it appears that he is imprisoned under a valid Idaho state court conviction. Should Petitioner be able to show that he was indicted by a grand jury that was acting outside of its authorized time frame, he may renew this claim. As of now, it will be denied and dismissed with prejudice.

Petitioner asserts that he has been denied his Eighth Amendment right to have adequate medical treatment while incarcerated. This is a civil rights claim, not a federal habeas corpus claim. This subclaim will be dismissed without prejudice.

**Claim 59**

Claim 59 is that the state trial court violated Petitioner's "constitutional rights, procedural, structural, to appeal [the court's] actions by deliberately blocking [his] right to appeal" when the court failed to hear or rule upon 27 motions. (Dkts. 182, pp. 3-32; 182-1, pp. 1-22.) Petitioner cites to his previously filed exhibits in 1:13-cv-00321-BLW (this case); 1:13-cv-321-BLW (2241 case); Idaho Supreme Court Docket 35281, 38532, 39236, 44725, 44974, 41347, and 41621; Case no. MO600093, CR-FE-2007-0005, CV-PC-2015-2352, and Dkt. 141 (Compact Disc No. 1).

As to the motions Petitioner may have filed when he was pro se that were not ruled upon, the Court concludes that his claim is without merit. Petitioner certainly *could have* appealed the trial court's failure to rule on his pro se motions. Petitioner's counsel did not raise this claim on any of his appeals, and Petitioner has not shown that any of the motions that were not ruled upon had merit, such that the issue should have been appealed. Therefore, this claim will be denied on the merits and dismissed with prejudice.

As to pro se motions Petitioner filed while represented by counsel, in *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984), the United States Supreme Court clarified that a trial court is not required to permit a "hybrid" representation of a criminal defendant. Therefore, a court may require a defendant to choose either to represent himself *or* to be represented by counsel. The United States Supreme Court has not recognized a right of the type which Petitioner asserts.

There is no precedent establishing the right of a *represented* criminal defendant to separately access the courts through an adequate prison or jail access-to-courts program. *McKaskle v. Wiggins* does not provide a legal basis for Petitioner's claims. Nor does *Faretta*, which established a Sixth Amendment right of a defendant to represent himself pro se if he desired. In *Faretta*, the United States Supreme Court did not decide whether implied in that right is a corresponding right to access a law library.

Finally, *Kane v. Garcia Espitia*, 546 U.S. 9 (2005), is also contrary to Petitioner's position. There, the Supreme Court reversed the Ninth Circuit Court, which had ordered that habeas corpus relief be granted to a California criminal defendant who had chosen to

proceed pro se in a felony criminal case but had received no law library access while in jail, despite a court order to the contrary. The Supreme Court held that habeas relief was not warranted because "*Faretta* sa[id] nothing about any specific legal aid that the State owes a pro se criminal defendant." *Id.* at 10.

Petitioner has not shown that his federal constitutional rights were violated or blocked by the trial court or any other court regarding his pro se motions. This claim in its entirety will be denied on the merits and dismissed with prejudice.

### Claim 60 (in Supplemental Response)

In Petitioner's Supplemental Response, he asserts that he was denied a reasonable bond during pretrial proceedings. Because this claim does not challenge the convictions or sentences at issue, it will be dismissed with prejudice for failure to state a claim upon which relief can be granted.

### Other Claims and Subclaims

Petitioner's Second Amended Comprehensive Petition (Dkt. 182, 182-1) is long and quite difficult to decipher. The state court record is even longer. The Court has done its best to analyze all of Petitioner's claims to determine whether any may have merit, and it has identified those upon which Petitioner can or might be able to proceed. The others will be dismissed with prejudice—meaning that they cannot be pursued again. To the extent that the Court has not specifically addressed any of Petitioner's claims or subclaims set forth in his Second Amended Comprehensive Petition (Dkt. 182, 182-1, with exhibits), the Court dismisses them with prejudice on procedural default grounds.

# ORDER

**IT IS ORDERED** that Respondent's Motion for Partial Summary Dismissal (Dkt. 203) is GRANTED in part and DENIED in part, as follows:

1. The following claims are DENIED on the merits and DISMISSED with prejudice: Claim 8(B); the Grand Jury Proceedings subclaim; 8(C) the *Franks* hearing subclaim; 8(D) the Conspiracy subclaim; 11(A), (B), (C), (D), (F), (G), (H), (J), (K), (L), (M), and (N); 12 (as federal claim);  13; 14; 15; 16; 18 (trial court did not have to follow Idaho Court of Appeals' direction not to retroactively determine competence after Idaho Supreme Court ruled contrarily on that issue); 20; 21; 22; 23; 30; 31; 32; 34; 39; 41; 42; 44; 46 (in part); 47; 48; 49; 50; 51; 52 (in part); 53; 56; 58 (cumulative error grounds, Eighth Amendment false imprisonment grounds, and all grounds other than deprivation of adequate medical treatment); and 59.

2. The following claims are DISMISSED with prejudice for failure to state a claim upon which relief can be granted or on duplication grounds: Claims 1; 5; 6;11(I); 12 (as state law claim); 17; 24; 25; 26; 27 based on Amendments 1 through 21 (excluding 14); 28 based on Amendments 1 through 21 (excluding 14); 29 based on Amendments 1 and 4 through 24 (excluding 14); 33 (all subclaims except trial counsel failed to request a competency hearing); 35; 36 based on Amendments 1-21 (excluding 14); 37; 38 based on Amendments 1 through 18 and 20-21

(excluding 6); 40; 43; 45; 46 (in remaining part); 52 (in remaining part); 54; 55; and 60.

