UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

FARON RAYMOND HAWKINS,

    Petitioner,

v.

JAY CHRISTENSEN,

    Respondent.

Case No. 1:13-cv-00321-BLW

**MEMORANDUM DECISION
AND ORDER**

    Petitioner Faron Hawkins ("Petitioner" or "Hawkins") is proceeding on his

Second Amended Comprehensive Petition for Writ of Habeas Corpus, construed

under 28 U.S.C. § 2254. (Dkt. 182.) The Petition challenges state court convictions

on two counts of bank robbery, after a trial in which Petitioner contended that he

was coerced to rob banks by government agents and after a remand by the Idaho

Court of Appeals concluding that, based on Petitioner's behavior, stories, and

**MEMORANDUM DECISION AND ORDER - 1**

events during pretrial proceedings, the trial court should have taken steps to determine Petitioner's competence to stand trial. State's Lodging B-4.

Earlier in this matter, the Court granted in part and denied in part Respondent's Motion for Summary Dismissal. Dkts. 203, 232. The Court ordered Respondent to file an Answer addressing the remaining claims on the merits: 2 (Fourteenth Amendment due process subclaim only); 9(E) whether the prosecutor had any written or recorded statements of Petitioner in its possession; 11(E) ineffective assistance of direct appeal counsel for failing to raise the issue of expiration of the grand jury's term before indictment; 18 (the trial court violated his Fourteenth Amendment due process rights by holding a sentencing hearing when Petitioner refused to yield on his choice for a defense expert and by not permitting Petitioner to select the expert of his choice); 19; 27; 28; 29; 33 (trial counsel failed to request a competency hearing); and 36 (Fourteenth Amendment only); 38 (Sixth Amendment only); and 44, whether there was a hearing with a sealed record on November 15, 2007.

The Petition is now fully briefed and ripe for adjudication. Dkts. 182, 255, 266. Other motions are also pending. The Court takes judicial notice of the state court records lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

**MEMORANDUM DECISION AND ORDER - 2**

Having carefully reviewed the record and considered the arguments of the parties, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying habeas corpus relief.

## BACKGROUND

### 1. Facts of the Crimes

On December 16, 2005, Petitioner entered a Key Bank in Boise, Idaho. He approached a teller, showed her a note demanding $15,000, and threatened to "shoot people" if his demands were not met or if he was followed outside the bank. State's Lodging A-4, pp. 555-58. The teller complied, and Petitioner left with the money. *Id.*, pp. 559-62. On that same day, Petitioner had made a telephone call to George Calley, a retired FBI special agent, who had conducted a bank robbery investigation that led to Petitioner's arrest and incarceration for robbing a bank in Horseshoe Bend, Idaho in 1978. State's Lodging G-20, p. 140. Based on the phone call, Calley called police investigators, who identified Petitioner as the Key Bank robber. The Key Bank teller identified Petitioner in a photographic line-up. State's Lodging A-4, pp. 568-72.

On January 4, 2006, the state of Idaho filed a criminal complaint against Petitioner in the Ada County District Court for the state of Idaho, charging him with the Boise Key Bank robbery. State's Lodging A-1, pp. 14-15. No action was taken on the complaint at that time, because authorities could not locate Petitioner.

About six months later, on June 6, 2006, Hawkins committed a robbery at a Washington Mutual Bank in Boise. He gave the teller a note demanding $15,000 and threatened to "shoot people." State's Lodging A-4, pp. 606, 622-23, 633. As he was leaving, he told the bank teller and other employees, "By the way, my name is Faron Hawkins, and this is all because of George Calley." *Id*., pp. 602, 635.

On June 16, 2006, Calley received another phone call from Petitioner, who asked him why he hadn't visited Petitioner's two sons who were incarcerated in Colorado and why he had not called Petitioner back. Petitioner revealed to Calley that he had robbed a Washington Mutual Bank branch in Boise and that he had "used both of their names" during the robbery. State's Lodging A-4, pp. 521-52; State's Lodging G-20, p. 149.

On June 27, 2006, an amended complaint was filed in Idaho, adding the Washington Mutual Bank robbery. State's Lodging A-1, pp. 17-18. Oregon law enforcement officers found Petitioner in a campground near The Dalles, Oregon. State's Lodging A-4, pp. 649, 652. After an eight-hour standoff, Petitioner was

**MEMORANDUM DECISION AND ORDER - 4**

arrested by Oregon authorities on August 11, 2006. *Id.*, pp. 535-39, 653-55, 672, 925, 927-35. Oregon officers obtained a search warrant for Petitioner's vehicles and camp trailer and seized items matching the description of items used  in both robberies. *Id.*, pp. 681-82, 684-88.

After his Oregon arrest, Petitioner was interviewed by Idaho Detective Dave Smith. Petitioner admitted to Smith that he had robbed a Boise bank on December 16. *Id.*, pp. 1043-44.

## 2. Pretrial Proceedings

Petitioner was arrested on the Idaho charges on August 28, 2006. *See* State's Lodging A-1, Register of Actions, p. 3. On August 29, 2006, Petitioner attended an initial video arraignment, where he was appointed counsel (the Ada County Public Defender). Public defender J. Bublitz appeared with him. Petitioner's bond was set for $1,000,000. The court set his preliminary hearing for September 12, 2006. State's Lodging A-1, pp. 3, 22.

Several different Ada County magistrate judges presided over preliminary matters in Petitioner's criminal case. *See* State's Lodging A-1. The presiding state district judge in the criminal case was Ada County District Judge Michael R. McLaughlin. The prosecuting attorneys were Roger Bourne and Jan Bennetts.

On September 12, 2006, Petitioner appeared in court with public defender Kevin Rogers, who asked to continue the preliminary hearing because he had just received discovery. The state did not object, and the hearing was rescheduled to September 27, 2006. *Id*., p. 24.

On September 27, 2006, Petitioner appeared with the public defender and made his first of many requests for appointment of a new attorney. The court dismissed the public defender from the case and ordered that the public defender give Petitioner the discovery. A review hearing was set for October 19, 2006. *Id*., p. 25. On October 4, 2006, Petitioner filed a pro se motion to compel, informing the Court that the public defender and the county prosecutor had not provided him with copies of their files. *Id*., pp. 26-27.

On October 19, 2006, Petitioner appeared pro se at the review hearing (designated a preliminary hearing in the court minutes). *Id*., p. 28. Because Petitioner had not been provided police reports and an interview tape, the preliminary hearing was reset to November 7, 2006. *Id*., pp. 24-25, 28.

On November 17, 2006, Petitioner appeared pro se and requested the reappointment of counsel. The magistrate judge granted the motion, appointing the public defender again. As a result, the preliminary hearing was continued to November 30, 2006. *Id*., p. 29.

**MEMORANDUM DECISION AND ORDER - 6**

On November 30, 2006, Petitioner appeared with public defender Steve Botimer, who reported that Petitioner did not want to accept the state's plea offer, but wanted to proceed to a hearing. *Id.*, p. 30. The hearing was reset to January 11, 2007. *Id.*

On January 2, 2007, a grand jury indicted Petitioner on both robbery charges, mooting the need for a preliminary hearing. *Id.*, pp. 33-34. Petitioner requested and was granted copies of the grand jury transcript. *Id.*, pp. 39-43.

Petitioner again asked to represent himself in the criminal proceedings, and the state district court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1976). State's Lodging A-3) The state district court granted Petitioner's request to represent himself, but appointed the Ada County public defender as standby counsel. State's Lodgings A-3, A-4, pp. 1-16. The public defender assigned to the case as standby counsel was Edward Odyssey.

At the *Faretta* hearing, Petitioner contended his children had been "taken by the Prosecutor's Office and Health and Welfare for the sole purpose of preserving their testimony against [him] on these charges of bank robbery." *Id.*, pp. 16-17. The court explained it had not entered any orders regarding anyone being held as a material witness and stated that it had no jurisdiction over the child custody

**MEMORANDUM DECISION AND ORDER - 7**

matters. *Id*., p. 19. The court also heard and denied Petitioner's motion for reduction of the $1,000,000 bond.

On February 2, 2006, Petitioner pleaded not guilty to both counts. The trial court set a jury trial for May 7, 2006. State's Lodging A-1, pp. 47-48. Petitioner, representing himself at the time, filed a number of pro se motions. (*Id*., pp. 49-55, 58-60, 67-72, 75, 77, 87-88, 92, 95. Petitioner requested and was granted two trial continuances. *Id*., pp. 52-53, 55, 68, 87, 92, 93; State's Lodging A-4, pp. 55-56, 70-71. Trial was to begin on September 17, 2007. On the day of the pretrial conference, the court denied another request by Petitioner to vacate the trial. State's Lodging A-4, pp. 112-45, 150-51.

On the day of trial, Petitioner asked for reappointment of counsel. The Court granted the motion and reset the trial to January 7, 2008, to allow counsel to prepare for trial. State's Lodging A-1, pp. 96-97, 100; State's Lodging A-4, p. 155. However, about a month later, Petitioner moved to represent himself again. State's Lodging A-1, p. 101. After hearing from Petitioner's counsel and completing a second *Faretta* colloquy, the court granted Petitioner's motion, but again appointed Odyssey as standby counsel. State's Lodging A-4, pp. 158-74.

Petitioner filed a list of witnesses, after which the State moved to quash subpoenas for some of the witnesses. After a hearing, the trial court quashed

MEMORANDUM DECISION AND ORDER - 8

Petitioner's subpoenas for persons related to his child custody matter, but permitted him to proceed with subpoenas of other named defense witnesses. State's Lodging A-4, pp. 276-301; *see also* State's Lodging A-1, pp. 161-62. It was not until this point, when the trial court held an ex parte hearing with Petitioner to inquire about what relevant information each witness possessed, that the court began to learn that Petitioner's defense would be that government agents coerced him to rob the banks. At the same hearing, Petitioner complained about his standby counsel, but the court found his claims meritless and stated that they were simply a "continuing effort on the part of the defendant to prolong and delay" the trial. *Id.*, pp. 309-22.

### 3. Trial Proceedings

Trial commenced on January 7, 2008. During trial, Petitioner participated in jury selection (State's Lodging A-4, pp. 480-90), cross-examined state witnesses (*id.*, pp. 542-50, 580-85, 626-29, 643-45, 660-65, 689-709, 727-39, 749-51), argued against a motion in limine (*id.*, pp. 724-25, 756-61, 869-70, 873-77), decided to defer his opening statement to the beginning of his case in chief and gave his opening statement (*id.*, pp. 767-76), examined his own witnesses (*id.*, pp. 777-847, 905-09, 961-87, 992-1024, 1029-32), and testified on his own behalf (*id.*, pp. 810-914, 916). He consulted with his standby counsel throughout the trial.

MEMORANDUM DECISION AND ORDER - 9

In the State's case in chief, the prosecutor called George Calley, the retired FBI agent. Calley testified consistently with the background set forth above. State's Lodging A-4, pp. 521-52. The prosecutor also called FBI special agent Scott Mace, who had interviewed Petitioner, and several bank personnel who were victims or witnesses of the robberies. State's Lodging A-4, pp. 521-52.

In his case in chief, Petitioner told a long story about how the government recruited him straight out of high school to work on top secret projects. After making some errors in transporting sidewinder missiles as an independent truck driver, government agents (assisted by local businessmen) forced him to wear a bomb vest and rob the banks, threatening to harm his family and detonate his bomb vests if he did not cooperate. He stated that he had no choice but to rob the two banks and hand over the money to officials to avoid personal injury and to protect his family. *See* State's Lodging A-4; B-4, pp. 9-13.

In support of his defense, Petitioner questioned FBI agent Scott Mace during the State's case-in-chief. Petitioner wanted to call as witnesses Idaho Detective Dave Smith; Donna Hawkins, Petitioner's mother; and several other individuals, but none of these people came to trial because of various issues with subpoenas, some due to Petitioner's fault and some due to the prosecutor's faulty instructions to the Ada County Sheriff's office. *See* State's Lodging G-19 pp. 52-53.

**MEMORANDUM DECISION AND ORDER - 10**

(Petitioner's claims based on this set of facts were addressed in the Court's previous Order. See Dkt. 232.)

During jury deliberations, Petitioner moved the court for permission to address the jury. In an about-face from his coercion defense, he now wanted to provide the jury with a statement that he "was mentally not able to function properly and my public defender did not help me decide" [sic]." State's Lodging A-4, p. 1102. The trial court denied the motion, finding that Petitioner "has been fully functional and focused and alert," and, "[i]n fact, his testimony before this jury on direct examination was clear, concise." *Id.*, pp. 1102-03. On January 11, 2008, the jury found Petitioner guilty of both counts of robbery. (State's Lodging A-1, p. 197.)