3. The following claims are DISMISSED with prejudice based on procedural default grounds: Claim 2 based on Amendments 1, 4, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, and 21; and Claim 18 based on Amendments 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, and 19.

4. The following claims are DISMISSED *without* prejudice for failure to state a federal habeas corpus claim upon which relief can be granted: 46 (denial of medical treatment only) and 58 (adequate medical treatment only).

5. The following claims are MOOT because they were omitted or blank: Claims 3, 4, 7, 10, and 57.

6. Petitioner may proceed to attempt to show cause and prejudice for the following claims: 18 (Fourteenth Amendment due process issue only—that trial court should have recused itself as a witness in the competency hearing); 33 (trial counsel failed to request a competency hearing); and 38 (Sixth Amendment only).

7. Respondent shall provide further facts and briefing in his Answer and Brief on the following claim, to which Petitioner may respond: 9(E) whether the prosecutor had any written or recorded statements of Petitioner in its possession; 11(E) ineffective assistance of direct appeal counsel for failing to raise the issue of

expiration of the grand jury's term before indictment; and 44, whether there was a hearing with a sealed record on November 15, 2007.

8. Petitioner may proceed to the merits of Claims 2 (Fourteenth Amendment due process subclaim only); 18 (trial court violated his Fourteenth Amendment due process rights by holding a sentencing hearing when Petitioner refused to yield on his choice for a defense expert and by not permitting Petitioner to select the expert of his choice); 19; 27; 28; 29; and 36 (Fourteenth Amendment only).

**IT IS FURTHER ORDERED:**

1. Mr. Prior's Motion to Withdraw as Legal Counsel for Petitioner (Dkt. 228) is GRANTED.

2. Petitioner's Motion for Order to Provide Petitioner with Copies of All Filings with this Court of John Prior (Dkt. 224) is DENIED as MOOT.

3. Petitioner's Motions to Show Cause/for a Hearing regarding Mr. Prior's services (Dkt. 226, 227, and 230) are DENIED as MOOT.

4. Respondent shall file an answer to **only the remaining claims and those defaulted claims set forth above that require more facts and briefing** within 120 days after entry of this Order, as follows: **33 (trial counsel failed to request a competency hearing); 38 (Sixth Amendment only); 9(E) whether the prosecutor had any written or recorded statements of Petitioner in its**

**possession; 11(E) ineffective assistance of direct appeal counsel for failing to**
**raise the issue of expiration of the grand jury's term before indictment; 44,**
**whether there was a hearing with a sealed record on November 15, 2007;**
**Claims 2 (Fourteenth Amendment due process subclaim only); 18 (trial court**
**violated his Fourteenth Amendment due process rights by holding a**
**sentencing hearing when Petitioner refused to yield on his choice for a defense**
**expert and by not permitting Petitioner to select the expert of his choice); 19;**
**27; 28; 29; and 36 (Fourteenth Amendment only)**. Respondent's right to
continue to assert the procedural default and other procedural defenses as to
claims addressed in this Order is recognized; for brevity's sake, they shall **not**
**be included in the Answer**. The answer should contain a brief setting forth the
factual and legal basis of grounds for dismissal and/or denial of the remaining
claims.

5. Petitioner shall file a reply (formerly called a traverse), containing a brief rebutting
   Respondent's answer and brief, which shall be filed and served within 60 days
   after service of the answer. **Petitioner shall address only these claims and no**
   **others in the Reply: 33 (trial counsel failed to request a competency hearing);**
   **38 (Sixth Amendment only); 9(E) whether the prosecutor had any written or**
   **recorded statements of Petitioner in its possession; 11(E) ineffective assistance**
   **of direct appeal counsel for failing to raise the issue of expiration of the grand**
   **jury's term before indictment; 44, whether there was a hearing with a sealed**

**record on November 15, 2007; Claims 2 (Fourteenth Amendment due process subclaim only); 18 (trial court violated his Fourteenth Amendment due process rights by holding a sentencing hearing when Petitioner refused to yield on his choice for a defense expert and by not permitting Petitioner to select the expert of his choice); 19; 27; 28; 29; and 36 (Fourteenth Amendment only).**

6. **No reconsideration arguments as to other claims shall be included in the Reply**. **No appeal or certificate of appealability arguments as to any claims shall be included in the Reply**. **Further, no new or additional claims shall be included in the Reply**.

7. Respondent has the option of filing a sur-reply within 21 days after service of the reply. At that point, the case shall be deemed ready for a final decision.

8. **No party shall file supplemental responses, replies, affidavits or other documents not expressly authorized by the Local Rules without first obtaining leave of Court**.

9. No discovery shall be undertaken in this matter unless a party obtains prior leave of Court, pursuant to Rule 6 of the Rules Governing Section 2254 Cases.

10. Violations of the Court's orders regarding the next round of briefing may result in sanctions, up to and including dismissal for failure to comply with a Court order, *see* Fed. R. Civ. P. 41(b); Habeas Rule 12, or default judgment.

DATED: March 30, 2020

B. Lynn Winmill
U.S. District Court Judge