### 4. Post-Trial Proceedings and First Direct Appeal

The same day he was convicted, Petitioner requested appointment of counsel for sentencing, which the court granted. State's Lodging A-4, p. 1110. Edward Odyssey was again appointed. Petitioner desired to file a motion for a mistrial and new trial. Odyssey thought there were no grounds for the motions, and told Petitioner he would not file them. Petitioner then asked to proceed pro se. *Id.*, pp. 1110-15.

Petitioner also filed a pro se motion to dismiss "on grounds of mental incapacity." State's Lodging A-4, pp.1115-1116. The trial court ordered a psychological evaluation pursuant to I.C. § 19-2522, appointing Dr. Chad Sombke to perform the evaluation. *Id.*, pp. 1117-19; State's Lodging A-1, pp. 198-99.

Dr. Sombke went to the jail to evaluate Petitioner in January 2008, but Petitioner refused to meet with him. *See* State's Lodging C-2, p. 13. On January 31, 2008, the court held a hearing to discuss why the evaluation had not taken place. Petitioner would not tell the court whether his refusal was an assertion of his Fifth Amendment right to remain silent, because Petitioner wanted to consult with a new attorney. The court concluded that Petitioner's refusal was an assertion of that right. State's Lodging A-4, pp. 1120-31.

Petitioner wavered on whether he wanted representation for his post-trial motions and sentencing. The trial court observed that "this court – throughout the course of these proceedings and Mr. Hawkins' representation of himself over many months – certainly has no reason to believe that Mr. Hawkins has a mental disease or defense that causes him to lack the capacity to understand the proceedings against him or to assist in his own defense." State's Lodging A-4, p. 1120. However, out of an abundance of caution, the court did not want to permit Petitioner to proceed pro se, explaining that, "if Mr. Hawkins is contending that he

is delusional, I don't think his decision whether to hire or not keep an attorney, at this point, is appropriate." *Id*., pp. 1117-18.

On February 12, 2008, Petitioner reaffirmed he wanted counsel to continue representing him. *Id*., p.1133. On February 20, 2008, Petitioner filed a motion to dismiss, a motion to strike verdict, a motion for new trial, and a "motion for pro se status." State's Lodging A-2, pp. 243-52.

On March 13, 2008, the court conducted another *Faretta* colloquy with Petitioner. State's Lodging A-4, pp. 1139-41, 1145. During the hearing, counsel said that, if required to argue Petitioner's pro se motions, his position would be that the motions had no merit. *Id*., p.1144. At the end of the hearing, the Court found that Petitioner had "freely and voluntarily chosen to represent himself; that he's competent to make that decision; and he understands the advantages of counsel; the disadvantages of representing himself; and that he is competent to make that decision." *Id*., p. 1147. Petitioner's request for self-representation was granted. *Id*.

After Petitioner complained he did not have access to a law library, the court reappointed counsel, but advised Petitioner that he could notify the court if he no longer wanted representation. *Id*., pp. 1176-78. Though represented, Petitioner continued to file pro se motions, which were denied. *See* State's Lodging A-2, pp. 256-69, 283-85; State's Lodging A-4, pp. 1179-80, 1211.

**MEMORANDUM DECISION AND ORDER - 13**

Petitioner was represented by Odyssey at the sentencing hearing, but Petitioner was dissatisfied with the representation. State's Lodging A-4, p. 1179. Petitioner was sentenced to concurrent sentences of thirty fixed years of incarceration, with life indeterminate. State's Lodging A -2, pp. 276-79. The judgment of conviction was entered on April 24, 2008. State's Lodgings A-4, pp. 1179-1121; A-2, p. 276.

New counsel Dennis Benjamin was appointed to represent Petitioner on direct appeal. Benjamin selected two claims for appeal: (1) whether the trial court erred by failing to sua sponte order a psychiatric examination and conduct a hearing to determine Petitioner's competency before trial, and (2) whether he was competent to waive counsel. State's Lodging B-1, p. 17. The Idaho Court of Appeals concluded the trial court abused its discretion by failing "to sua sponte order a psychiatric evaluation and conduct a hearing to determine Hawkins' competence to stand trial because there was enough indicia existing to raise a bona fide doubt as to Hawkins' mental capacity." State's Lodging B-4, p. 14. The court reasoned: "When taking the entire record into account, the [trial] court should have entertained a reasonable doubt about Hawkins' mental competency either to stand trial or to represent himself." *Id.*, p. 13.

MEMORANDUM DECISION AND ORDER - 14

Although the issue of the appropriate remedy had not been raised or briefed, the Idaho Court of Appeals stated in its opinion, "Because it is not possible to retroactively make a determination as to Hawkins' competency at the time he was tried, we must vacate the judgment of conviction and leave the state free to retry Hawkins if he is found competent to stand trial." *Id.*, p. 14 (footnote omitted). The Idaho Supreme Court denied the state's petition for review and issued its remittitur. State's Lodgings B-5 to B-8.

**5. Proceedings on First Remand and State's Interlocutory Appeal**

On remand, the trial court entered an order for psychiatrist Michael Estess to conduct a psychological examination/evaluation of Petitioner, who was still represented by Benjamin. State's Lodging C-1, pp. 29-30. At the request of Dr. Estess, the court also ordered that Petitioner undergo psychological testing by Dr. Sombke. *Id.*, pp. 34-36. The state moved for a retroactive competency hearing. *Id.*, pp. 47-68. Petitioner retained private attorney John Eric Sutton to represent him on remand. Petitioner later said he thought Sutton was going to co-counsel with Benjamin, but instead Sutton fired Benjamin, allegedly without Petitioner's permission. *Id.*, pp. 69-70.[1]

---

[1] However, if Petitioner had retained counsel, he was not entitled to have appointed counsel.

**MEMORANDUM DECISION AND ORDER - 15**

Dr. Sombke evaluated Petitioner on July 15, 2010, and August 4, 2010. State's Lodging C-1, p. 160. Dr. Sombke found that Petitioner's test results did not show signs of malingering. He diagnosed Petitioner with delusional disorder and concluded:

> As a result of the information and observations obtained during this evaluation, it is this examiner's opinion that Mr. Hawkins does not currently understand the risks and benefits of treatment and he does not have the capacity to make informed decisions about treatment. He is currently not receiving any psychiatric treatment for his psychiatric illness and it appears as though he will need supervision, care, and treatment at a psychiatric facility in order to become competent in the future.

State's Lodging C-1, p. 165 (report of 08/11/10). Dr. Sombke further concluded:

> Mr. Hawkins does have the capacity to understand the proceedings against him on a basic and factual level, but he does not have the capacity to assist in his own defense in any logical or rational manner. He will need to receive psychiatric treatment in order for him to become competent in the future.

*Id.*

On November 12, 2010, the court held a hearing to determine Petitioner's present competency. State's Lodging C-2, pp. 5-7. Petitioner was represented by Sutton. Dr. Sombke testified that he had changed his mind about Petitioner's diagnosis, based on his later review of one to two years of prison medical records from Petitioner, an earlier psychological report from Dr. Michael Johnston,

**MEMORANDUM DECISION AND ORDER - 16**

psychological evaluations of Petitioner's "common-law" wife, Darcy Bervik,[2] and consultations with Dr. Estess. State's Lodging C-2, p. 20-22. Dr. Sombke opined that, while Petitioner was not malingering (as his test results had confirmed), he was manipulating the evaluators.

Dr. Sombke and Dr. Estess opined that letters written by Petitioner to his parents, two years of incarceration records, and interviews with Bervik and Petitioner's mother showed that Petitioner's elaborate stories of coercive government intervention in his life did not permeate his communications, but were selectively used (with the content changing from time to time). *See* State's Lodging C-2. At the competency hearing, Dr. Estess and Dr. Sombke testified that Petitioner had been competent to stand trial. State's Lodging C-2, pp. 16-46, 53-54, 68-95.

After the competency proceeding, the judge found that Petitioner had been competent during the first trial, and that he currently was competent to proceed to a new trial. State's Lodging C-1, pp. 134-36. However, because the court felt "constrained by the law of the case," the court ordered that Petitioner be retried. *Id*., p. 136.

---

[2] Elsewhere in the record, Darcy Bervik is referred to as Darcy Burbick.

**MEMORANDUM DECISION AND ORDER - 17**

Petitioner filed a pro se affidavit complaining about Sutton's representation, and Sutton filed a motion to withdraw. State's Lodging C-1, pp. 78-79, 111-31, 137-235. The court granted Sutton's motion to withdraw, and appointed new counsel to represent Petitioner for the new trial proceedings. *Id.*, p. 240; State's Lodging C-3, pp. 12-14.

The State filed a motion for permissive appeal to challenge the trial court's order that required a new trial in the face of its finding that Petitioner had been competent during trial. State's Lodging C-1, pp. 243-52. The trial court granted the state's motion and stayed the trial pending the appellate court's opinion. *Id.*, pp. 272-77, 339-40, 363-64.

The Idaho Supreme Court permitted the interlocutory appeal and reversed the trial court, explaining that neither the Idaho Court of Appeals' dictum nor the law of the case doctrine prevented the trial court from making a retroactive competency determination. State's Lodging D-4.

### 6. Proceedings on Second Remand

On May 29, 2013, the trial court held a status hearing on the second remand. Petitioner had retained counsel Eric Fredricksen to represent him. State's Lodging E-1, p. 88. At that time, the trial court notified Petitioner that he would have a second chance to present evidence relating to his competency:

I have read [the State's] motion for the court to take judicial notice of the prior proceedings. And certainly, Mr. Fredericksen, I will give you an opportunity to respond to that. But I am inclined to do that in this respect. Certainly the defense can subpoena Dr. Estess, cross-examine him, determine what the basis of his opinion was regarding the retroactive competency, perhaps, if necessary, take his deposition. I mean I will let you folks work out the details there. But you could subpoena him, call him to testify, cross-examine him.

And then certainly you have the opportunity to present evidence to the court from your expert or fact witnesses regarding Mr. Hawkins' competency back in 2007 or perhaps even his current competency.

State's Lodging E-3, p. 7. The competency hearing was set for August 29, 2013. *Id*., p. 9.

On June 17, 2013, the court held a status hearing. Frederickson indicated he was trying to find an expert for Petitioner. State's Lodging D-2, p. 129. The court declared Petitioner indigent for the purpose of receiving funding for a psychiatrist or psychologist to evaluate him on the retroactive competency issue. *Id*., pp. 128-29.

On June 28, 2013, Frederickson filed a motion to withdraw as attorney for Petitioner, because Fredericksen had not received payment from Petitioner and for other reasons Fredricksen could not disclose. *Id*., pp. 101-05.

MEMORANDUM DECISION AND ORDER - 19

On July 3, 2013, the court held a status hearing. Frederickson's motion to withdraw was discussed on that date. Petitioner asked to proceed pro se, without standby counsel. State's Lodging E-4, pp. 9-10. The trial court expressed reluctance to permit Hawkins to proceed pro se, explaining:

> That kind of presents a conundrum for the court, or a conflict, because the focus of this hearing is the argument that was presented by your attorneys in the appeal before the Court of Appeals that you were not competent to essentially stand for trial back in January of 2007, I believe in your – when your jury trial was held, okay? And so that raises a question about your competency then, your competency since then, and your competency now, and so if someone is saying that they aren't competent, you can understand when they want to represent themselves that creates a real conflict in the court's way of looking at this thing.

*Id.*, p. 10. After another *Faretta* colloquy with Petitioner, the court allowed Fredericksen to withdraw. The court appointed the Ada County public defender as standby counsel for Petitioner. *Id.*, pp. 11-28. The court set a follow-up hearing for July 17, 2003.

At the status hearing on July 17, 2013, Petitioner appeared with his standby counsel. The court advised Petitioner that he had the right to appointed counsel, including standby counsel if desired. Petitioner insisted he wanted to proceed pro se without standby counsel. State's Lodging E-4, pp. 11-12. The court completed

MEMORANDUM DECISION AND ORDER - 20

another *Faretta* colloquy and found his waiver of counsel was knowing, intelligent, and voluntary. State's Lodging E-3, pp. 14-17.

 Petitioner stated at the hearing that he could not hire an expert for the August hearing until the State provided him with another copy of discovery, because his former attorney did not forward that to him. The Court ordered the State to provide a copy of the discovery to Petitioner, and then made sure Petitioner understood that he must have his expert ready to testify in Court on August 29, and that he should subpoena both his own expert and Dr. Estess. Petitioner indicated that he understood. State's Lodging E-3, pp. 21-30.

On July 31, 2013, the court held another status hearing, at which time Petitioner stated that he desired to hire Dr. Robert Cloninger, a well-known psychiatrist from St. Louis, who charged $450 an hour, plus travel and lodging expenses. State's Lodging E-2, pp. 134-37. The court denied the request, finding the costs associated with Dr. Cloninger unwarranted. Petitioner stated that Dr. Cloninger was willing to reduce his fees to be the same price as the State had spent on both Dr. Estess and Dr. Sombke, but he presented no statement from Dr. Cloninger that this representation was true, nor did he address Dr. Cloninger's travel expenses. *See* State's Lodging E-5, pp. 6-7. The Court would not appoint Dr. Cloninger, but, instead, the court instructed standby counsel to assist Petitioner in

retaining a qualified psychiatrist within a 500-mile radius of Boise, Idaho. State's Lodging E-2, pp. 141-44. The court also vacated the August hearing date to give Petitioner time to find an expert. *Id*., pp. 143-45.

On August 13, 2013, the court issued an order stating that Petitioner had made no showing that there was not an expert in the Boise area comparable to the St. Louis expert Petitioner wanted to hire. The court narrowed its 500-mile-radius order to 150 miles and ordered Petitioner to select an expert in the Boise-Nampa-Caldwell-Twin Falls area. Petitioner and his standby counsel were ordered to disclose the name of the expert to the court in writing by August 29, 2013. Petitioner was warned that his failure to submit the name of his expert by that date, or to submit to testing by the expert within thirty days of disclosure would result in Petitioner waiving his right to present evidence at the retroactive competency hearing. State's Lodging E-1, pp. 229-31.

The court set a status conference for October 17, 2013, for the purpose of selecting an expert for Petitioner. The court notified Petitioner that if he did not submit the name of an expert prior to the hearing, one would be selected for him. *Id*., p. 261.

On October 17, 2013, Petitioner renewed his request for Dr. Cloninger to be appointed as his expert. State's Lodging E-5, pp. 5-6. The court denied Petitioner's

request and appointed a local psychologist, Dr. Robert Engle, to examine him. The

court specifically advised Petitioner that he had three choices: (1) to have the Ada

County public defender irrevocably appointed as his counsel and permit counsel to

select a local expert for him; (2) to submit to an evaluation by Dr. Engle, selected

by the court; or (3) be sentenced immediately. State's Lodging E-5, pp. 11-12.

Petitioner asked the court to consider permitting his parents to pay the cost

of Dr. Cloninger. The Court said that was a possibility, but his parents would need

to submit financial commitment documentation to the court, and Petitioner would

have to work that out with his counsel. *Id*., pp. 13-14. Petitioner refused to be

represented by the public defender unless he was guaranteed that Dr. Cloninger

would be his expert. The court would not permit that condition, and asked

Petitioner to choose among the three options. Petitioner chose to be sentenced that

day. *Id*., pp. 15-16.

The court then questioned Petitioner about his current mental status.

Afterwards, the court found:

> [T]he court will find from the totality of the record that
> Mr. Hawkins, particularly in light of the extensive
> motions that he has filed since this was submitted back to
> the court in April of this year . . . that Mr. Hawkins is
> competent, and he understands the nature of the
> proceeding, that he has made a decision, and I find him to
> have made a knowing and intelligent decision to continue
> to insist that a psychiatrist from St. Louis, Missouri, be

**MEMORANDUM DECISION AND ORDER - 23**

appointed to testify on his behalf for his articulated basis
for not appointing that psychiatrist [sic], that there have
been numerous delays caused as a result of again Mr.
Hawkins' . . . failure to follow through with the court's
specific order.

The court will find that there has been ample opportunity
afforded to Mr. Hawkins to present evidence to the court
regarding his mental status at his trial in 2007. The court
will find that the testimony and evidence presented to the
court by Dr. Estess that Mr. Hawkins was competent to
stand trial, that he was at the time of his evaluation by
both Dr. Sombke and Dr. Estess was capable of
understanding the proceedings, assisting in his defense,
and that remains the case today.

State's Lodging E-5, pp. 18-19.

The court asked the State for comments, and then permitted Petitioner to

comment. He said:

You denied me a hearing, you know, to be able to
put Estess and Sombke back on the stand. You let the
prosecutors lie. You, of course, are biased and
prejudiced. I don't know what else there is to say.

State's Lodging E-5, p. 20. The court thanked Petitioner for his comments and

reinstated the judgment and Petitioner's concurrent unified sentences of thirty

years fixed with life indeterminate. State's Lodgings E-1, pp. 280-84; E-5, pp. 19-

20. Petitioner filed a motion for reduction of sentence, which the trial court denied.

*Id.*, pp. 270-79, 297-99.

**MEMORANDUM DECISION AND ORDER - 24**

### 7.  Second Direct Appeal

Dennis Benjamin represented Petitioner on appeal following the second remand. The Idaho Supreme Court heard the appeal, consisting of three issues: "(1) whether retroactive competency hearings that occur more than a year after trial violate due process; (2) whether there was insufficient evidence to support the district court's determination that Petitioner was competent to stand trial in 2008; and (3) whether Petitioner was competent to waive his right to counsel." State's Lodging F-9, pp. 5-6; *compare* State's Lodging F-1, pp. 17-18 (Petitioner's statement of issues combined issues 1 and 2, and set forth 3 separately).

After Benjamin filed the opening brief (State's Lodging F-1), Petitioner filed a pro se opening brief. State's Lodging F-7. Because Petitioner was represented by counsel, the Idaho Supreme Court took no action on the pro se brief. State's Lodging G-20, p. 381. During the course of the appeal, Benjamin filed a motion to withdraw as counsel (State's Lodging F-4) and a supporting affidavit asserting that Petitioner was "dissatisfied with [Benjamin's] performance in this case, with [his] performance in the original appeal and in [his] performance as his trial counsel during the remand proceedings following the original appeal." State's Lodging F-5, p. 2. Petitioner believed Benjamin "should have raised additional issues." *Id.*

The Idaho Supreme Court granted Benjamin's motion, and permitted Petitioner to proceed pro se. State's Lodging F-6. Petitioner filed an "Affidavit in Support of Closing Argument" and "Closing Brief of Appellant." State's Lodgings F-11, F-12. The Idaho Supreme Court ordered that these filings be "considered only for the purpose of identifying relief sought by the Appellant." State's Lodging F-8.

The Idaho Supreme Court affirmed the state district court's decision to reinstate the original judgment. State's Lodging F-9. The Idaho Supreme Court refused to consider the claims in Petitioner's reply brief because they "largely repeat[ed] issues that the district court declined to address," because they were "unrelated to the competency issues that were originally raised on appeal and which were the subject of the district court's decision," and because they were raised in the reply brief for the first time on appeal. *Id.*, p. 13.

### 8.   Federal Habeas Corpus Petition and Stay of Federal Proceedings

On July 22, 2013 (mailbox rule date), after the Idaho Supreme Court determined that a retroactive competency determination could be made in Petitioner's case, he filed a federal habeas corpus petition under 28 U.S.C. § 2241(c)(2)(3), asking the federal court to intervene in the state proceedings. Dkt. 2.

He filed numerous motions, amendments, supplements, and other papers. Dkts. 3-12, 15, 16, 17-19, 20-25, 26-28.

In the Initial Review Order, Magistrate Judge Ronald E. Bush opined that Petitioner must proceed under 28 U.S.C. § 2254. Dkt. 29, pp. 2-3. This case was reassigned to this Court. Petitioner was ordered to file a second amended habeas petition or a motion to stay if he intended to pursue state court action. Dkt. 33. Petitioner filed a notice of appeal that was denied, because the United States Court of Appeals for the Ninth Circuit did not have jurisdiction without a final order from the district court. Dkts. 34, 37.

This Court ordered Hawkins to file a comprehensive Second Amended Petition for Writ of Habeas Corpus, under the proper habeas statute, 28 U.S.C. § 2254; Petitioner was ordered to include the proper respondent, all of his claims, information about how and when each claim was exhausted, and whether he had any pending state court actions. Dkt. 47. Instead, Petitioner filed a non-conforming Amended Supplemental Petition for Writ of Habeas Corpus. Dkt. 49. He was ordered to file another amended petition that conformed to the Court's prior order. Dkt. 53, pp. 1-2. Disregarding the Court's instructions, Petitioner filed his third amended petition for writ of habeas corpus. Dkt. 60. The State responded with a

Motion to Stay, which this Court granted because Petitioner had filed a petition for post-conviction relief. Dkts. 65, 88.

### 9. Post-Conviction Proceedings

On February 13, 2015, while his appeal before the Idaho Supreme Court was still pending and he was litigating his federal habeas petition, Petitioner filed a state pro se petition for post-conviction relief. State's Lodging G-19, pp. 6-74. Petitioner was appointed conflict counsel, Joseph Ellsworth. *Id*., pp. 92-93, 113-14. Because Hawkins continued to file pro se pleadings even though he was represented by counsel, the post-conviction court ordered the state clerk of court to refuse acceptance of pro se documents. *Id*., pp. 115-16.

Ellsworth moved to withdraw because Petitioner was not satisfied with the representation and desired to proceed pro se. *Id*., pp. 129-31. The trial court denied the motion because counsel was needed to help clarify Petitioner's pro se petition. Ellsworth was ordered to file an amended petition. State's Lodging G-21, pp. 7-12, 18. Ellsworth renewed his motion to withdraw, filed a motion asking the court to accept Petitioner's pro se filings, and filed various pro se motions and documents from Petitioner. State's Lodging A-1, pp. 140-327. The State filed an answer and motion for summary disposition. *Id*., pp. 328, 346-64. Ellsworth filed a

supplemental petition for post-conviction relief with various attachments that incorporated Hawkins' initial pro se petition. *Id*., pp. 546-609.

The post-conviction court filed a lengthy notice of intent to dismiss the petition, requiring Petitioner to respond to avoid summary dismissal. State's Lodging A-1, pp. 610-38. After Ellsworth responded, the court denied post-conviction relief. *Id*. pp. 657-58. Ellsworth again asked to withdraw. *Id*., pp. 639-40.

Petitioner also filed a pro se Rule 35 motion to correct an illegal sentence. State's Lodging I-1, pp. 43-45. The trial court denied the Rule 35 motion. *Id*., pp. 208-09.

### 10. Post-Conviction and Rule 35 Appeals

On appeal from the post-conviction denial, new counsel Greg Silvey was appointed to represent Petitioner. State's Lodging H-1. Silvey raised two issues on appeal: (1) whether the post-conviction court erred by denying the motions to withdraw as counsel and failing to rule on the subsequent motions to withdraw, and (2) whether the post-conviction court erred by failing to take judicial notice of the underlying criminal case. State's Lodging H-3, p. 12. The Idaho Court of Appeals affirmed denial of post-conviction relief, and the Idaho Supreme Court denied the petition for review. State's Lodgings H-6 to H-9.

On appeal from the denial of his Rule 35 motion, Petitioner represented himself and raised forty-two issues related to his underlying convictions. State's Lodging J-5. The Idaho Court of Appeals affirmed denial of the Rule 35 motion because claims challenging a conviction cannot be raised in a Rule 35 motion. State's Lodging J-7. Petitioner did not seek review from the Idaho Supreme Court. State's Lodging J-8.

Finally, Petitioner filed a pro se petition for writ of mandate in the Idaho Supreme Court, raising multiple claims. State's Lodging J-1. The Idaho Supreme Court denied the petition. State's Lodging J-2. Petitioner filed a pro se "motion for review of entire cases" State's Lodging J-3, which the Idaho Supreme Court denied. State's Lodging J-4.

### 11. Recent Federal Habeas Proceedings

Petitioner's federal habeas corpus matter was stayed for approximately five years to permit Petitioner to try to exhaust his state court remedies. This Court lifted the stay on August 31, 2018. Petitioner again was ordered to file one comprehensive petition, to include the following for each claim: (1) its federal legal basis, (2) the facts supporting the claim, (3) the procedural facts showing how and when the claim was properly presented to the Idaho Supreme Court, and (4) a brief argument stating why the state court decision is contrary to, or an

unreasonable application of, federal law. Petitioner then filed his Second Amended Comprehensive Petition, the operative pleading in this case. Dkt. 182.

Respondent filed a Motion for Summary Dismissal on April 5, 2019. Dkt. 203. The Court granted it in part, and denied it in part. The parties were ordered to research several procedural issues, address cause and prejudice for the default of several claims, and brief the remaining claims on the merits. The briefing is completed. Therefore, the Court now considers the remaining claims on the merits.

## HABEAS CORPUS STANDARDS OF LAW

### 1. AEDPA Deferential Review Standard

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). This is a highly deferential review standard

If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (internal citation omitted).  Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into

**MEMORANDUM DECISION AND ORDER - 32**

a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

## 2.  De Novo Review Standard

In some instances AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

## DISCUSSION OF PETITIONER'S CLAIMS

### 1. Claim 2

Claim 2 is that Judge Michael McLaughlin, the state district judge who presided over Petitioner's trial, violated Petitioner's federal due process rights by conducting a retroactive competency hearing.

#### A. *Due Process Standard of Law re: Competency*

The Due Process Clause requires a defendant to be competent at the time of trial. *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975). The test for competency is "whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as a factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. U.S.*, 362 U.S. 402, 402 (1960) (per curium)). A trial court's "failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Pate v. Robinson*, 383 U.S. 375 (1966).

 In *Robinson*, the defendant's mother testified that, at eight years old, he acted a little peculiar after a brick was dropped on his head from a third-story window; in 1946 as a young man who returned from military service, he became noticeably erratic; in 1951 he began exhibiting signs of mental illness; in 1952 he

was admitted to a mental hospital; in 1953 he killed his 18-month-old son; in 1957

his mother asked police to pick him up so that she could "put him away" after

attacking a relative; and in 1959, he killed his common-law wife as she worked in

a restaurant, the crime that was the subject of the defendant's current criminal

action.

In addition, at the *Robinson* trial the following evidence was presented:

> [f]our defense witnesses expressed the opinion that
> Robinson was insane. In rebuttal the State introduced
> only a stipulation that Dr. William H. Haines, Director of
> the Behavior Clinic of the Criminal Court of Cook
> County would, if present, testify that in his opinion
> Robinson knew the nature of the charges against him and
> was able to cooperate with counsel when he examined
> him two or three months before trial. However, since the
> stipulation did not include a finding of sanity the
> prosecutor advised the court that 'we should have Dr.
> Haines' testimony as to his opinion whether this man is
> sane or insane. It is possible that the man might be insane
> and know the nature of the charge or be able to cooperate
> with his counsel. I think it should be in evidence, your
> Honor, that Dr. Haines' opinion is that this defendant was
> sane when he was examined.' However, the court told the
> prosecutor, 'You have enough in the record now. I don't
> think you need Dr. Haines.' In his summation defense
> counsel emphasized 'our defense is clear * * *. It is as to
> the sanity of the defendant at the time of the crime and
> also as to the present time.' The court, after closing
> argument by the defense, found Robinson guilty and
> sentenced him to prison for his natural life.

*Id*., 383 U.S. at 383–84.

**MEMORANDUM DECISION AND ORDER - 35**

Here, Respondent argues that, because there is no governing United States
Supreme Court case prohibiting a retroactive competency hearing, Petitioner
cannot meet the §2254(d)(1) standard for relief. Dkt. 255, p. 31. While that is true,
it is also true that, in *Drope v. Missouri*, the United States Supreme Court
identified a fact pattern in which a retroactive competency hearing would *not*
adequately protect a defendant's due process rights.

The Supreme Court recognized there are 'inherent difficulties" in conducting
a retroactive competency hearing, even "under the most favorable circumstances."
420 U.S. at 183. It held that, under the particular circumstances in *Drope*, a
retroactive competency hearing would not be adequate. *Id*.

The facts in *Drope* were as follows. In 1969, Drope was charged with raping
his wife. Drope's counsel filed a motion for a trial continuance because he wanted
Drope to be examined and receive psychiatric treatment, attaching the report of a
psychiatrist who had examined Drope at his counsel's request. The psychiatrist had
recommended treatment. The motion was denied because it was "not in proper
form," and the trial was held because counsel failed to file a correct motion. *See id*.
at 154-165.

Drope's wife testified, confirming the same "strange behavior" contained in
the psychiatrist's report and stating that she had changed her mind about not

wanting to prosecute petitioner because he had tried to kill her on the Sunday
before trial. On the second day of the trial, Drope attempted suicide and was
hospitalized, but, despite his absence, the trial court denied a motion for a mistrial,
finding that his absence was voluntary. The trial went on without him. The jury
returned a guilty verdict. Drope was sentenced to life imprisonment.

Drope filed a motion to vacate the conviction and sentence, alleging that the
trial court violated his constitutional rights when it failed to order a pretrial
psychiatric examination and it completed the trial in his absence. The motion was
denied. The state appellate court affirmed, holding that neither the psychiatric
report attached to Drope's motion for a continuance nor his wife's testimony raised
a reasonable doubt of his fitness to proceed, that the suicide attempt did not create
a reasonable doubt of his competence as a matter of law, and that he had failed to
demonstrate the inadequacy of the procedures used to protect his rights.

Upon review of these questions, the United States Supreme Court held that
(1) when considered together with the information available prior to trial and the
testimony of petitioner's wife at trial, the information concerning Drope's suicide
attempt created a sufficient doubt of his competence to stand trial to require further
inquiry; (2) in Drope's case, the bearing of mental illness on incompetence was
sufficiently likely that, in light of the evidence of [his] behavior including his

suicide attempt, and there being no opportunity without his presence to evaluate that bearing in fact, the trial court should have suspended the trial until such an evaluation could be made; and (3) Drope's due process rights would not be adequately protected by remanding the case for a  retroactive psychiatric examination to determine whether he was competent to stand trial in 1969, but he should be retried if presently competent. 420 U.S. at 183.

The United States Supreme Court noted that both the sentencing court and the state court of appeals noted *only* observations that suggested Petitioner was competent ("that petitioner did not have 'any delusions, illusions, hallucinations,' was 'well oriented in all spheres,' and 'was able, without trouble, to answer questions testing judgement,' but the Supreme Court was concerned that "neither court mentioned the contrary data." *Id*., 420 at 175-176. The same reported "also showed that petitioner, although cooperative in the examination, 'had difficulty in participating well,' 'had a difficult time relating,' and that he 'was markedly circumstantial and irrelevant in his speech.'" *Id*. Nevertheless, "neither [lower] court felt that petitioner's episodic irrational acts described in the report or the psychiatrist's diagnoses of '(b)orderline mental deficiency' and '(c)hronic (a)nxiety reaction with depression' created a sufficient doubt of competence to require further inquiry." *Id*., p. 176.

Finding inadequacies in the record, the Supreme Court noted: "It does not appear that the examining psychiatrist was asked to address himself to medical facts bearing specifically on the issue of petitioner's competence to stand trial, as distinguished from his mental and emotional condition generally." *Id*. In addition, "[1] because of petitioner's absence during a critical stage of his trial, neither the judge nor counsel was able to observe him, and [2] the hearing on his motion for a new trial, held approximately three months after the trial, was not informed by an inquiry into either his competence to stand trial or his capacity effectively to waive his right to be present." *Id.*, pp. 182-183.

Distinguishing Drope's facts from *Robinson*, the Supreme Court stated:

> Here, the evidence of irrational behavior prior to trial was weaker than in *Robinson*, but there was no opinion evidence as to petitioner's competence to stand trial. Moreover, Robinson was present throughout his trial; petitioner was absent for a crucial portion of his trial. Petitioner's absence bears on the analysis in two ways: first, it was due to an act which suggests a rather substantial degree of mental instability contemporaneous with the trial, *see Pate v. Robinson*, 383 U.S., at 389, 86 S.Ct., at 844 (Harlan, J., dissenting); second, as a result of petitioner's absence the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him.

*Id*., pp. 180-181.

**MEMORANDUM DECISION AND ORDER - 39**

**B.** *Discussion*

Petitioner's claim is that: (1) retroactive competency hearings held more than a year after trial violate due process; (2) insufficient evidence supports the district court's determination that he was competent to stand trial in 2008; and (3) he was not competent to waive his right to counsel. *See* State's Lodging F-5, pp. 5-6.

In its analysis of this issue, the Idaho Supreme Court observed:

> The general rule in other jurisdictions is that retrospective competency hearings are disfavored, but they "are permissible when a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." 22A C.J.S. Criminal Law § 791. "A 'meaningful' determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original proceedings." *Id*. When determining whether a retroactive hearing is permissible, courts have considered various "non-exhaustive factors," including:
>
> [1] the passage of time since the trial, [2] statements made by the defendant at trial, [3] the availability of contemporaneous medical and psychiatric evidence, [4] the availability of transcript or video record of the relevant proceedings, and [5] the availability of witnesses, both expert and nonexpert, who could offer testimony regarding the defendant's mental status at the time of trial.

*Id*., p. 7.

The Idaho Supreme Court reviewed the evidence contained in the

record in Petitioner's case:

> In this case, the district court was presented with
> evidence relating to the factors used to gauge whether a
> meaningful retroactive competency proceeding could
> take place. The testimony of Drs. Estess and Sombke is
> particularly informative because they were the only two
> experts who presented evidence at Hawkins' competency
> hearing. Both doctors opined that Hawkins was
> competent.
>
> Dr. Estess testified to interaction with Hawkins at
> the time of trial. Dr. Estess testified that he first saw
> Hawkins during the two-year timeframe of "'06 to April
> of '08" and discussed Hawkins' mental state with his
> clinical staff and jail staff. In Dr. Estess' view, Hawkins
> was not consistent in manifesting delusions and
> "selectively presented information" regarding delusions
> about government conspiracies to his parents and
> common-law wife, which made it doubtful that he
> suffered from delusions. He characterized Hawkins as
> "manipulative," "play[ing] mind games with people,"
> and "deceitful." Dr. Estess' conclusion was that Hawkins
> was entirely competent to stand trial. Dr. Estess also
> testified that he read pretrial hearing transcripts and the
> trial transcript, which reaffirmed his opinion that
> Hawkins was competent.
>
> Dr. Sombke also testified at the November 12,
> 2010, competency hearing and concluded that Hawkins
> was competent and that the stories Hawkins told were
> just an attempt "to benefit his current situation."
> Originally, Dr. Sombke had evaluated Hawkins on
> August 4, 2010, and reported that Hawkins did not have
> the capacity to assist in his own defense because he
> suffered from delusional beliefs. However, Dr. Sombke

**MEMORANDUM DECISION AND ORDER - 41**

changed his mind after reviewing collateral information
which showed that Hawkins did not consistently report
involvement with government agencies. This collateral
information included Department of Correction reports,
the prison psychiatrist's notes, notes from treatment staff,
a psychiatric evaluation of Hawkins' common-law wife,
an evaluation conducted by Dr. Michael Johnston, and
information received from Dr. Estess. Dr. Sombke
explained the changed opinion as follows:

> In reviewing the collateral
> information from the prison and the other
> evaluations I saw, I saw almost no
> references to the C.I.A., the D.I.A., or
> government agencies. It wasn't present in
> what Mr. Hawkins was telling other people.
> So it was just—it was just not consistent
> with the true delusional disorder that would
> have been in those other conversations.

> Drs. Sombke and Estess both explained that it was
> reasonable to originally consider Hawkins incompetent
> based upon his statements but to alter that opinion based
> on collateral information. They explained that this is
> because a professional conducting a competency
> evaluation must take the subject's representations at face
> value and that it is difficult to diagnose a person who is
> not being honest. Hawkins was represented by counsel at
> the November 12, 2010, competency hearing and counsel
> was able to cross-examine Drs. Sombke and Estess as to
> these opinions.

*Id.*, pp. 8-10.

The question for habeas corpus review is how Petitioner's facts compare to

the mental health issues and existing evidence in *Drope* and *Robinson* regarding

MEMORANDUM DECISION AND ORDER - 42

the efficacy of a retroactive competency hearing with respect to Petitioner's due process rights. The Court finds that the Idaho Supreme Court properly identified a minimum of five factors for courts to consider when determining the important due process issue at stake. This Court will review the Idaho Supreme Court's decision beginning with these factors and ending with the facts in the record that might suggest that Petitioner is incompetent.

### i. The passage of time since the trial

Petitioner was found guilty on January 11, 2008. The retroactive competency hearing was held on November 12, 2010—two years, ten months, and two days later. The Court compares this length of time to those found acceptable in other cases. In *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001), the Ninth Circuit recommended that the case be remanded so that the state court could hold a retroactive hearing eighteen years after the original trial:

> We have said that retrospective competency hearings may be held when the record contains sufficient information upon which to base a reasonable psychiatric judgment. *See De Kaplany*, 540 F.2d at 986 & n. 11; *see also Moran*, 57 F.3d at 696. Although many years have passed since Odle was convicted and sentenced, the state trial court should be able to "adduce sufficient evidence" to determine whether Odle was competent to stand trial. *Evans v. Raines*, 800 F.2d 884, 888 (9th Cir. 1986).[7] Expert witnesses who testified at trial, as well as experts who have since examined Odle, submitted declarations describing Odle's mental state at the time; defense

MEMORANDUM DECISION AND ORDER - 43

>counsel and an investigator submitted declarations
>describing Odle's behavior during trial proceedings.
>Moreover, medical records, psychiatric reports and jail
>records submitted at trial are still available. Given this
>old and new evidence, "it is not unreasonable to conclude
>that a fair retroactive hearing could be ... conducted." *De
>Kaplany*, 540 F.2d at 986 n. 11.

*Odle v. Woodford*, 238 F.3d 1084, 1089–90 (9th Cir. 2001).

In *United States v. Duncan*, 643 F.3d, 1242 (9th Cir. 2011), the defendant

pleaded guilty on December 3, 2007. On January 11, 2011, the Ninth Circuit court

observed and ordered:

>We recognize that the Supreme Court has
>cautioned against retrospective assessments of a
>defendant's competence. *See Pate v. Robinson*, 383 U.S.
>375, 387, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (rejecting
>the state's suggestion to hold a retrospective competency
>hearing and requiring the state to retry the defendant
>instead). But, in circumstances similar to those here, we
>have held that such assessments can be made. In
>particular, "when the record contains sufficient
>information upon which to base a reasonable psychiatric
>judgment," we have declined to put the government to
>the expense of a new trial. *Odle v. Woodford*, 238 F.3d
>1084, 1089–90 (9th Cir. 2001); *see also de Kaplany*, 540
>F.2d at 986 n. 11. Because this record falls comfortably
>within that category, we remand for a retrospective
>competency hearing.

*Id.*, p. 1250 n.3. The retroactive competency hearing was held in January and

February 2013, five years after the guilty plea. *See* Dkts. 745-794 in Case No.

2:07-cv-000991-EJL, *United States v. Duncan*.

**MEMORANDUM DECISION AND ORDER - 44**

In comparison to these two cases, the time frame between Petitioner's trial and the retroactive competency hearing was not as lengthy—just under three years, compared to five and eighteen years. Three years does not automatically equate to a due process problem.

ii. <u>Statements made by the defendant at trial</u>

Petitioner represented himself at trial and testified on his own behalf. Therefore, evaluators in his case had far more evidence available to be analyzed in a retroactive competency proceeding than in case where the defendant been represented by counsel and chosen to remain silent, or, as in *Drope*, where the trial court banned the defendant from being present "for a crucial portion of his trial." *Id.*, pp. 180-181.

In Petitioner's case, the trial transcript shows that Petitioner was lucid, his choices were strategic, and he acted to protect his interests. The Court sets forth two examples indicative of Petitioner's skillful handling of his own case:

> The Court:   Are you requesting to suppress all of the evidence obtained by the state in this case or is there specific items of evidence that you're seeking to suppress?
>
> Defendant:   The main things as far as suppression – and, again, I don't have my notes with me, but the main things would be when they entered the van where there was evidence taken and

is going to be admitted into this court, or
tried anyway. What they did is they broke
into the vehicle, looked at the vehicle and
then went and got the warrant and then came
back. And through that, there was no
probable cause for entry to the vehicle. The
vehicle wasn't in my name. It wasn't
registered to me.

State's Lodging A-4, pp. 210-211.

| The Court: | You may address the court. |
|---|---|
| Defendant: | Being as this motion in limine was just presented to me at 5:40 last night, I haven't even had time to check as far as the legal ramifications as far as what this could mean. I could certainly want to expand or limit my questions towards Detective Rosenbraugh depending on what this actually means and the ramifications of that as well as the fact that I may want to re-call her. If I don't have time to do such, I would request the court hold a hearing on this motion in limine and also state the fact that the items in the motion are incorrect and erroneous. |

State's Lodging A-4, pp.724-725.

It is true that Petitioner's entire theory of defense is odd and incredible—that
he was coerced by government agencies to rob two banks in retaliation for him
making errors in his independent contractor task of transporting sidewinder
missiles for the government. However, the Court agrees with Dr. Estess that this

**MEMORANDUM DECISION AND ORDER - 46**

chosen theory of defense does not necessarily support a diagnosis that Petitioner is suffering from delusional disorder, because this theme does not pervade his conversations or attention in regular life. Petitioner's chosen occupation in his later years was bank robbery, and he seems to have concocted this story only to attempt to avoid a bank robbery conviction. The significant other people in his life did not identify this story as a recurring theme; on the contrary, Petitioner states that he suffered from these delusions for about 20 years. In short, an odd excuse for bank robbery and an odd theory of defense at a criminal trial do not equate to being delusional. This Court agrees with psychiatrist Paul S. Bassford, who reported on May 10, 1978, as to an earlier crime of Petitioner: "In my opinion, the authenticity of his story is not paramount to whether or not he has a mental illness or defect." State's Lodging C-1, pp. 141-142.

The Court concludes that the record here clearly supports Dr. Estess' conclusion and Dr. Sombke's final conclusion that Petitioner was competent and manipulative, not delusional, during the time period in question.

   iii.  <u>The availability of contemporaneous medical and psychiatric evidence</u>

There are sufficient medical and psychiatric records of Petitioner from before, during, and after trial to support a meaningful retroactive competency determination. The following items were available to Dr. Sombke and Dr. Estess:

**MEMORANDUM DECISION AND ORDER - 47**

- Dr. Michael Johnson's March 20, 2008 psychological evaluation (State's Lodging C-2, pp.70-75).

- Dr. David DeLawyer's 2006 psychological evaluation of Darcy Bervik. (State's Lodging C-1, pp. 143-159 (report)).

- Dr. Estess' own evaluation of Petitioner from being his treating psychiatrist at the jail in 2006 and 2007, prior to his trial (*Id.*, p. 62). Dr. Estess diagnosed Petitioner with depression during that time, but he did not require any other treatment other than a depression medication (*Id.*, p. 64).

- Opinions of other mental health staff at the jail who talked with Petitioner and were aware of how he conducted himself, what he talked about, and how he behaved. None of the staff thought Petitioner suffered from a mental illness (*Id.*, pp. 64-65).

- Medical records and opinions of medical staff at the jail who treated Petitioner (State's Lodging C-1, p.166; State's Lodging C-2, p.70).

- Opinion of the chief social worker at the IDOC; Estess asked her to find any mental health records of Petitioner, but there weren't any to be found (State's Lodging C-2, pp. 70-72).

    iv. <u>The availability of transcript or video record of the relevant proceedings</u>

The more records contemporaneous with the trial that are available, the more likely it is that experts and the court can piece together a picture of what defendant's competence looked like yesterday. Transcripts of Petitioner's appearances at court hearings, conferences, and trials were readily available to the Idaho courts for their analysis. Petitioner's case is quite unique because he

**MEMORANDUM DECISION AND ORDER - 48**

represented himself throughout many of the proceedings, and, thus, there is substantially more evidence of his day-to-day thinking and speaking in the record than, for example, in a case where a defendant was represented by counsel and chose to remain silent at trial.

Throughout Petitioner's self-representation, he filed many motions and responses to the State's motions, demonstrating that he had the capability of understanding the legal proceedings. While the gist of his story at trial was that government agents compelled him to rob the two banks by government agents, it was quite clearly a strategy rather than a mental illness, because the delusion was not consistent throughout Petitioner's thoughts and speaking outside of his criminal case.

In addition to Petitioner's statements during trial proceedings, later court records demonstrate that he was not delusional during post-conviction proceedings. At the November 29, 2010 hearing, for example, Petitioner showed no sign of being delusional. He lucidly questioned why his counsel did not put on any evidence at the hearing, and said he had been prepared for trial by another attorney, Dennis Benjamin, and he had expected Benjamin to represent him and to put on "a huge amount of evidence." State's Lodging C-2, part 2, p. 7. He asked the trial court to reopen the hearing so that he could put on additional evidence. He raised

the issue that Dr. Cloninger was planning to examine him, and attributed this plan to Benjamin. *Id.*, p. 8.

Both mental health experts who testified as to Petitioner's competence said that being delusional isn't something you turn on and off. The large cache of transcripts in Petitioner's many proceedings show that Petitioner was not consistently delusional before, during, or after the proceedings. Petitioner has not shown that, by 2010, anything significant had happened to cure his allegedly delusional thinking and permit him to act *with* reasonableness and lucidity and *without* consistent references to government officials continuing to interfere with his life.

> v. <u>The availability of witnesses, both expert and nonexpert, who could offer testimony regarding the defendant's mental status at the time of trial.</u>

The following individuals who observed or interacted with Petitioner during the trial time frame provided information to the experts regarding to Petitioner's words and actions during and near the time of trial, in addition to the experts listed above:

- Darcy Bervik, his common-law wife.

- Donna Hawkins, Petitioner's mother.

- Jail deputies and other staff.

**MEMORANDUM DECISION AND ORDER - 50**

- Jail mental health providers.

- Jail medical providers.

- Dr. Michael Johnson.

- Dr. Chad Sombke.

- Dr. Michael Estess.

- Petitioner's attorneys.

These persons provided a broad view of Petitioner's interactions and representations of his delusions or mental disorders. Petitioner has not shown that he had other witnesses available to testify contrarily, such as persons who could support Petitioner's position that, over the past 20 years, he consistently referred to government agents in his conversations.

vi. Analysis of Content

Upon the foregoing facts—combined with Petitioner's choice not to present additional expert witness testimony as to his competency—the Idaho Supreme Court determined:

> Hawkins' primary challenge to the district court's retroactive competency determination is based on the timing of the determination. As we have explained, the passage of time alone does not invalidate a retroactive competency determination. There was important evidence presented that mitigated the impact of the passage of time. The contemporaneous medical observations of Dr. Estess and his staff were important to the determination that Hawkins was competent in 2008.

**MEMORANDUM DECISION AND ORDER - 51**

> Likewise, Drs. Estess and Sombke were able to review the trial transcript when formulating their opinions.
>
> The district court attempted to give Hawkins a second chance to present evidence relating to his competency, but Hawkins failed take advantage of this opportunity due to his insistence on having Dr. Cloninger serve as his expert witness. The district court's extension of the opportunity for Hawkins to present additional evidence regarding his competency shows that the district court made every reasonable effort to develop a complete factual record upon which to make a meaningful competency determination. The district court relied on its earlier 2010 competency determination only after Hawkins left it with no alternative.
>
> The district court's competency finding was based upon substantial and competent evidence. The expert witnesses agreed that Hawkins was competent at the time of trial in 2008. The district court, as finder of fact, was entitled to rely on these opinions. For these reasons, we are unable to find error in the district court's decision that Hawkins was competent at the time of trial.

State's Lodging F-9, p. 10.

This Court agrees there was sufficient evidence in Petitioner's record to permit the state district court to perform a retroactive competency determination without holding a hearing, and that the process selected by the trial court did adequately protect Petitioner's federal due process rights. That Petitioner chose not to use a local expert instead of his preferred out-of-state mental health expert does

not nullify the trial court's offering of that resource to Petitioner in the due process analysis.

The Court has carefully analyzed whether the initial conclusion of Dr. Sombke supports Petitioner's contention and overcomes Dr. Sombke's second opinion and Dr. Estess's opinion. To the contrary, the record reflects that Dr. Sombke's initial report was not well-informed, and hence, his conclusion was not accurate because it was not based on accurate facts. *With* the comprehensive collection of collateral materials available to piece together a broad landscape of Petitioner's day-to-day interactions with many different witnesses, a retroactive competency determination was completely appropriate. Without the collateral material, it was easy for Petitioner to paint a self-portrait that made him appear delusional. Because Dr. Sombke's first opinion was contextless, the Court finds it unreliable, as Dr. Sombke seemed to admit and correct after his more in-depth review.

Dr. Sombke explained the cursory nature of his conclusion at the competency hearing:

> Mr. Hawkins … did have a factual understanding of the court-related procedures. But throughout that, my whole interview with him, he was perseverating on the fact that he was – had been trained in part of the CIA and DIA, and he had this government involvement. And he presented that consistently throughout that interview with

**MEMORANDUM DECISION AND ORDER - 53**

> me, and led me to believe, and to believe at that time, that
> he was delusional in regards to his interactions with those
> government agencies.
>
> And because of that … very fixed and, I guess,
> relevant delusion that he had, that was the reason that I
> had, at that time, found him not competent to proceed,
> because his whole – everything that he talked about had
> to do with his government involvement and how that led
> to his alleged crime.

State's Lodging C-2, pp. 19-20.

After reporting this conclusion to Judge McLaughlin, Dr. Sombke obtained

jail records from May 2008 to May 2010 and notes from Petitioner's treating

psychiatrist and  staff. He also reviewed reports from Darcy's mental health

evaluator and another evaluation report on Petitioner written by Dr. Michael

Johnston. *Id*., p. 21. Dr. Sombke also reviewed letters that Petitioner had written to

his parents. *Id*., pp. 26-27.

Importantly, Dr. Sombke clarified that, "Even in my initial evaluation, I

thought he had the capacity [to understand the proceedings against him]." State's

Lodging C-2, p. 29. Indeed, Dr. Sombke's initial report states that Petitioner "had

good insight into his current legal situation," that he "understands the Court stuff

very well," that he "had an understanding of the players, the roles of the

prosecutor, of the judge, the defense attorney, the jury," and he "understood what

he had done that brought him into court." *Id*., pp. 39-40.

**MEMORANDUM DECISION AND ORDER - 54**

The big issue, said Dr. Sombke, was whether Petitioner was delusional." *Id.*,

pp. 30-31. He explained how the additional materials caused him to revise his

conclusion:

> If someone holds a delusion for that fixed [sic] and
> for that period of time, where he says it's been 20 years
> or more, that delusion is going to permeate his life
> throughout all segments of his life, where it wouldn't be
> just compartmentalized right when he talks in court or
> whatever. It would be part of his life.
>
> And reviewing the collateral information from the
> prison and other evaluations I saw, I saw almost no
> references to the CIA, the DIA or government agencies.
> It wasn't present in what Mr. Hawkins was telling other
> people. So it was just – it was just not consistent with the
> true delusional disorder that would have been in those
> other conversations.

State's Lodging C-2, p. 31.

Dr. Sombke found that Dr. DeLawyer's evaluation report on Darcy Bervik

showed that Petitioner did not talk to Darcy about the government agencies during

the two years they lived in the van together. Rather, Darcy reported that they

simply ran out of money and needed to stay out of the public eye because of past

outstanding crimes, and so Petitioner and her sons robbed banks to pay the

family's expenses. *State's* Lodging C-2, pp. 33-35. Dr. Sombke saw "hardly

**MEMORANDUM DECISION AND ORDER - 55**

anything" from the Ada County Jail record that would indicate a government conspiracy. *Id.*, p. 35.

Similarly, there was no mention of government agencies in Dr. Johnston's report of Petitioner from 2008. *Id.*, p. 34. Rather, to Dr. Johnson, Petitioner presented himself as having multiple personality disorder, having three personalities, David, Abel, and Faron. *Id.* These personalities were never brought up to Dr. Sombke, because, by that time, Petitioner had changed his targeted mental health issue from multiple personalities to delusional thinking, in an effort to escape the two new robbery charges. *Id.*, pp. 34-35.

In addition to Dr. Sombke's revised opinion based on the comprehensive record, Dr. Michael Estess, a psychiatrist, was also convinced from the same expansive record and his own additional research into Petitioner's background that Petitioner did not suffer from a delusional disorder that rendered him incompetent to stand trial in 2007. Estess actually treated Petitioner in the jail in 2006 and 2007, prior to trial. *State's Lodging C-2*, p. 62. Estess testified that he diagnosed Petitioner with depression during that time, but he did not require any treatment other than a depression medication. *Id.*, p. 64. Neither Dr. Estess nor any other mental health staff at the jail who talked with Petitioner and who was aware of how

he conducted himself, what he talked about, and how he behaved, thought Petitioner suffered from a mental illness. *Id*., pp. 64-65.

Dr. Estess spoke with Dr. Sombke; reviewed the presentence report of April 2008; reviewed a polygraph report of November 2006; read the Court of Appeals' opinion from December 2009; reviewed Petitioner's old and contemporary jail and prison medical and other records again; spoke to jail staff; spoke with defense counsel Dennis Benjamin and John Sutton; spoke with the prosecuting attorney; spoke with Donna Hawkins, Petitioner's mother; spoke with Darcy; spoke with the chief social worker at the IDOC and asked her to find any mental health records of Petitioner (but there weren't any to be found); reviewed a letter Petitioner wrote to his parents chastising them for speaking to Estess (State's Lodging C-2, pp. 70-72); reviewed some FBI reports that were conducted prior to trial and police reports that had to do with authorities' interactions with Petitioner; reviewed the transcripts of a number of hearings held prior to trial, where Petitioner represented himself (*id*., p. 74); all of the IDOC medical records; Dr. Johnson's 2006 psychological evaluation; and Dr. DeLawyer's 2006 psychological evaluation of Darcy. State's Lodging C-2, pp.70-75.

Dr. Estess summarized his analysis as follows: "[C]onversation is cheap, and people can say anything they want. But there must be some other collateral,

clinical evidence of what a person represents." *Id*., p. 67. Dr. Estess concluded that his review of Petitioner's life showed that he did not consistently present as delusional. Petitioner told Darcy that he worked for the government and had assets to impress her before they were married, but Estess pointed out that this line of deception was completely different from, and for a different purpose, than his later assertions about his interactions with government agents. *Id*., p. 83. Petitioner was not able to find work after he was convicted of petty theft, and so the family started living in their van and turned to robbing banks for an income. 84-85. Darcy said that Petitioner taught his two stepsons how to rob banks. *Id.*, p. 85. (During later proceedings, both stepsons were incarcerated in other jurisdictions for bank robbery.) Petitioner did not mention anything about being controlled by the government to his parents, either before or after he was charged with the crime. Petitioner's letters to his parents "were not disjointed" but normal. State's Lodging C-2, p. 89. He wrote to his mother that he was upset that she spoke with Dr. Estess, which might make her a witness. *Id*. The letter shows not that he was delusional, but that he understood how the competency process works, and that he particularly understood that his mother's truthful testimony about his lack of consistent delusional manifestations would harm him.

MEMORANDUM DECISION AND ORDER - 58

Estess also found that Petitioner's incarceration grievances did not show any indication that he was delusional while in prison. *Id.*, pp. 89-91. His grievances were "logical," appeared to be "reasonable," "appropriate," and "easy to understand." *Id.*, p. 90. They did not "reflect peculiar, unusual, or psychotic process." *Id.*

Dr. Estess opined:

> I think he is perfectly competent to meet all the criteria that would allow him to be determined competent to stand trial. There's nothing about him, in my opinion, that would preclude his ability to confer with his attorney in his own defense or to understand the nature and circumstances of his legal difficulties.

*Id.*, p. 92.

At the next hearing on November 29, 2010, the trial court concluded:

> [B]ased on the totality of evidence, the Court will find that the defendant is competent to proceed, to assist in his own defense, and is capable of understanding the proceedings.
>
> The Court will further find that – retroactively, the Court will find that Dr. Estess' opinion that the defendant was competent during his trial that that has been established by clear and convincing evidence.
>
> That being said, the Court will follow the remittitur from the Court of Appeals and will set this matter for trial.

**MEMORANDUM DECISION AND ORDER - 59**

State's Lodging C-2, part 2, pp. 2-3.

When the prosecutor announced that the State intended to file an interlocutory appeal on the legal issue of whether a retroactive competency determination was permissible, the trial judge said, "If I get some sort of an order from a higher court telling me to stop, I'll stop." *Id*., p. 3.

The judge reiterated:

> I think, for purposes of the record, again, this retroactive decision by Dr. Estess, again, based upon the totality of the record that he reviewed, that, again the Court has made its – from the totality of the facts, certainly by not only a preponderance of the evidence, but I think by clear and convincing evidence, the Court was satisfied that the defendant was competent to proceed at his trial.

*Id*., p. 6.

This Court has also reviewed the record for contrary evidence—anything that would indicate that Petitioner *was* delusional. In an investigatory report of December 15, 2006, Darcy Bervik reported to FBI special agent Scott Mace the following: (1) that she had heard Petitioner talk about his associates named Nigel, Kenny, Mike, or Stephanie, but she had never met any of them; (2) that Petitioner had mentioned Kenny "about 15 years ago" and he had told her later that Kenny had gotten into trouble and was killed; (3) that, from what Petitioner said, Darcy

**MEMORANDUM DECISION AND ORDER - 60**

thought these four persons were in good physical condition and might have worked for the United States or a foreign government; (4) that she did not attend a meeting with Kenny and Mike outside of Boise just prior to a bank robbery committed by Petitioner, as he had represented; (5) that she did not know whether any of these people actually existed. State's Lodging C-1, p. 473. It was clear from this short report made for the specific purpose of investigating the robberies at issue that Mace had raised these issues with Darcy (and not vice versa), and Darcy had acknowledged that Petitioner *had* spoken of these persons before.

In contrast, Dr. DeLawyer did not raise any specific questions about these persons or government conspiracies. However, the fact that Darcy did not raise these issues shows that they were not a consistent part of the family's lives. The DeLawyer report is much more comprehensive and paints a picture of a career criminal who began to rob banks because he needed money to support his family and could not search for a normal job because he would be found and prosecuted for the earlier robberies. He became caught in a sort of hamster's wheel—robbing banks because his only means of providing an income for his family without his identity being detected was to engage in more illegal secretive activities. The FBI report does not call into question the DeLawyer report or the trial court's

conclusion that Petitioner's general life did not include consistent delusional references to Nigel, Kenny, Mike, and Stephanie.

Based upon the entire record, this Court concludes that the Idaho Supreme Court's opinion—that Petitioner's due process rights were not violated by the manner in which the retroactive competency determination was handled in this matter—was not contrary to, or an unreasonable application of, United States Supreme Court precedent. The Court also agrees that the State provided clear and convincing evidence to show that Petitioner was competent at the time of trial. This claim will be denied as presented in all of its theories and facets.

## 2. Claim 9(E)

Petitioner asserts that the State hid and blocked him from the content of his children's interviews in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959). Here, the narrow claim remaining after the Motion to Dismiss is that the prosecution used the children's statements as evidence to find him retroactively competent. In its last Order, the Court concluded that Petitioner has provided no evidence of that, and it preliminarily denied the claim on the merits.

However, the Court required Respondent to check the state court record and determine whether the prosecution had any of the children's statements in its

possession, whether statements were provided to the State's experts, and whether statements were used in the competency proceedings. If Respondent found anything, he was required to disclose what was found to Petitioner and the Court. If there was none, Respondent was required to report that.

The Court now revisits this claim. In response to the Court's questions, Respondent states that "there is no evidence establishing the children's statements were in the prosecutor's criminal file, provided to the state's experts, or relied upon by the experts in determining Hawkins' competency." Dkt. 255, p. 42. *See* Dkt. 255-1, Affidavit of Tracie Smith (declaring that the prosecutors' criminal files have been reviewed and they do not contain any statements from Hawkins' children).

Beginning with a review of what happened at trial, this Court finds that the state court record reflects the prosecutor informed Judge McLaughlin that the State was not intending to call the children as witnesses at trial. Petitioner likewise informed the court that he did not intend to call or impeach the children at trial. State's Lodging A-4, pp. 39-40. The trial court granted Petitioner's motion to exclude the testimony of the children. *Id*., p. 44. The prosecution did not try to introduce the children's statements or call the children as witnesses at trial. Petitioner did not use the children's testimony at trial or sentencing. These facts

bolster Respondent's representations that the prosecutor did not have the children's statements in its file. Further, Judge McLaughlin consistently denied Petitioner's motions that touched on the child custody proceedings, declaring them irrelevant to the criminal matter. *See* State's Lodgings A-1 to A-4. Judge McLaughlin also directed Petitioner to the child custody court to obtain release of information pertaining to minor children.

In the competency proceedings, Drs. Sombke and Estess both detailed the information they reviewed, which does not include any statements from Petitioner's children. State's Lodging C-1, pp.160, 166; State's Lodging C-2, pp.16-17, 20-27, 35-36, 46-47, 62-63, 69-75. No children's statements are included in the state court record lodged in this Court.

The Court concludes that there is no factual basis for this claim in the record. The Court further agrees with Respondent that Petitioner "has failed to establish how the alleged interviews are exculpatory or how they would have affected the trial court's ruling regarding his competency." Dkt. 255, p. 43. This claim will be denied on the merits under a de novo review standard.

### 3. Claim 11(E)

Petitioner asserts that attorney Dennis Benjamin provided ineffective assistance of counsel on direct appeal in several ways. In its prior Order, the Court

**MEMORANDUM DECISION AND ORDER - 64**

determined that this claim appears to be procedurally defaulted, because it was not exhausted on post-conviction appeal. The *Martinez v. Ryan* exception does not apply, because the errors alleged involve appellate counsel, not trial counsel. The Court concluded that each subclaim was subject to denial on the merits, with the exception of the subclaim that Benjamin failed to raise the issue of expiration of the grand jury's term before indictment, which required more information to resolve. The Court will do so now.

The *Strickland* principles apply to appellate counsel claims. *Evitts v. Lucey*, 469 U.S. 387 (1985). To constitute prejudice on appeal, an attorney must have failed to raise an issue obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would have resulted in reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not ineffective for failing to raise the issue, and petitioner suffered no prejudice as a result of its omission. *Id.*, p. 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments

and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id*., p. 754. "[T]he process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

Petitioner asserts that the grand jury's term had expired before the indictment was issued, and, therefore, the indictment was void under state law and could not confer subject matter jurisdiction over the cases. *See State v. Dalling*, 911 P.2d 1115, 1116-17 (Idaho 1996). Earlier in this matter, the Court could not find underlying facts in the record about the grand jury's term to enable it to address this ineffective assistance of appellate counsel claim. Therefore, the Court permitted the parties to supplement the record and brief this issue here.

Respondent has provided the affidavit of Tracie Smith, which shows that the grand jury's term had not expired when it rendered Petitioner's indictment. Dkt. 255-1. Respondent explains:

> In *State v. Dalling*, 911 P.2d 1115, 116-17 (Idaho 1996), the Idaho Supreme Court explained that, under I.C.R. 6(j), a grand jury in Idaho can only serve six months, and if a grand jury returns an indictment after that six-month period, that indictment is invalid and does not confer subject matter jurisdiction to the courts.

**MEMORANDUM DECISION AND ORDER - 66**

> At the time Hawkins was indicted, two functioning grand juries existed in Ada County. On August 24, 2006, the Ada County Prosecutor filed a request to form a grand jury. (Dkt. 255-2, Appendix A.) The state district judge granted the request and on August 28, 2006, filed orders to issue summons for the purpose of forming Grand Jury Panel A and Grand Jury Panel B. (Id., Appendices B-E.) Hawkins' Indictment was signed by the Foreman of one of those grand juries on January 2, 2007. (State's Lodging A-1, 33-34.)

> No other grand juries were in existence at that time, and neither grand jury was discharged until February 28, 2007. (Dkt. 255-2, Appendices F-G.)

Dkt. 255, pp. 45-46.

Plaintiff has not come forward with facts rebutting the information about the grand juries' terms of service relative to his indictment. Hence, there is no factual basis in the record supporting Petitioner's claim that Benjamin should have raised a grand jury expiration issue on appeal. Had Benjamin done so, it would have been denied for lack of a factual basis. Therefore, the Court concludes that this claim fails on the merits for lack of a showing of either deficient performance or prejudice. It is subject to denial with prejudice on de novo review.

### 4. Claim 18

#### i. Not Holding a Competency Hearing after Appeal

Petitioner has been permitted to proceed on a portion of Claim 18—that the trial judge erred in not holding a competency hearing as ordered by the Idaho

Court of Appeals, resulting in a due process violation of the Fourteenth

Amendment. After the first remand, the trial judge ordered a competency hearing.

Petitioner alleges that, on October 17, 2013, the trial court did not follow its own

order to hold a competency hearing or the Idaho Court of Appeals' order to hold a

competency hearing. Rather, without issuing another order and in the midst of a

status conference for the upcoming competency hearing, the trial court simply

turned the status conference into a sentencing hearing without a 14-day advance

notice, denying Petitioner's motion to appoint the psychological expert of

Petitioner's choice, "even if Petitioner paid for it." (Dkt. 182, p. 19.)

 Prior to the interlocutory appeal, the trial court determined that the State had

shown retroactive competence by clear and convincing evidence. After the State

prevailed on appeal and the case was remanded—which cleared the way for the

retroactive competency determination to take place—the Court gave Petitioner an

additional opportunity to present any other evidence, including an expert witness at

public expense (to be determined within the reasonable parameters set by the trial

court).

 On July 17, 2013, Petitioner revealed to the court his plans to meet with Dr.

Cloninger, and the court advised him to be ready to present his expert at the

hearing on August 29, 2013. State's Lodging E-3, pp. 17, 22-23. However, a few

**MEMORANDUM DECISION AND ORDER - 68**

weeks later, on July 31, 2013, Petitioner notified the court that Dr. Cloninger's hourly charge was $450, and he was located in St. Louis, Missouri. The court told Petitioner to find a local expert (within 500 miles of Boise, to include Seattle, Portland, or Salt Lake City)[3], because it would not authorize such a large expenditure of public funds when local experts were equally qualified. State's Lodging E-2, p. 142. The court vacated the August 29 competency hearing date to give Petitioner time to find an expert, and decided to hold a status conference that day instead. (*Id*., pp. 143-45.) Notwithstanding that Petitioner had not yet even retained an expert witness for the competency hearing, let alone had an evaluation, he objected to continuing the hearing beyond August 29, 2013. *Id*., p. 144.

On October 17, 2013, Petitioner again demanded Dr. Cloninger and said Dr. Cloninger was willing to accept for payment a sum equal to the total amount that the State had paid for both of its experts. State's Lodging E-5, pp. 5-8. However, Petitioner presented nothing from Dr. Cloninger to support this assertion. Nor did Petitioner address Dr. Cloninger's additional fees for lodging and travel. *See id*. Judge McLaughlin stated: "[T]he court will not impose upon the people of Idaho

---

[3] The Court later reduced this radius to 150 miles. *See, e.g*., State's Lodging E-5, p. 6. This is immaterial here because, either way, Petitioner has not shown that he could not find a qualified expert within that radius and the record reflects that he refused to hire any expert except Dr. Cloninger.

**MEMORANDUM DECISION AND ORDER - 69**

the cost of flying in a psychiatrist from St. Louis, Missouri, when in fact there are

ample, capable, qualified psychiatrists, psychologists, within the range that the

court outlined earlier in its order." *Id*., pp. 13-14.

The court gave Petitioner various options (not to include retaining Dr.

Cloninger), one of which was to be sentenced "forthwith today." State's Lodging

E-5, pp. 11-12. A second option was to have stand-by counsel appear of record for

Petitioner and find a local expert for Petitioner. *Id*., p. 11. A third was to submit to

a psychological evaluation by Dr. Robert Engle, a local forensic psychologist

selected by the court. *Id*., p. 7. Petitioner said he refused to meet with Dr. Engle,

and, after consulting with his stand-by counsel, Petitioner chose to be sentenced

immediately. *Id*., pp. 8, 15.

The trial court made the following findings:

> [T]he court will find from the totality of the record
> that Mr. Hawkins, particularly in light of the extensive
> motions that he has filed since this was submitted back to
> the court in April of this year . . . that Mr. Hawkins is
> competent, and he understands the nature of the
> proceeding, that he has made a decision, and I find him to
> have made a knowing and intelligent decision to continue
> to insist that a psychiatrist from St. Louis, Missouri, be
> appointed to testify on his behalf for his articulated basis
> for not appointing that psychiatrist, that there have been
> numerous delays caused as a result of again Mr.
> Hawkins' . . . failure to follow through with the court's
> specific order. The court will find that there has been
> ample opportunity afforded to Mr. Hawkins to present

> evidence to the court regarding his mental status at his
> trial in 2007.
>
> The court will find that the testimony and evidence
> presented to the court by Dr. Estess that Mr. Hawkins
> was competent to stand trial, that he was at the time of
> his evaluation by both Dr. Sombke and Dr. Estess was
> capable of understanding the proceedings, assisting in his
> defense, and that remains the case today.

*Id.*, pp.18-19.

Petitioner's claim that the Idaho Supreme Court did not have authority to authorize a retroactive competency determination under federal constitutional law is without a factual or legal basis. After remand, when the trial court decided to close its retroactive competency evaluation without an opinion from an expert for Petitioner (because Petitioner refused to cooperate with the trial court's discretionary decision to refuse to spend public funds on travel costs for Petitioner's expert), it had authority to do so. Upon review, the Idaho Supreme Court approved of the trial court's discretionary action.

Petitioner has pointed to no federal precedent that supports his contention that the trial court transgressed the federal Constitution when faced with Petitioner's refusal to work within the given parameters for use of public funds for his expert. This claim amounts to no more than a challenge to the Idaho court's implementation of Idaho state court system procedures and has no merit as a

**MEMORANDUM DECISION AND ORDER - 71**

federal claim. At best, it is merely a restatement of Plaintiff's Claim 9, discussed and denied above. This claim will be denied on de novo review.

### ii.   Holding a Sentencing Hearing without Notice

Similar to the claim discussed directly above, Petitioner also asserts that the trial court violated his federal due process rights by holding a sentencing hearing without notice and by denying him the expert witness of his choice. The record reflects that Petitioner chose to proceed with sentencing on the spot—among other alternatives the trial court presented to him. Petitioner stated: "Just go ahead and sentence me."; "Just sentence me. Do that. If you've got any authority at all, just sentence me. Okay?"; "You're a diseased man" [directed to the judge]; and "Add five years." *Id*., pp. 17-19. Petitioner already had been provided with a sentencing hearing that met due process standards when he was sentenced before the appeals that called into question and resolved the competency issue, and Petitioner had been represented by counsel and had been given ample notice and opportunity to present evidence at that hearing, held on April 23, 2008. State's Lodging A-4, p. 1179, *et seq*. When Petitioner said he wanted to be sentenced immediately, the court merely reinstated the same sentence after the second remand. State's Lodging E-5, pp. 19-21.

**MEMORANDUM DECISION AND ORDER - 72**

Even if it was error to hold the second sentencing hearing without advance notice, it was harmless error, because Petitioner has not shown what more he would have presented at the second sentencing hearing had he been permitted additional time to prepare. The harmless error question upon de novo review of a sentencing error is whether the error had a "substantial and injurious effect or influence" in determining the sentence. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), (quoting and adopting standard in *Kotteakos v. United States*, 328 U.S. 750 (1946)).

Petitioner brings forward nothing showing that, had he been permitted additional time to prepare for sentencing, he would have presented evidence supporting a lesser sentence. Therefore, the Court concludes that the failure to give Petitioner notice and time to prepare for a new sentencing hearing—if it was error in the face of Petitioner's choice to be sentenced immediately—was harmless.

The Court also notes that Petitioner mentioned nothing about the alleged government coercion in his allocution at the full sentencing hearing held directly after his trial, even though a deluded person's allocution almost surely would have requested mercy on grounds that he would not have committed the crimes but for the alleged coercion. *See* State's Lodging A-4, pp. 1199-1204. Because that time frame was contemporaneous with the trial, his allocution also supports the

conclusion that Petitioner did not suffer from delusions at the time of trial and sentencing.

This entire claim will be denied on the merits on de novo review.

### iii.      Denial of an Expert

Petitioner asserts that his due process rights were violated when he was not permitted to hire Dr. Cloninger to testify about Petitioner's competence for purposes of the retroactive competency determination. The Court has found no precedent requiring a trial court to appoint Petitioner the expert of his choice, regardless of the cost to the public. The law is clear that when a defendant's sanity is at issue, the defendant has the right to "access to a competent psychiatrist" to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). The *Ake* Court expressly stated that an indigent defendant does not have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id*.

The trial court in Petitioner's case did more than was required by *Ake*: it permitted Petitioner to choose his own expert, even though the court limited the choice to an expert within 500 and then 150 miles of the trial location. When Petitioner refused, the trial court offered a different option, to appoint Dr. Engle to

**MEMORANDUM DECISION AND ORDER - 74**

examine him, but Petitioner again refused. Here, the trial court did not refuse to appoint an independent expert for Petitioner; Petitioner simply refused to work within the reasonable parameters set by the trial court to obtain an expert to aid his defense. There is no *Ake* violation. Petitioner waived his opportunity to have an expert witness appointed at public expense for him due to his insistence to hire his expert of choice (which in itself is not a constitutional right). This claim is subject to denial on de novo review.

### iv. Failure to Recuse

Petitioner also argues in his Supplemental Brief that the state district court should have recused itself because it considered its own observations of Petitioner during trial in making the competency determination. Dkt. 231, p. 8. The Idaho Supreme Court found the state district court's involvement in the trial was a plus, not a minus, in the equation for determining whether there was sufficient evidence to find that Petitioner's due process rights were adequately protected by a retroactive competency hearing. The Idaho Supreme Court stated: "We … find it significant that the same judge making the retroactive competency determination presided over the trial and had the opportunity to factor in his first-hand observations of Hawkins' condition at the time of trial and compare those observations with the testimony of the experts." State's Lodging F-1, p. 10.

**MEMORANDUM DECISION AND ORDER - 75**

The parties were ordered to show whether this claim was properly presented to the Idaho Supreme Court. If so, the parties would be permitted to address this claim at the next stage of proceedings in this action. If not, it is procedurally defaulted, and Petitioner must show cause and prejudice to proceed. Petitioner has not shown that the trial court's failure to recuse itself during trial proceedings was a claim presented to the Idaho Supreme Court. Nor has Petitioner shown cause or prejudice to excuse the default of this claim.

Even if the Court reviews the merits of this claim, it agrees with Respondent's analysis:

> [T]he state is unaware of any binding precedent requiring a trial judge to be recused based merely upon preliminary observations of a defendant while in court. Indeed, trial judges are required to continually observe defendants to make sure a competency evaluation should not be ordered. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966) (the trial court's failure to make a sua sponte inquiry into defendant's competence deprived him of a fair trial). Additionally, the Supreme Court has explained that recusal of judges is only required if an opinion is based upon "an extrajudicial source and results in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). As further explained in *Liteky v. U.S.*, 510 U.S. 540, 550-51 (1994):

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

> While *Liteky* dealt with the issue of bias and 28 U.S.C. § 455(a), there is no reason to believe those same principles do not apply in Hawkins' case, particularly since there is no Supreme Court precedent governing the recusal of a judge who a defendant claims will be a witness at a competency hearing.

Dkt. 255, pp. 54-55.

Based on the foregoing, this claim will be dismissed on procedural default grounds, and, alternatively denied on the merits under de novo review.

### 5. Claim 19

Claim 19 is that the trial judge denied Hawkins a competency hearing when he was proceeding pro se. This claim duplicates several others discussed above. The trial court followed the order of the Idaho Supreme Court in performing a retroactive competency determination when the State prevailed on the interlocutory appeal. Petitioner was afforded the opportunity to provide expert testimony to supplement the record upon which his competency would be determined, but he

refused to cooperate with the trial court in finding a local expert. Furthermore, as Respondent argues, "there was no basis for another hearing where the trial court had already provided Hawkins's counsel the opportunity to cross-examine Drs. Sombke and Estess, and, based upon their testimony, had already ruled Hawkins was competent at trial." Dkt. 255, p. 56.

The trial court was within its discretion to require Petitioner to have counsel to aid him in the competency hearing, because it goes without saying that an incompetent person cannot represent himself. After Petitioner was found competent, he was permitted to represent himself. He was further permitted to bring forward additional evidence to prove his incompetency after the hearing concluded—remedying any omissions of appointed counsel at the hearing—but Petitioner chose not to do so.

Petitioner also contends in his Amended Petition that Judge McLaughlin and the State hired Dr. Estess after they reviewed and did not like the first report of Dr. Sombke. Dkt. 182, p. 20. The record reflects that this characterization is not true. As set forth above, Dr. Estess was appointed by the Court first. Second, Dr. Estess asked that Dr. Sombke be retained to perform the psychological testing. Therefore, Dr. Estess intended to create a comprehensive report after reviewing Dr. Sombke's test results of Petitioner and the other collateral materials. The Court rejects this

**MEMORANDUM DECISION AND ORDER - 78**

incorrect contention as to sequencing as the basis for habeas corpus relief. This claim is subject to denial on either deferential or de novo review.

### 6. Claim 27

Petitioner has been permitted to proceed on a portion of Claim 27—that a "Pro se litigant must have Testamentary Capacity, a disposing sound mind, a testators capacity. State denied this by denying a competency hearing" (verbatim). Dkt. 182, p. 30. This claim has been properly exhausted as a Fourteenth Amendment due process claim.

As the Idaho Supreme Court noted, "the district court was presented with evidence relating to the factors used to gauge whether a meaningful retroactive competency proceeding could take place." State's Lodging F-9, p.8. The court then explained that "[t]he testimony of Drs. Estess and Sombke is particularly informative because they were the only two experts who presented evidence at Hawkins' competency hearing. Both doctors opined that Hawkins was competent." *Id*., pp.8-9.

This claim is duplicative of several other claims discussed in detail above. Petitioner was retroactively found competent. For the same reasons, the Court rejects this claim—whether "competency" is characterized as "a testator's capacity" or in other words generally used in criminal cases.

### 7.  Claim 28

Petitioner alleges that the trial court's failure to sua sponte order a competency hearing at time of trial was a due process violation that a retroactive competency hearing could not cure 34 months later. Dkt. 182, p. 31. This claim has been properly exhausted as a Fourteenth Amendment due process claim.

This trial error was remedied by the appeal and remand of the case for a competency determination. That is, the error is no longer in need of remediation, because it was cured by the retroactive competency hearing.

Further, *if* the record after remand did reflect that Petitioner was incompetent at the time of trial, and then only if the State refused to retry or release him, then Petitioner's claim that the trial court should have sua sponte identified the need for and conducted a competency hearing prior to trial would be viable. However, the totality of the record reflects that Petitioner *was* competent. This Court agrees that the State demonstrated Petitioner's competence during the time period at issue by clear and convincing evidence. This claim falls by the analysis and conclusion set forth above as to Claim 2. Therefore, Claim 28 will be denied and dismissed with prejudice.

### 8. Claim 29

Petitioner contends that the "State denied Hawkins a competency hearing for 3½ years while it had him proceed pro se" (verbatim). Dkt. 182, p. 31. This claim has been properly exhausted as a Fourteenth Amendment due process claim. Because the Court has determined that the State has shown that Petitioner was competent during his trial proceedings with the analyses above, Petitioner's argument that he should not have been permitted to represent himself fails.

To the extent that Petitioner claims that he did not have the mental ability to understand the nature and effect of his acts (Dkt. 182, p. 32), first, this claim is procedurally defaulted. Second, there is insufficient evidence in the record to support it, notwithstanding the many years Petitioner has had to come forward with evidence. Therefore, it fails on de novo review.

### 9. Claim 33

Petitioner alleges that the Ada County Defenders and the state of Idaho failed to provide him with constitutionally adequate representation. This claim is procedurally defaulted. The Court gave Petitioner notice that it would permit him to show cause and prejudice for the default of his subclaim that trial counsel failed to request a competency hearing. Dkt. 182-1, p. 3; *see* Dkt. 232, p. 96.

Respondent argues that, irrespective of whether Petitioner can show cause and prejudice or actual innocence, this claim fails under de novo review because Petitioner represented himself during trial and the vast majority of his pretrial proceedings.

Parsing the periods of time when Petitioner was represented by counsel from those where Petitioner represented himself, the Court questions only whether Attorney John Eric Sutton presented an adequate defense in the competency hearing after the first remand. Even if Sutton was deficient in his performance, Petitioner has not shown prejudice by bringing forward the evidence Sutton had access to that would have shown that Petitioner was incompetent. This specific claim (Claim 38) is more fully addressed below. Therefore, Petitioner has not shown prejudice sufficient to warrant relief regarding Sutton's performance.

As to his other counsel, Petitioner has shown neither deficient performance nor prejudice. This claims fails on the merits on either deferential or de novo review.

**10. Claim 36**

Petitioner has been permitted to proceed on a portion of Claim 36—that the Idaho Supreme Court violated his Fourteenth Amendment due process rights

"when it err[ed], failed to follow the bright line decision in retroactive competence hearings, setting a cut off limit engaging due process." State's Lodging 182-1, p. 5.

There is no bright-line precedent to support this claim, as discussed above. There is no United States Supreme Court precedent prohibiting retroactive competency hearings. This claim fails on the merits.

### 11. Claim 38

Claim 38 is that Attorney John Eric Sutton provided ineffective assistance of counsel. Sutton represented Petitioner in the competency hearing after the first remand. Petitioner asserts that Sutton (a) failed to adequately cross-examine state witness; (b) appeared in court with breath [that] was "abnormal, clearly under [the] influence of substance"; (c) promised to call a rebuttal witness that never testified; (d) failed to introduce even one document into evidence (e) gave the state "confidential client files that the state did not have"; and (e) permitted hearsay evidence. State's Lodging 182-1, p. 5. Petitioner also newly asserts that Sutton had a conflict of interest and "sold him out" to keep in good graces with Roger Bourne over a personal matter. Dkt. 231, p. 8.

This claim is procedurally defaulted. The Court permitted Petitioner to proceed on a Sixth Amendment legal theory only and required him to show cause and prejudice at this stage of litigation.

The record reflects that Sutton did little in the presentation of Petitioner's position at the competency hearing. His cross-examination of the expert witnesses was not particularly helpful. He presented no evidence on Petitioner's behalf. *See* State's Lodging C-2. However, the Court finds that, even if Sutton performed deficiently, Petitioner has not shown that any prejudice to his defense resulted. That is, Petitioner has not shown what evidence was available that Sutton should have presented or what Sutton should have done differently. This type of evidence is required to demonstrate both deficient performance and prejudice. Even if Sutton was under the influence of alcohol or drugs, Petitioner has not shown how that affected his performance to the extent that there is a reasonable chance that the competency evaluation would have had a different result.

This claim fails on the merits under a de novo review standard and will be denied.

### 12. Claim 44

Petitioner asserts that the trial court and prosecutors "conspire[d] to block evidence and rulings to be placed on record so high courts [could] not review and be appealed" by sealing a hearing held on November 15, 2007. Dkt. 182-1, p. 9. Petitioner filed a motion to suppress and a motion to extend discovery on November 14, 2007 State's Lodging A-1, p. 8, but the Court finds no evidence in

the record that a hearing was held on November 15, 2007. If one had been held, then Petitioner or his attorneys would have proof of having been given notice of, and attended, the hearing.

This claim was denied on the merits and dismissed with prejudice in the Court's previous Order. Respondent was ordered to review the state court record and notify the Court and Petitioner of the results of the review.

Respondent searched the record and has reported in an affidavit of counsel that there is no evidence in the record that a hearing was held on November 15, 2007. If such a hearing existed, even if it was sealed, there would be a record in the Clerk's record. Dkts. 255-2, pp. 2-3; 255, p. 76. Not only does no such record exist, but the register of actions does not indicate any such hearing occurred. *Id.*.

In its prior Order, the Court preliminarily concluded that Petitioner perhaps was referring to a hearing held on November 2, 2007. At that time, Petitioner and both attorneys appeared for a hearing. After having requested representation by counsel, and having been assigned the public defender, Petitioner moved to have the public defender removed from the case and to represent himself. The trial court asked the prosecutor to step outside the room and said that it would seal the record—because Petitioner's disagreements with his counsel properly should be

heard ex parte as an attorney-client privileged matter. State's Lodging A-4, p. 159-77.

The court stated: "We'll have the courtroom cleared ... at this time because we're going to have to take up some things that may pertain – we'll turn off the recording device, and Madam Court Reporter will keep a sealed record of this proceeding." *Id*., p. 159.

The court then questioned defense counsel about Petitioner's allegations of deficient performance, permitted Petitioner to respond, and proceeded through another *Faretta* colloquy to ensure that Petitioner was going to undertake self-representation knowing the potential consequences of that decision. *Id*., pp. 160-175. Afterwards, the prosecution was called back in, and the court reported, "Mr. Bourne, I have determined that Mr. Odyssey was not – has not been deficient in his representation of Mr. Hawkins at this point. And Mr. Hawkins has elected to represent himself." *Id*., p. 175) Another similar ex parte sealed hearing was held on January 2, 2008. *See* State's Lodging A-2, pp. 304-05.

The sealed portions of the record was made part of the public record when the trial had concluded and the transcript was prepared for appeal. State's Lodging A-2, pp. 304-05. To the extent that Petitioner's claim is meant to challenge either of these ex parte hearings, it is denied on the merits and dismissed with prejudice.

**MEMORANDUM DECISION AND ORDER - 86**

To the extent that Petitioner contends that there was an hearing on November 15 and the transcript has been kept secret is denied for lack of any factual support.

### 13. Conclusion

Having disposed of all of Petitioner's claims, the Court concludes that the Second Amended Petition for Writ of Habeas Corpus will be denied and dismissed with prejudice. No hearing is required. No certificate of appealability will issue. No motions for reconsideration should be filed. Nothing further should be filed in this case except a notice of appeal.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion for Hearing (Dkt. 269) is DENIED.

2. Petitioner's Motion to Expedite for Emergency Considerations (Dkt. 270) is DENIED as MOOT.

3. The remaining claims in the Second Amended Petition for Writ of Habeas Corpus (Dkt. 182) are DENIED. The Petition is DISMISSED with prejudice.

4. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the

notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: January 6, 2022

B. Lynn Winmill
U.S. District Court Judge